ACCEPTED
15-25-00093-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/4/2025 6:01 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00093-CV

# In the Court of Appeals for the Fifteenth Judicial District Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/4/2025 6:01:43 PM
CHRISTOPHER A. PRINE
Clerk

THE STATE OF TEXAS,

*Appellant*,

*v.*

CITY OF SAN ANTONIO; RON NIRENBERG, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF SAN ANTONIO; ERIK WALSH, IN HIS OFFICIAL CAPACITY AS CITY MANAGER OF THE CITY OF SAN ANTONIO,

*Appellees.*

On Appeal from the
407th Judicial District Court, Bexar County

## APPELLANT'S MOTION FOR TEMPORARY RELIEF

In the aftermath of the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and the concomitant enforceability of Texas's abortion laws, numerous Texas cities have attempted to avoid state law by paying for women to travel to obtain elective abortions outside Texas's borders. San Antonio has recently joined the ranks of these cities, expressly stating and otherwise indicating its intent to use public money to pay for individuals' travel for out-of-state abortions, as well as other "reproductive health" services to individuals. But the Texas Constitution's Gift Clauses create a "positive and absolute" prohibition on most gifts of public funds to private individuals. *Bexar County v. Linden*, 220

SW. 761, 762 (Tex. 1920); *see, e.g.*, Tex. Const. art. III, § 52(a). San Antonio's funding program violates these provisions for multiple reasons.

And this program works irreparable harm to the State. "As a sovereign entity, the State has an intrinsic right to . . . enforce its own laws," *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015) (citing *Printz v. United States*, 521 U.S. 898, 912 n.5 (1997)), as well as an interest "in the maintenance and operation of its municipal corporations in accordance with th[at] law," *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (per curiam) (quoting *Yett v. Cook*, 281 S.W. 837, 842 (Tex. 1926)). Absent temporary relief here, Texas "would be impotent" to enforce its most fundamental law, the state constitution, *id.*, under this case's circumstances. Per the City's own representations, it intends to make unconstitutional payments this summer—while the parties are briefing this appeal. None of the funds will be recoverable once the City disburses them. Absent temporary relief, it is unlikely that any court will have a chance to determine whether those payouts are constitutional before the City makes them—given recently enrolled legislation, the City will likely attempt to make payments this summer.

Because it is highly unlikely that this Court will decide this appeal before the date on which the City has expressly contemplated issuing its first payments, the State requests an order preventing the City from issuing any payments under this funding program during the pendency of this appeal. After all, as the Texas Supreme Court explained in another Gift Clause case, "this potential violation of the Texas Constitution cannot be remedied or undone if payments commence while the underlying appeal proceeds." *In re State*, No. 24-0325, 2024 WL 2983176, at *5 (Tex. June

14, 2024). **Though the State does not file this motion as an emergency motion,** *see* **Tex. R. App. P. 10.3, it requests a ruling expeditiously so that it may seek further review if necessary.**

## STATEMENT OF FACTS

### I.  Factual Background

The City of San Antonio's "Reproductive Justice Fund" (the Fund) provides funding for certain "reproductive and sexual healthcare services." App.0016, 0056.[1] San Antonio does not itself furnish these services; instead, it disburses money from the Fund to non-governmental organizations for them to use. *See* App.0056-57. Interested organizations apply for Fund money by submitting proposals explaining how they plan to use it. *See* App.0032. The City distributes funds by entering into "agreements" with recipient organizations. App.0016; *see* App.0056. The City has not suggested that it receives anything in exchange for these funds.

Recipients have used Fund monies for a variety of services that fall into three different categories: upstream services, midstream services, and downstream services. App.0016; *see also* App.0056. In public-health parlance, "the term 'upstream' refers to policy approaches that have potential to affect large populations." App.0016, 0056. The term "downstream services," on the other hand, means "policy approaches that have potential to affect . . . individual needs." App.0016, 0056. "Midstream" approaches "fall somewhere in between." App.0016, 0056. In 2024,

---

[1] The appendix attached to this motion contains Bates pagination. All citations to the appendix in this motion refer to that Bates pagination, not PDF pagination.

3

the City distributed approximately $500,000 from the Fund. App.0016-17, 0024, 0056. Those City dollars paid for things like "doula training, high school education on sexually transmitted infections (STIs), STI testing, contraception . . . , workshops on healthy pregnancies and sexual and reproductive health, and wraparound prenatal care services including doula, acupuncture[,] and mental health services." App.0016-17, 0056. Examples of downstream services include "[t]ransportation to abortion[s]," App.0023, and in the 2024 round of funding, "transportation to abortion . . . services was optional," but "[n]one of the four awardees proposed abortion transportation or navigation," App.0026. The City finalized the 2024 funding agreements on November 21, 2024. App.0016, 0056.

The very next day, members of the San Antonio City Council sent a memo to the Community Health Committee (CHC), expressing their desire to "[p]rovide downstream services that were not met through the already awarded $500,000." App.0027. CHC proposed "provid[ing] an additional $100,000 to fund downstream services" for "reproductive health"; these services, as the City noted, "could include travel out of State." App.0017, 0056. On March 20, 2025, to "gauge interest" in this "new solicitation," the City held a "virtual meeting" in which San Antonio's Metropolitan Health District (Metro Health), the City's public-health agency, App.0225, discussed CHC's request, App.0017, 0056. The City invited to this meeting only the ten organizations that had previously applied for the 2024 round of funding. App.0027, 0029, 0056.

The day after that meeting, the City sent the organizations an interest form "asking whether they would be interested in pursuing a new funding opportunity specific

4

to downstream services." App.0017, 0029, 0056. But while multiple types of "downstream services" exist, *see* App.0023, the interest form specifically highlighted out-of-state travel for abortions, App.0017, 0029, 0057. Specifically, the form asked the organizations "whether they would have interest in pursuing an additional funding opportunity specific to out of State travel" for abortions. App.0017, 0057; *see also* App.0029. That was the only specific service that the interest form spotlighted (as opposed to the general category of "downstream services"). App.0017, 0029, 0057. Nine entities stated that they would like to receive funding; three of those organizations "indicated interest in an additional funding opportunity limited to out-of-state travel for abortion"—that is, *not* including any other downstream services. App.0017, 0030, 0057. A fourth organization "indicated interest" in funding out-of-state travel for abortions "if the City were to provide legal protection for the organization." App.0017, 0030, 0057.

Metro Health asked the City Council to "authorize an expedited procurement [process] to support downstream services for reproductive health care generally and/or specific types of reproductive health care, which [could] include out-of-state travel." App.0017; *accord* App.0057. Metro Health's director reiterated that the "[p]urpose" of this funding would be to "[p]rovide downstream services that were not met through the already awarded $500,000." App.0027. On April 3, Metro Health gave a presentation to the City Council, highlighting the four specific organizations that had expressed interest in "an additional funding opportunity limited to out-of-state travel for abortion." App.0016-17, 0031. Before voting, members of the City Council expressed concern that the Legislature could pass Senate Bill 33 (SB

5

33) before San Antonio could spend the money, asked how early funds "could be disbursed," and wondered whether SB 33 would apply to activity that occurred before the bill's effective date. *See* City of San Antonio, Tex., *San Antonio City Council A Session*, SASpeakUp, at 2:41:30-2:46:00 (Apr. 3, 2025, 11:00 a.m.), https://saspeakup.com/HU81151; *infra* p. 8 (discussing SB 33).

The City Council passed an ordinance that very day creating an expedited procurement process for organizations to seek funding for downstream services. App.0056-58 (the ordinance). The ordinance allots an additional $100,000 of City money to the Fund for such services. App.0057. On multiple occasions, it specifically highlights out-of-state travel to obtain abortions. App.0056-57; *see also* App.0017.

The City has explained how the expedited procurement process works. First, in mid-April 2025, Metro Health solicited applications from organizations interested in providing downstream services. App.0032, 0040. Only the ten organizations that applied for Fund disbursements in 2024 (the same organizations that the City invited to its interest meeting) could apply for the additional $100,000. App.0027, 0040. The City allotted thirty days for applications, App.0027, 0032, so the application window closed in mid-May, *Request for Proposals—Reproductive Justice Fund Downstream Services*, City of San Antonio (Apr. 14, 2025), https://perma.cc/SE77-T8YX [hereinafter *Request for Proposals*] (noting that solicitations were due on May 14, 2025, at 11:00 a.m.); App.0032.

The City represents that Metro Health anticipates taking another thirty days to finish evaluating and scoring applications, App.0027; *see* App.0032, and that it "expect[s]," App.0226, to complete that process around "mid-June 2025," App.0027,

0032, 0226. The City has already established its evaluation criteria. App.0028; *see* App.0027 (noting that the City will use the "[s]ame scoring matrix and solicitation requirements" for these disbursements as with the 2024 round of funding). At the end of June, the City says, the City Council will decide whether to execute contracts with the organizations the City itself has handpicked. App.0032. Thus, per the City's trial-court representations, the City could enter into agreements as early as June. App.0032, 0040. The City has stated that payments could occur later this summer. App.0032.

## II.  Procedural Background

Texas sued the City of San Antonio, as well as its mayor and city manager in their official capacities (collectively, "the City"), alleging that this funding program violates article III, section 52(a) of the Texas Constitution, one of several constitutional Gift Clauses. *See* Tex. Const. art. III, § 52(a). *See generally* App.0001-33. It sought a "declaration" that the City is violating the state constitution "by spending taxpayer money on support for out-of-state abortions, including travel for out-of-state abortions." App.0010. It also sought temporary and permanent injunctive relief (1) prohibiting the City from "spending taxpayer money on support for out-of-state abortions, including travel for" such abortions; and (2) prohibiting the City and any of its agents "from continuing to implement the allocation and expenditure of taxpayer dollars for support for out-of-state abortions, including out-of-state travel." App.0010. After a hearing, the trial court granted the City's plea to the jurisdiction without hearing the State's temporary injunction, App.0257; it signed its final judgment on May 16, App.0261.

Shortly after Texas filed its notice of appeal, the Legislature voted to pass SB 33. *See History—SB 33*, Tex. Legislature Online, https://capi-tol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB33 (last visited June 4, 2025). This bill prohibits "governmental entit[ies]," including cities, Tex. Gov't Code § 2273.001(4), from, among other things, "donat[ing] . . . money," *id.* § 2273.001(5), or "spend[ing] money to provide to any person logistical support for the express purpose of assisting a woman with procuring an abortion or the services of an abortion provider," Act of May 26, 2025, 89th Leg., R.S., S.B. 33, § 3 (to be codified at Tex. Gov't Code § 2273.0031); *see* Tex. Gov't Code § 2273.001(5) (de-fining "taxpayer resource transaction"). This prohibition encompasses "providing money for . . . travel or any form of transportation to or from an abortion provider." Act of May 26, 2025, 89th Leg., R.S., S.B. 33, § 3 (to be codified at Tex. Gov't Code § 2273.0031). Both Houses of the Legislature have passed SB 33, *History—SB 33*, *supra*, so it now awaits only the Governor's signature to become law. If the Governor signs it, it will take effect on September 1, 2025. Act of May 26, 2025, 89th Leg., R.S., S.B. 33, § 6.

## Standard of Review

"This Court has inherent authority to issue orders necessary or proper to pre-serve its jurisdiction during the pendency of an appeal." Order at 2, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—15th Dist. Dec. 6, 2024) (first citing *In re Shestawy*, 154 S.W.3d 114, 120 & n.50 (Tex. 2004); then citing *Richards v. League of United Latin Am. Citizens (LULAC)*, 863 S.W.2d 449 (Tex. 1993); and then citing

8

Tex. Gov't Code § 22.221(a)). "A stay pending appeal is, of course, a kind of injunction, so the familiar considerations governing injunctive relief in other contexts will generally apply in this context, as well." *In re State*, 2024 WL 2983176, at *2. First, the Court "make[s] a preliminary inquiry into the likely merits of the parties' legal positions." *Id.* at *3. Next, the Court must consider whether the State, as "the applicant for a stay pending appeal," has shown that it "will suffer irreparable harm if relief is not granted." *Id.* And finally, the Court must "consider the harm that other parties or the public will suffer if relief is granted—as well as any potential injury to non-parties caused by granting or denying relief." *Id.*

The Texas Supreme Court has articulated these requirements in explaining how a party can obtain relief under Texas Rules of Appellate Procedure 29.3 and 52.10. *See generally id.* But this Court has also relied on them in determining whether to grant relief under its "inherent authority to issue orders necessary or proper to preserve its jurisdiction during the pendency of an appeal," as well as under Rule 24.4. Order at 2, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—15th Dist. Dec. 6, 2024); *see* Appellant's Motion for Temporary Order and Alternative Motion for Expedited Appeal at 9, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—15th Dist. Nov. 12, 2024) (invoking these factors); Reply Br. in Support of the State's Motion for Emergency Relief at 5-7, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—15th Dist. Dec. 2, 2024) (invoking Rule 24.4); *see also* Order Denying Motion to Vacate Order of December 6, 2024, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—15th Dist. Jan. 23, 2025).

# ARGUMENT

## I. The State Is Likely to Succeed on the Merits.

**A.** The State is likely to succeed on its Gift Clause claim. "A challenged expenditure satisfies" the Gift Clauses only when "(1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; *and* (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished." *Borgelt v. Austin Firefighters Ass'n, IAFF Loc. 975*, 692 S.W.3d 288, 301 (Tex. 2024). San Antonio's funding program flunks all three requirements.

To start, the payments that the City contemplates will constitute a pure gift, as the City has never suggested that the organizations will vouchsafe any consideration in exchange for the funds. *Id.* As the Texas Supreme Court has explained, the Gift Clauses prohibit "gratuitous payments to individuals, associations, or corporations." *Id.* at 300 (emphasis omitted) (quoting *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002)); *see* Tex. Const. art. III, § 52(a). "A political subdivision's paying public money is not 'gratuitous' if the political subdivision receives return consideration," *Tex. Mun. League*, 74 S.W.3d at 383, but the City's program does not contemplate that the City will receive any consideration in exchange for Fund dollars.

And the payments would serve no public purpose. *See Borgelt*, 692 S.W.3d at 301. As an initial matter, these payouts would provide only a "private benefit." *Id.* at 304. The organizations render "downstream services" to *individuals*, in contrast

10

to upstream services, which consist of "policy approaches" that "have potential to affect large populations." App.0016, 0056.

But even if Fund disbursements could serve a public purpose, that public purpose is not "legitimate," *Borgelt*, 692 S.W.3d at 301, because it creates an expedited pathway to spend public funds on out-of-state travel to obtain elective abortions. Absent a threat to the life of the mother, Texas law recognizes and protects unborn life. *See* Tex. Health & Safety Code § 170A.002; *State v. Zurawski*, 690 S.W.3d 644, 653 (Tex. 2024). Thus, paying someone to leave the state for the purpose of ending that unborn life does not constitute a legitimate use of public resources. The City's funding program therefore does not "bring[] a public benefit." *Borgelt*, 692 S.W.3d at 301. Indeed, the Texas Legislature has recently made clear that the action San Antonio has taken here runs afoul of state law and policy. *See* Act of May 26, 2025, 89th Leg., R.S., S.B. 33; *History—SB 33*, *supra*. And while the City, as a home-rule municipality, possesses broad general powers, *see generally* Tex. Loc. Gov't Code § 51.072, it does not have the authority to violate the state constitution or statutes, Tex. Const. art. XI, § 5(a) ("[N]o charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State.").

The City resisted this idea in the trial court, suggesting that Texas cannot "bar" its residents from traveling out of state to obtain abortions due to "the constitutional right to interstate travel." *Dobbs*, 597 U.S. at 346 (Kavanaugh, J., concurring); App.0044 n.4. But the City misses the point. Applying the Gift Clauses here does

11

not "bar" anyone from traveling out of state—it simply prohibits the City from paying for it. For Gift Clause purposes, the only relevant question is whether it serves a legitimate public purpose to donate public monies to Texas residents to do elsewhere what is illegal in Texas. *Borgelt*, 691 S.W.3d at 301. It does not. Just because a citizen has a right to do something (for example, travel out of state) does not mean the City has the authority to pay for it.

Finally, because, by its terms, San Antonio's program will not "accomplish[]" any public purpose, no controls can ensure that it does so. *Id.* But even if the program did accomplish a legitimate public purpose, it would still fail because the City apparently does not contemplate retaining control over the way organizations use the funds once the City has disbursed them. *See id.* at 308 (explaining that a municipality retained controls over the way public employees used certain leave hours). For example, the City has not suggested that it can punish the organizations if the organizations fail to use City funds for a legitimate public purpose.

**B.** The City has argued that none of this matters because, in its view, the State's lawsuit is unripe for adjudication—but that's wrong. Ripeness "emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). Thus, the ripeness inquiry "focuses on whether the case involves 'uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3532 (2d ed. 1984)). But ripeness need not "be determined only as of the date a case is filed," as "the time of filing" is not "the only period ever

12

relevant to ripeness." *Perry v. Del Rio*, 66 S.W.3d 239, 250 (Tex. 2001). Rather, the Texas Supreme Court has instructed lower courts to "include[]" "[i]ntervening events that occur after decision in lower courts" in a ripeness analysis, "just as must be done with questions of mootness." *Id.* Thus, even if a claim was not ripe when filed, that "is not a jurisdictional infirmity requiring dismissal if the case has matured." *Id.*

This case is ripe now and will ripen still further during the pendency of this appeal. *See id.* When the State filed its lawsuit, the City had already:

- solicited the interest of ten preselected organizations (some of which the City knew had previously met its evaluation criteria, *compare* App.0025 (original 2024 applicants), *with* App.0031 (applicants interested in the new round of funding)) in receiving funding for downstream services, specifically highlighting out-of-state travel for abortions, App.0056-57;

- learned that nine organizations had interest in "additional funding opportunit[ies] for downstream services" and that four specifically had interest in funding out-of-state travel for elective abortions, App.0057;

- set evaluation criteria for determining whether an organization will receive funding, App.0028; and

- passed the ordinance, *see* App.0056-58.

More has transpired since the lawsuit's filing day. Two days before the trial court issued its final order in this case, the time to apply for funding expired. *See Request for Proposals*, *supra*; App.0032, 0261. The City has represented that assessing applications will take until mid-June and that the City Council will consider applications in June. App.0032. The City says that it contemplates disbursing payments in

13

"Summer of 2025." App.0032. And it has not halted this process during this litigation. *See Request for Proposals*, *supra*. In other words, nothing has prevented the City from going forward with its application process as planned.

And the purpose for which the City will donate the funds has never been a mystery: The City specifically seeks to fund out-of-state travel for abortions. *See Patterson*, 971 S.W.2d at 442 ("[R]ipeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote."). The City's official request for proposals expressly states that it "seeks proposals to address 'downstream' gaps in San Antonio's reproductive health landscape, *with particular attention to abortion transportation and support*." *Request for Proposals*, *supra* (emphasis added). The very day after the City gave $500,000 to fund other downstream services, City councilmembers asked CHC to "[p]rovide" new "downstream services that were not met through the already awarded $500,000." App.0027. This demand and its timing indicate the councilmembers' dissatisfaction with what the first round of funding reached—and the "already awarded $500,000" did not cover travel out of state to obtain elective abortions. App.0026-27. Moreover, the City specifically asked the ten organizations it solicited whether they had any interest in providing funding for out-of-state travel to abortions, and four organizations responded in the affirmative. App.0056-57. Metro Health even highlighted those four organizations in its presentation to the City Council, suggesting that the councilmembers placed a high priority on funding out-of-state travel for abortions. App.0031. The "facts have developed sufficiently"

14

such that neither the State nor the Court need guess how the City intends to use these new dollars. *Patterson*, 971 S.W.2d at 442.

But even if the State's lawsuit was not ripe earlier—which the State by no means concedes—it will ripen during the pendency of this appeal. *See Perry*, 66 S.W.3d at 250. As of the filing date of this motion, this Court's website indicates that the Clerk's and Reporter's Records in this case could arrive at the Court as late as July. Clerk's Ltr. to Counsel at 3, *State v. City of San Antonio*, No. 15-25-00093-CV (Tex. App.—15th Dist. May 21, 2025). But even if the record arrives at this Court in June, the State's opening brief will not be due until July. *See* Tex. R. App. P. 38.6(a). The City says it will complete its application process in June, and it plans to begin making payments in this summer, perhaps as early as late June—in other words, while this appeal is ongoing. App.0032. That would cause the State irreparable injury, *infra* Part II, but it also means that even if the case wasn't ripe before, it will be before the parties have even finished briefing this appeal, *see Perry*, 66 S.W.3d at 350; App.0032; *see also In re State*, 2024 WL 2983176, at *3 (explaining that the Court need assess only the State's *likelihood* of merits success to award temporary relief).

This discussion takes the City at its word that it will not send out payments until it said it would. But nothing binds the City to the timeline it has articulated. The parties have no Rule 11 agreement in place. No legal requirements command the City to complete the procurement process in this way. Before the trial court, the City insisted that its charter mandates this timeline, App.0255, but the charter does no such thing. It merely requires an "opportunity for competitive bidding" before the City "award[s]" contracts. San Antonio, Tex., City Charter art. IV, § 27, ¶ 1 (2025). It

15

does not say how long that "opportunity" must take. *See id.* And more to the point, the "competitive bidding" period has already closed. *See Request for Proposals*, *supra*. Nothing requires Metro Health to take thirty days to consider the applications, and Metro Health may not need that long. *See* App.0032. Indeed, the City has carefully stated that its timeline is merely an "expected" one, App.0226 (affidavit of Metro Health's Public Health Director), and that the City merely "anticipates" that Metro Health "will not complete [its] evaluation and scoring process until mid-June 2025," App.0040. That language doesn't bind the City.

And the City has incentive not to adhere to its "expected" timeline. App.0226. Councilmembers expressed concern that SB 33 could overtake the City's planned Fund disbursements and specifically asked how early funds "could be disbursed." *Supra* pp. 5-6. At the time of this motion's filing, SB 33 awaits only the Governor's signature, and once the Governor has signed it, it will go into effect on September 1 of this year.

Because the City anticipates making Fund payments while this appeal proceeds, *Zimmerman v. City of Austin* is inapposite. *Contra* App.0048-50. In that case, the court of appeals concluded that a lawsuit challenging the City of Austin's "proposed expenditure" of $150,000 "for abortion access logistical support services" was unripe. 620 S.W.3d 473, 476 (Tex. App.—El Paso 2021), *judgment vacated on other grounds*, 658 S.W.3d 289 (Tex. 2022) (per curiam). Austin had directed its health department to disburse "the funds to qualified organizations through a competitive bidding process." *Id.* The court of appeals concluded that the plaintiff's Gift Clause challenge to that "proposed expenditure" was not ripe, *id.*, because "there [was] no

certainty that any expenditures w[ould] ever be made, given . . . multiple contingencies" that had to occur before disbursements could take place, *id.* at 488. Specifically, Austin argued that its public-health department had to "put out and request an 'RFA' (a Request for Application) soliciting applications from qualified abortion-assistance organizations. Thereafter, if it received any bids," the public-health authority would score any "applications from qualified organizations." *Id.* at 487. Upon accepting any bids, the City would then negotiate "a social service contract with any chosen organization(s), after which the City Council would need to approve any proposed contracts before they could be finalized." *Id.* None of those things had happened yet. *Id.* But here, San Antonio has already solicited "applications from qualified organizations"—indeed, that solicitation has closed. *Id.*; *Request for Proposals*, *supra*. By its own account, the City is in the middle of its approval process. App.0032. And as the State has explained, the City will be poised to make payments by the time the State files its opening brief in this case. *Supra* pp. 15-16.

Nor does the Gift Clause claim require further ripening. *Zimmerman* (which issued before the U.S. Supreme Court's decision in *Dobbs*) suggested that the terms of abortion-assistance contracts could inform the Gift Clause questions of whether the expenditure would serve a public purpose or afford a public benefit, as those contracts might have "dictate[d] the specifics of how the funds would be distributed." 620 S.W.3d at 488 (citing *Tex. Mun. League*, 74 S.W.3d at 383). Not so here. As the State has explained, services that, by its own admission, the City will direct toward specific individuals do not serve a *public* purpose. *Supra* pp. 10-11; *see Borgelt*, 692 S.W.3d at 301, 304. And funding acts outside of Texas that would be illegal in Texas

does not serve a *legitimate* public purpose in any event. *Supra* pp. 11-12; *see Borgelt*, 692 S.W.3d at 301, 304. In other words, the City's funding program is unconstitutional by its terms, and the provisions of an individual contract will not change that. The State's claim is thus ripe, and the State is likely to succeed on the merits. *See In re State*, 2024 WL 2983176, at *3.

**C.** In the trial court, the City maintained that the State's lawsuit attempted to interfere with the City's lawmaking process and thus violated the separation of powers. That is misguided. The State has not asked any court to enjoin the City's vote on whether to disburse monies from the Fund. In its petition's prayer for relief, the State requested a declaration that the City violates the Gift Clauses "*by spending taxpayer money* on support for out-of-state abortions." App.0010 (emphasis added). It also sought injunctive relief prohibiting the City and any of its agents "*from spending taxpayer money*" or "implement[ing] the allocation and expenditure of taxpayer dollars" for particular purposes. App.0010 (emphasis added). That the City voted to take a particular action does not prohibit the trial court, this Court, or any other court from enjoining the City from taking that action—courts do that all the time. *See, e.g.*, *State v. City of Austin*, No. 15-24-00077-CV, 2025 WL 1200903, at *5 (Tex. App.—15th Dist. Apr. 24, 2025, no pet. h.) (remanding the case to the trial court to enter a temporary injunction prohibiting the enforcement of a city ordinance pending a final trial on the merits); *State v. City of San Marcos*, No. 15-24-00084-CV, 2025 WL 1142065, at *15 (Tex. App.—15th Dist. Apr. 17, no pet. h.) (same).

## II. The State Will Experience Irreparable Harm Absent Temporary Relief.

As the Texas Supreme Court has recognized, local-government action that violates the Gift Clauses irreparably harms the State. "'*[U]ltra vires* conduct' by local officials 'automatically results in harm to the sovereign as a matter of law.' Indeed, the violation of duly enacted state law by local government officials 'clearly inflicts irreparable harm on the State.'" *In re State*, 2024 WL 2983176, at *4 (first quoting *Hollins*, 620 S.W.3d at 410; and then quoting *Tex. Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied)). The Texas Supreme Court has "likewise recognized that the State has a 'justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporations in accordance with law,' and that '[a]s a sovereign entity, the State has an intrinsic right to . . . enforce its own laws.'" *Id.* (alteration in original) (quoting *Hollins*, 620 S.W.3d at 410). As the Texas Supreme Court has held, if a local government issues payments in violation of the Gift Clauses, Texas will sustain an irreparable sovereign injury. *Id.* Moreover, "[w]hen the State files suit to enjoin *ultra vires* action by a local official, a showing of likely success on the merits is sufficient to satisfy the irreparable-injury requirement" for temporary-relief purposes. *Hollins*, 620 S.W.3d at 410. For the reasons the State has already explained, *supra* Part I, absent temporary relief, the City will likely violate the Texas Constitution and thereby inflict irreparable harm on the State—harm that always counsels heavily in favor of a temporary order, *e.g.*, *Hollins*, 620 S.W.3d at 410.

Temporary relief is also necessary here to "preserv[e] the status quo based on the unique facts and circumstances presented." *In re Geomet Recycling LLC*, 578 S.W.3d 82, 89 (Tex. 2019). Here, that means that the newly allocated $100,000 in the Fund remain unspent. As the Supreme Court has explained in another Gift Clause case, the "harm here alleged is irreparable" because "[o]nce the funds are distributed to individuals, they cannot feasibly be recouped if it is later determined they were paid in violation of the Texas Constitution." *In re State*, 2024 WL 2983176, at *5.

Moreover, granting temporary relief allows the Court ample time to consider the weighty constitutional issues that this case involves while simultaneously protecting its own jurisdiction. *See* Order at 2, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—15th Dist. Dec. 6, 2024). The Texas Supreme Court has issued temporary relief under Rule 52.10 to prevent a county from making payments during the pendency of an appeal when the State alleged that those payments would violate the Gift Clauses. *In re State*, 2024 WL 2983176, at *5. That Court likewise forbade a county from mass-distributing unsolicited mail-in-ballot applications to preserve its jurisdiction so it could resolve *Hollins*. Order, *In re State*, No. 20-0715 (Tex. Sept. 15, 2020). And in another Gift Clause case, this Court issued a temporary order to prevent a county from making payments that would overtake the Court's jurisdiction. Order, *State v. Harris County*, No. 15-24-00120-CV (Tex. App.—15th Dist. Dec. 6, 2024). The Court there noted its own "inherent authority to issue orders necessary or proper to preserve its jurisdiction during the pendency of an appeal." *Id.* at 2. It should do the same here.

Unless the Court issues temporary relief, it may not be able to issue adequate prospective injunctive relief in the future. "[T]he only remedies available in an *ultra vires* action" or challenges to the constitutionality of a local policy are "injunctive and declaratory relief." *Id.*; *see Rolling Plains Groundwater Conservation Dist. v. City of Aspermont*, 353 S.W.3d 756, 760 (Tex. 2011) (per curiam); *City of Elsa v. M.A.L.*, 226 S.W.3d 390, 392 (Tex. 2007) (per curiam). After the City makes payments, no injunctive relief can recoup money that goes out the door. Appeals can take years, but the City intends to make payments this summer, while the parties are briefing this appeal. App.0032. Temporary relief is thus necessary to prevent the City from disbursing funds during the appeal.

The City may suggest that the State must obtain a temporary restraining order (TRO) if the City Council notices its intent to vote on whether to disburse funds while this appeal proceeds. But it is far from clear that the State can obtain a TRO here. As the City has correctly noted, the Texas Open Meetings Act requires the City Council to provide seventy-two hours' notice before any meeting where the Council could vote on whether to distribute Fund monies. Tex. Gov't Code § 551.043. But Bexar County requires seventy-two hours' notice before a TRO hearing. *Presiding*, Bexar County, https://perma.cc/2HHY-D4G7 (last visited June 4, 2025); *see also* App.0267. Putting aside for the moment that this policy seemingly defeats the entire purpose of a TRO, the policy also likely inhibits the State from obtaining a TRO prohibiting payments before any City Council vote to approve payments. *Compare* Tex. Gov't Code § 551.043, *with Presiding*, *supra*. The trial court suggested that the State could potentially obtain an "emergency TRO" ex parte,

App.0251-52, but Bexar County's website does not reflect this, *Presiding*, *supra*; App.0267. Absent temporary relief from this Court, the City will likely make unlawful payments during this appeal. And it would be inefficient to require the State to wait to file another motion when what the City plans to do is clear, *supra* Section I.B, and this motion is already before this Court.

## III. The Equities Favor Relief.

The equities weigh in favor of granting temporary relief. "As for injury to other parties, the [City] itself will suffer no cognizable injury unless its legal rights are incorrectly circumscribed during the pendency of the appeal. The [City] is not harmed by being required to follow the Texas Constitution." *In re State*, 2024 WL 2983176, at \*5. Moreover, the Court "must judge the likely harm to the County's legal rights in light of [its] preliminary assessment of the merits," and as the State has discussed, that assessment "does not favor" the City. *Id.*; *see supra* Part I.

"As for [any] harm to the public, in general[,]" San Antonio citizens "are not harmed by requiring the [City] to abide by the Texas Constitution." *In re State*, 2024 WL 2983176, at \*5. True, "a very small percentage" of the City's residents may "temporarily be denied receipt of the disputed payments if a stay is granted. But if those payments would have been illegal, then the temporary denial of them is not a harm that can tip the scales" in the City's favor. *Id.* "Requiring the government to follow the law benefits everyone. Temporarily preventing expenditure of these funds while the State's appeal proceeds ensures" that "public funds are not irrecoverably spent in violation of the Texas Constitution." *Id.*

## Prayer

The Court should enjoin the City from making payments from the $100,000 that the City has newly allocated to the Fund during the pendency of this appeal.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General

/s/ Sara B. Baumgardner
Sara B. Baumgardner
Assistant Solicitor General
State Bar No. 24108865
Sara.Baumgardner@oag.texas.gov

Counsel for Appellant

## Certificate of Conference

I certify that I conferred on June 2 and 4, 2025, with Kennon L. Wooten, counsel for appellees. Undersigned counsel for the State did not hear whether appellees oppose this motion by the close of business on June 4, the time the State planned to file this motion. The State therefore assumes that appellees oppose this motion.

/s/ Sara B. Baumgardner
Sara B. Baumgardner

## Certificate of Compliance

Microsoft Word reports that this motion contains 5,993 words, excluding exempted text.

/s/ Sara B. Baumgardner
SARA B. BAUMGARDNER

# Index

Texas's Petition and Application for Temporary Restraining Order and Injunctive Relief ......................................................................... Tab A

Defendants' Plea to the Jurisdiction ..................................................... Tab B

Transcript of the Hearing of April 30, 2025 .......................................... Tab C

Order Granting Defendants' Plea to the Jurisdiction ............................ Tab D

Bexar County 9:00 AM Presiding-Court Motions ................................. Tab E

# TAB A: TEXAS'S PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

FILED
4/7/2025 12:24 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Mario Hernandez
Bexar County - 407th District Court

**2025CI07833**

(3) CIT PCT 2
SAC 4

Cause No.

| | |
|---|---|
| STATE OF TEXAS,<br>　　*Plaintiff*,<br><br>v.<br><br>CITY OF SAN ANTONIO; RON NIRENBERG, in his official capacity as Mayor of the City of San Antonio; ERIK WALSH, in his official capacity as City Manager of the City of San Antonio,<br>　　*Defendants*. | IN THE DISTRICT COURT<br><br><br>BEXAR COUNTY, TEXAS<br><br><br>____ JUDICIAL DISTRICT |

---

## PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

---

The City of San Antonio is using taxpayer dollars to fund an illegal abortion-procurement scheme. The City of San Antonio has appropriated $100,000 to its Reproductive Justice Fund specifically to pay for pregnant women to travel for out-of-state abortions. Exhibit 1 at 4–6. The State of Texas brings this suit to require the City of San Antonio to follow state law and ensure that public dollars aren't used to illegally fund abortions.

### I.　DISCOVERY CONTROL PLAN

1.　Texas intends to conduct discovery under Level 3 of Rule 190 of the Texas Rules of Civil Procedure.

### II.　PARTIES

2.　Plaintiff the State of Texas is a sovereign state.

3.　Defendant City of San Antonio is a local government entity as defined in Texas Government Code § 554.001. It may be served with citation by serving Mayor Ron

**0002**

Nirenberg through the City of San Antonio, Texas, 100 Military Plaza, San Antonio, Texas 78205.

4.      Defendant Ron Nirenberg is the mayor of the City of San Antonio. He may be served at his office at City Hall, 100 Military Plaza, San Antonio, Texas 78205. He is sued in his official capacity as Mayor of the City of San Antonio.

5.      Defendant Erik Walsh is the city manager of the City of San Antonio. He may be served at his office at City Hall, 100 Military Plaza, San Antonio, Texas 78205. He is sued in his official capacity as City Manager of the City of San Antonio.

### III.   Jurisdiction and Venue

6.      This Court has subject matter jurisdiction over the claims asserted under Article V, § 8 of the Texas Constitution, Section 24.007 of the Texas Government Code, Sections 37.001 and 37.003 of the Texas Uniform Declaratory Judgment Act, and Section 65.021 of the Texas Civil Practice and Remedies Code.

7.      The Court has jurisdiction over Texas's request for injunctive relief against defendants Ron Nirenberg and Erik Walsh because these city officials are acting *ultra vires* by providing taxpayer money to fund elective abortions in violation of the state constitution.[1]

8.      Venue is proper because a substantial portion of the events giving rise to the claims occurred in Bexar County, Texas, and the residence or principal office of all Defendants is

---

[1] *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 369 (Tex. 2009) (ruling that governmental immunity does not preclude prospective injunctive remedies in official-capacity suits against government actors who "violate statutory authority or constitutional provisions.")

in Bexar County, Texas. *See* Tex. Civ. Prac. & Rem. Code §§ 15.002, 15.003, 15.005, 15.035.

9. Texas brings its claims exclusively under state law and expressly disclaims any federal cause of action or any reliance on federal law that would trigger subject-matter jurisdiction under 28 U.S.C. § 1331.

## IV. LEGAL BACKGROUND

10. Under the Texas Constitution, the Legislature has "no power to authorize any county, city, town, or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual . . . whatsoever[.]" Tex. Const. art. III, § 52(a) (Gift Clause).

11. The Texas Supreme Court has interpreted the Gift Clause to allow transfers of public funds to private entities so long as: "(1) the expenditure is not gratuitous but instead brings a public benefit; (2) the predominant objective is to accomplish a legitimate public purpose, not to provide a benefit to a private party; *and* (3) the government retains control over the funds to ensure that the public purpose is in fact accomplished."[2]

12. The Human Life Protection Act generally prohibits a person from "knowingly perform[ing], induc[ing], or attempt[ing] an abortion." Tex. Health & Safety Code § 170A.002. That prohibition does not apply if the woman on whom the abortion is performed "has a life-threatening physical condition" arising from a pregnancy that places her "at risk of death or poses a serious risk of substantial impairment of a major bodily

---

[2] *Borgelt v. Austin Firefighters Ass'n*, 692 S.W.3d 288, 301 (Tex. 2024); *see also Texas Mun. League Intergovernmental Risk Pool v. Texas Workers' Compensation Comm'n*, 74 S.W.3d 377, 383–84 (Tex. 2002).

*Petition and Application for Temporary Restraining Order and Injunctive Relief*     3

function unless the abortion is performed." Tex. Health & Safety Code § 170A.002(b)(2)). Violations of this law carry a potential criminal penalty of anywhere from two years to life in prison and a civil penalty of not less than $100,000. Tex. Health & Safety Code § 170A.004–005; Tex. Penal Code §§ 12.32–.33.

13. In addition to the Human Life Protection Act, Texas has several statutes predating *Roe v. Wade* that address the subject of abortion. *See* Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6. Under those statutes, any person who causes an abortion is guilty of an offense and shall be confined in a penitentiary. *Id.* at 4512.1. An individual may not act as an accomplice to abortion or an attempted abortion. *Id.* at 4512.2.–.3.

### COUNT I
### The City's Allocation of $100,000 to Fund Out-of-State Abortions Violates the Texas Constitution's Gift Clause

14. The City of San Antonio's allocation violates the Texas Constitution. Sections 4512.1 and 4512.2 of the Revised Civil Statutes, as well as section 7.02 of the Texas Penal Code, outlaw conduct in Texas that "procures" a drug-induced abortion. *See* article 4512.1, Revised Civil Statutes; Tex. Penal Code § 1.04(a)(1).

15. It is also a crime to aid or abet a violation of the state's abortion laws. *See* Tex. Penal Code § 7.02(a)(2).

16. As such, using taxpayer dollars to fund out-of-state abortions serves to support and encourage acts that are unlawful in Texas. Defendants are transparently attempting to undermine and subvert Texas law and public policy.

17. The City's payment of public funds to procure abortions does not serve a "legitimate public purpose," as there is no "return consideration" for financially

supporting the abortion of an unborn child out-of-state.[3] Because there is no legitimate public purpose, the City cannot establish that it has "retain[ed] public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment."[4]

18.     The "predominant purpose" of the City's allocation of public dollars is to assist abortion-assistance organizations and pregnant mothers who want to abort their unborn children in procuring abortions that would be unlawful in Texas.[5]

19.     There is no "legitimate public purpose" in expending taxpayer dollars to assist women in procuring abortions that are prohibited by state law, nor can there be any "legitimate public purpose" in an expenditure that is solely aimed at undermining and subverting state law and public policy.

20.     Local government does not exist to fund abortions, nor do elective abortions constitute "essential healthcare."[6]

21.     There is no "clear public benefit" that the City of San Antonio will receive by using taxpayer money to undermine Texas law, because there is no "clear public benefit" from using taxpayer money to help mothers abort their unborn children.[7] Through passing laws that generally prohibit abortions, Texas has established public policy negating any

---

[3] *Borgelt*, 692 S.W.3d at 301.
[4] *Texas Mun. League*, 74 S.W.3d at 384.
[5] *See Borgelt*, 692 S.W.3d at 304; Exhibit 1.
[6] *Compare Councilmember Cabello Havrda Applauds Reproductive Justice Fund*, City of San Antonio (April 3, 2025), https://rb.gy/kpuqdr, *with Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022) ("The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision . . .").
[7] *See Texas Mun. League*, 74 S.W.3d at 383.

argument that funding abortions procured out of state can serve a "clear public benefit"—the two are mutually exclusive.

22.     Even if there were a legitimate public purpose (and there isn't), the City of San Antonio does not contemplate retaining control over the use of the funds.[8]

23.     Because the City of San Antonio's allocation of $100,000 to fund out-of-state abortions violates the Gift Clause, Defendants' expenditures are *ultra vires* and must be enjoined, and the expenditure should be declared invalid under the Uniform Declaratory Judgment Act.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

24.     A temporary restraining order provides emergency relief to preserve the status quo until a hearing may be held on a temporary injunction.[9]

25.     "A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits."[10]

26.     To obtain a temporary injunction, an applicant must plead and prove: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim."[11] These requirements are readily met here.

---

[8] *See* San Antonio City Council A Session, 11:00 AM at 2:44:20–2:46:10 (Apr. 3, 2025), https://www.saspeakup.com/HU81151 (Councilmember McKee-Rodriguez discussing the eventual disbursement of funds, asking "at what point is it no longer city dollars that are being spent and city dollars that have been spent?")

[9] *Texas Aeronautics Comm'n v. Betts*, 469 S.W.2d 394, 398 (Tex. 1971).

[10] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

[11] *Id.* at 204.

**A. Texas is Likely to Succeed on the Merits**

27.     Texas is likely to succeed on the causes of action described above. Texas, as a sovereign entity, "has an intrinsic right to enact, interpret, and enforce its own laws."[12] This includes a right to "reassert the control of the state."[13] Injuries to this right are sufficient to both create standing to sue and show irreparable harm.[14]

28.     The State is "the guardian and protector of all public rights" and has authority to sue to redress any violations of those rights.[15] The State's interests extend to preventing "an abuse of power by public officers" and to issues concerning the "maintenance and operation of its municipal corporations in accordance with law."[16]

29.     Texas has a probable right to relief because the City of San Antonio's planned expenditure violates the Texas Constitution, intentionally undermines Texas's criminal and civil statutes, and flouts the State's prohibition against gratuitous payments of public funds to private persons without any return consideration to the State or its political subdivision. The purpose of the expenditure is not to accomplish a legitimate public purpose but rather to financially support abortion-assistance organizations and subsidize

---

[12] *State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015).
[13] *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).
[14] *See, e.g., Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020); *Texas v. EEOC*, 933 F.3d 433, 447–48 (5th Cir. 2019); *Texas Ass'n of Bus. v. City of Austin, Texas*, 565 S.W.3d 425, 441 (Tex. App.—Austin 2018, pet. denied).
[15] *Yett v. Cook*, 115 Tex. 205, 220 (281 S.W. 837, 842) (1926); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex re. Barez*, 458 U.S. 592, 607 (1982) ("[A] State has a quasi-sovereign interest in the health and wellbeing—both physical and economical—of its residents in general.").
[16] *Yett*, 115 Tex. at 220.

the procurement of abortions for pregnant mothers who wish to abort their unborn children.[17] There is no public benefit from subsidizing the procurement of abortions.

## B. Texas will be Imminently and Irreparably Injured Absent an Injunction

30. This litigation implicates important State interests, namely, the sanctity of its constitution and it laws.

31. The City of San Antonio approved the use of $100,000 "to support the expedited Reproductive Justice Fund solicitation" and "expedited procurement" for "out-of-state travel for abortion-related [conduct]" on April 3, 2025. *See* Ex. 1 at 4, 6.

32. The City of San Antonio is initiating the procurement process in "[m]id-April" with implementation of this illegal program scheduled for "Summer 2025." Ex. 1 at 19.

33. The Texas Supreme Court has explained that a century's worth of precedent establishes "the State's 'justiciable interest in its sovereign capacity in the maintenance and operation of its municipal corporation in accordance with law.'"[18] The Court noted that an *ultra vires* suit is a necessary tool to reassert the State's control over local officials who are misapplying or defying State laws.[19] The Court reasoned: "[This] tool would be useless . . . if the State were required to demonstrate additional, particularized harm arising from a local official's specific unauthorized actions."[20]

34. The Court continued that "[t]he [State] would be impotent to enforce its own laws if it could not temporarily enjoin those breaking them pending trial."[21] The Court found

---

[17] *See Texas Mun. League*, 74 S.W.3d at 383–84 (discussing the prohibition against gratuitous payments of public funds to private persons).
[18] *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (quoting *Yett*, 115 Tex. at 842).
[19] *Id.* at 410.
[20] *Id.* (internal citations omitted).
[21] *Id.*

that "[w]hen the State files suit to enjoin ultra vires action by a local official, a showing of likely success on the merits is sufficient to satisfy the irreparable-injury requirement for a temporary injunction."[22]

## C. Emergency Injunctive Relief is Necessary to Preserve the Status Quo

35. "The status quo is the last actual, peaceable, non-contested status which preceded the pending controversy." Here, the status quo is before Defendants, without legal authority, unconstitutionally allocated $100,000 to fund the procurement of abortions. It is crucial that this Court maintain the status quo during the pendency of this action so that public dollars are not used to fund abortions before this Court can determine the constitutionality of Defendants' allocation.

## V. DEMAND FOR RELIEF

The State of Texas demands the following relief:

a. A declaration that the defendants are violating the state constitution's gift clause by spending taxpayer money on support for out-of-state abortions, including travel for out-of-state abortions;

b. A temporary and permanent injunction that prohibits the defendants from spending taxpayer money on support for out-of-state abortions, including travel for out-of-state abortions;

c. Grant temporary and permanent injunctions prohibiting Defendants and any of their officers, agents, servants, employees, attorneys, representatives, or any other persons in active concert or participation with them from continuing to implement the allocation and expenditure of taxpayer dollars for support for out-of-state abortions, including out-of-state travel;

d. An award of costs and attorneys' fees;

e. All other relief that the Court may deem just, proper, or equitable.

---

[22] *Id.*

Dated: April 4, 2025

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

*/s/ Amy Snow Hilton*
**AMY SNOW HILTON**
Chief, Healthcare Program Enforcement Division
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov

**KATHERINE PITCHER**
Assistant Attorney General
Healthcare Program Enforcement Division
Texas Bar No. 24143894
Katherine.Pitcher@oag.texas.gov

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 936-1709
Fax: (512) 499-0712

**COUNSEL FOR STATE OF TEXAS**

## **Declaration**

My name is Amy S. Hilton, and I am an employee of the Office of the Texas Attorney General. I am executing this declaration as part of my assigned duties and responsibilities. I am over the age of 18 and otherwise fully capable of making this declaration. I have read the foregoing *Petition and Application for Temporary Restraining Order and Injunctive Relief*, and I declare under penalty of perjury that the facts stated therein are within my personal knowledge and are true and correct.

Executed in Travis County, Texas, on the 4th day of April, 2025.

*/s/ Amy S. Hilton*
Amy S. Hilton

**EXHIBIT 1**

# City of San Antonio



# AGENDA
# City Council A Session

Municipal Plaza Building
114 W. Commerce Street
San Antonio, Texas 78205

---

**Thursday, April 3, 2025**            **11:00 AM**            **Municipal Plaza Building**

---

The City Council will hold its regular meeting in the Norma S. Rodriguez Council Chamber in the Municipal Plaza Building beginning at the above referenced date and time for the following items. Once convened, the City Council will take up the following items in any order during the meeting but no sooner than the designated times.

**11:00 AM: Call to Order**

Members of the public can comment on items on the agenda. To sign up to speak visit www.saspeakup.com. Click on meetings and events and select the meeting you'd like to participate in. Sign up to speak or submit a written comment. Questions relating to these rules may be directed to the Office of the City Clerk at (210) 207-7253.

Individuals signing up for public comment may register for VIA bus fare or parking validation at www.saspeakup.com. VIA bus fare or parking at City Tower Garage (located at 100 Blk N. Main) will be provided to individuals who request the assistance. Staff will provide VIA bus fare passes and parking validation tickets in the lobby of City Council Chambers.

To view the Live meeting please view our Live Stream

During the meeting, the City Council may meet in executive session for consultation with the City Attorney's Office concerning attorney-client matters under Chapter 551 of the Texas

Government Code.

## ACCESS STATEMENT

**The City of San Antonio ensures meaningful access to City meetings, programs and services by reasonably providing: translation and interpretation, materials in alternate formats, and other accommodations upon request. To request these services call (210) 207-2098 or Relay Texas 711 or by requesting these services online at https://www.sanantonio.gov/DEI/Language-Services. Providing at least 72 hours' notice will help to ensure availability.**

Intérpretes en español estarán disponibles durante la junta del consejo de la ciudad para los asistentes que lo requieran. También se proveerán intérpretes para los ciudadanos que deseen exponer su punto de vista al consejo de la ciudad. Para más información, llame al (210) 207-7253.

For additional information on any item on this agenda, please visit www.sanantonio.gov or call (210) 207-7080.

5. Ordinance authorizing an expedited procurement for Reproductive Justice Health Care to support downstream reproductive and sexual healthcare services which may include out-of-state travel. [Erik Walsh, City Manager; Claude A. Jacob, Director, Health]

**THE CITY COUNCIL MAY RECESS FOR LUNCH AND RECONVENE TO CONSIDER ANY UNFINISHED COUNCIL BUSINESS**

6:00 P.M. – If the Council has not yet adjourned, the presiding officer shall entertain a motion to continue the council meeting, postpone the remaining items to the next council meeting date, or recess and reconvene the meeting at a specified time on the following day.

Printed on: 04/03/2025  07:15 PM



# City of San Antonio

## Agenda Memorandum

**Agenda Item Number:** 5

**Agenda Date:** April 3, 2025

**In Control:** City Council A Session

**DEPARTMENT:** Health Department

**DEPARTMENT HEAD:** Claude Jacob

**COUNCIL DISTRICTS IMPACTED:** Citywide

**SUBJECT:**

Action for an expedited procurement for Reproductive Justice Health Care Services

**SUMMARY:**

This ordinance authorizes expedited procurement for Reproductive Justice Health Care to support downstream reproductive and sexual healthcare services which may include out-of-state travel.

**BACKGROUND INFORMATION:**

The City issued an initial Request for Proposals (RFP) on June 24, 2024, for the selection of multiple community-based organizations to promote Reproductive Justice through community capacity-building, health care navigation and reproductive and sexual healthcare services. Through the RFP, the City sought contracts to bolster "upstream" and "midstream" drivers of reproductive health through education, trainings, collaborations and outreach, as well as provide free "downstream" culturally and linguistically appropriate direct services to residents in geographic scarcity areas and/or to populations most in need in San Antonio. In public health, the term "upstream" refers to policy approaches that have potential to affect large populations, compared to "downstream," individual needs. "Midstream" approaches fall somewhere in between.

On November 21, 2024, City Council authorized agreements with four agencies in response to the RFP. Through the agreements, contractors provide doula training, high school education on sexually transmitted infections (STIs), STI testing, contraception including long-acting reversible contraception, workshops on healthy pregnancies and sexual and reproductive health, and

wraparound prenatal care services including doula, acupuncture and mental health services for a combined value of $499,179.24.

On February 28, 2025, the Community Health Committee was briefed on a request for a new Reproductive Justice Fund solicitation to provide an additional $100,000 to fund downstream services that were not met through the already awarded funds. The Community Health Committee ultimately voted to forward this request to a future A Session for City Council consideration for downstream services that could include travel out of State.

To gauge interest in a new solicitation to provide downstream services, the original ten proposers were invited to a virtual meeting held on March 20, 2025. During this meeting, Metro Health and Finance staff discussed the request as it came from the Community Health Committee. An Interest Form was sent to all ten original proposers asking whether they would be interested in pursuing a new funding opportunity specific to downstream services for Reproductive Justice. All ten firms responded. Questions posed on the Interest Form were whether the organizations would have interest in pursuing an additional funding opportunity for downstream services, and whether they would have interest in pursuing an additional funding opportunity specific to out of State travel for abortion-related care. Nine of the ten indicated interest in an additional funding opportunity for downstream services. Three of the ten indicated interest in an additional funding opportunity limited to out-of-state travel for abortion-related care, and one response indicated interest if the City were to provide legal protection for the organization.

**ISSUE:**

Metro Health requests City Council authorize an expedited procurement to support downstream services for reproductive health care generally and/or specific types of reproductive health care, which may include out-of-state travel.

**ALTERNATIVES:**

Should City Council choose not to approve this item, an expedited solicitation for additional downstream reproductive health care services will not occur.

**FISCAL IMPACT:**

The $100,000 to support the expedited Reproductive Justice Fund solicitation to fund downstream services are available in Metro Health's FY 2025 General Fund Budget. Staff recommendations of funding reallocations will come back to Council for consideration at the time of award.

**RECOMMENDATION:**

Staff recommends an expedited solicitation for additional downstream reproductive services that may include out-of-state travel.

**THIS IS A PROPOSED DRAFT AND WILL BE REPLACED BY THE FINAL, SIGNED ORDINANCE OR RESOLUTION ADOPTED BY THE CITY COUNCIL.**

**ORDINANCE**

**AUTHORIZING AN EXPEDITED PROCUREMENT FOR REPRODUCTIVE JUSTICE HEALTH CARE TO SUPPORT DOWNSTREAM REPRODUCTIVE AND SEXUAL HEALTHCARE SERVICES WHICH MAY INCLUDE OUT OF STATE TRAVEL.**

\* \* \* \* \*

**WHEREAS,** the City issued an initial Request for Proposal (RFP) on June 24, 2024, for the selection of multiple community-based organizations to promote Reproductive Justice through community capacity-building, health care navigation and reproductive and sexual healthcare services; and

**WHEREAS**, through the RFP, the City sought contracts to bolster "upstream" and "midstream" drivers of reproductive health through education, trainings, collaborations and outreach, as well as provide free "downstream" culturally and linguistically appropriate direct services to residents in geographic scarcity areas and/or to populations most in need in San Antonio; and

**WHEREAS,** in public health, the term "upstream" refers to policy approaches that have potential to affect large populations, compared to "downstream," individual needs and "Midstream" approaches fall somewhere in between; and

**WHEREAS,** On November 21, 2024, City Council authorized agreements with four agencies in response to the RFP and through the agreements, contractors provide doula training, high school education on sexually transmitted infections (STIs), STI testing, contraception including long-acting reversible contraception, workshops on healthy pregnancies and sexual and reproductive health, and wraparound prenatal care services including doula, acupuncture and mental health services for a combined value of $499,179.24; and

**WHEREAS,** On February 28, 2025, the Community Health Committee was briefed on a request for a new Reproductive Justice Fund solicitation to provide an additional $100,000.00 to fund downstream services that could include travel out of State; and

**WHEREAS**, the Community Health Committee ultimately voted to forward this request to a future A Session for City Council consideration; and

**WHEREAS**, to gauge interest in a new solicitation to provide downstream services, the original 10 proposers were invited to a virtual meeting held March 20, 2025; and

**0018**

**WHEREAS**, an Interest Form was sent to all 10 original proposers asking whether they would be interested in pursuing a new funding opportunity specific to downstream services for Reproductive Justice; and

**WHEREAS**, questions posed on the Interest Form were whether the organizations would have interest in pursuing an additional funding opportunity for downstream services, and whether they would have interest in pursuing an additional funding opportunity specific to out of State travel for abortion-related care; and

**WHEREAS**, all 10 firms responded with nine of the 10 indicating interest in an additional funding opportunity for downstream services; and

**WHEREAS**, three firms indicated interest in an additional funding opportunity limited to out of State travel with one additional firm indicating interest if the City were to provide legal protection for the organization; and

**WHEREAS**, Metro Health requests City Council provide direction on whether to proceed with an expedited procurement for an additional $100,000.00 to support downstream services for reproductive health care which may include out of State travel; and

**WHEREAS**, the proposed additional services would supplement the four contracts worth $499,179.24 awarded by City Council on November 21, 2024; **NOW THEREFORE**:

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF SAN ANTONIO:**

**SECTION 1.** A Reproductive Justice Fund expedited procurement for downstream services to support reproductive and sexual healthcare services which may include out of State travel is hereby authorized. The City Manager or designee, or the Director of the San Antonio Metropolitan Health District or designee, is authorized to execute any and all documents to effectuate the solicitation referenced in this ordinance.

**SECTION. 2** The $100,000 to support the expedited Reproductive Justice Fund solicitation to fund downstream services are available in Metro Health's FY 2025 General Fund Budget. Staff recommendations of funding reallocations will come back to Council for consideration at the time of award.

**SECTION 3.** The financial allocations in this Ordinance are subject to approval by the Deputy Chief Financial Officer, City of San Antonio. The Deputy Chief Financial Officer may, subject to concurrence by the City Manager or the City Manager's designee, correct allocations to specific Cost Centers, WBS Elements, Internal Orders, General Ledger Accounts, and Fund Numbers as necessary to carry out the purpose of this Ordinance.

**SECTION 4.** This Ordinance is effective immediately upon the receipt of eight affirmative votes; otherwise, it is effective ten days after passage.

**PASSED AND APPROVED this _____ day of April 2025.**

**0019**

**M A Y O R**
Ron Nirenberg

**ATTEST:**                                              **APPROVED AS TO FORM:**


_____                    _____
Debbie Racca-Sittre, City Clerk                        Andrew Segovia, City Attorney

**0020**

# Reproductive Justice Fund Downstream Services



## City Council A Session

April 3, 2025

Presented by: Dr. Claude Jacob, Metro Health Director

# Current Landscape





## Health Education

**Harris Co**.: $2.7 million

**Austin**: $200,000

**St. Louis:** $161,852



## Ob-Gyn Access & Wraparound Care

**Harris Co**: $1.3 million

**New York**: $2.2 million+

**St. Louis:** $288,721



## Abortion Access

**Austin**: $550,000

**Columbus, OH**: $1 million

**New York:** $2.25 million

**Chicago:** $2.5 million

**Seattle**: $1.5 million

**Portland**: $200,000

0022

# Downstream Examples



- Home Pregnancy Tests

- Emergency Contraception

- Subsidized Doulas

- African American Maternal Mental Health Care Visits

- STI Testing and Treatment

- Transportation to Prenatal Care

- Transportation to Abortion Care



**Downstream**

**0023**

# RFP Awards Executed Nov. 2024



6% Upstream ($29,951)

35% Midstream ($174,713)

59% Downstream ($294,515)

**Total Awarded Amount: $499,179**

0024

# Original Ten Applicants



- **Empower House SA**

- **Latched Support, Inc.**

- **San Antonio AIDS Foundation**

- **Young Women's Christian Association of San Antonio**

- Beat AIDS Coalition Trust

- Jane's Due Process

- Parenting Plus

- San Antonio Community Resource Directory

- Sueños Sin Fronteras de Tejas

- Usawa Wellness Services, PLLC



0025

# Abortion Navigation



- In the first request for proposals, transportation to abortion care services was optional, along with many other services.

- None of the four awardees proposed abortion transportation or navigation.

- Two respondents included these services as an element of a broader package *(Beat AIDS Coalition Trust and Parenting Plus)*
  - *Parenting Plus* advanced to the interview phase but was not recommended for award.

- Abortion navigation was not addressed by any of the other respondents.

0026

# Community Health Committee Meetings



- Memo from D6 was received November 22, 2024; co-signed by D1, D2, D3 & D5

- Presented to Community Health Committee on January 23 and February 28, 2025

- Purpose: Provide downstream services that were not met through the already awarded $500,000

  - Solicitation/eligibility will be restricted to the original ten applicants

  - Same scoring matrix and solicitation requirements will be used

  - Timeline is 30-day solicitation followed by 30-day review and scoring period

- Community Health Committee approved move to A Session for Council consideration

0027

# Evaluation Criteria





- Experience, Background and Qualifications *(20 points)*

- Proposed Plan *(30 points)*

- Funding and Budget Narrative *(15 points)*

- Non-profit Status *(10 points)*

- SBEDA Program *(10 points)*
  - Small Business Enterprise Prime *(5 points)*
  - Minority/Women-Owned Business Enterprise Prime *(5 points)*

- Local Preference Program *(10 points)*

- Veteran-Owned Small Business Preference Program *(5 points)*

0028

# Vendor Meeting & Interest Form



- Virtual meeting held March 20, 2025, with original ten respondents to discuss results of Community Health Committee meeting

- Interest Form sent to all ten proposers on March 21, 2025, asking whether they would have interest in responding to additional funding for:
  - Downstream services
  - Travel for abortion care

- All proposers responded

0029

# Interest Form Results



- Out of ten organizations responding:

    - **Nine** were interested in an additional funding opportunity for downstream services

    - **Three** were interested in an additional funding opportunity to provide travel for abortion care

    - A **fourth** vendor indicated they would be interested if the City were to provide legal protection for the organization

0030

# Interested Applicants



- **Beat AIDS Coalition Trust**
- **Jane's Due Process**
- **Sueños Sin Fronteras de Tejas**
- **Young Women's Christian Association of San Antonio***

- Empower House SA
- Latched Support, Inc.
- Parenting Plus
- San Antonio AIDS Foundation
- Usawa Wellness Services, PLLC



Request for Proposal

0031

# Next Steps / Timeline



**Based on Council Guidance:**

- Initiate RFP *(Mid-April)*

- Complete Evaluation / Results *(Mid-June)*

- Consider Proposed Contracts at A Session *(End of June)*

- Implementation *(Summer 2025)*



0032



# Thank You!

April 3, 2025

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Amy Hilton on behalf of Amy Hilton
Bar No. 24097834
amy.hilton@oag.texas.gov
Envelope ID: 99353003
Filing Code Description: Petition
Filing Description:
Status as of 4/8/2025 10:50 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy SnowHilton | | amy.hilton@oag.texas.gov | 4/7/2025 12:24:39 PM | SENT |
| Mary JoToupin | | maryjo.toupin@oag.texas.gov | 4/7/2025 12:24:39 PM | SENT |
| Katherine Pitcher | 24143894 | katherine.pitcher@oag.texas.gov | 4/7/2025 12:24:39 PM | SENT |

TAB B: DEFENDANTS' PLEA TO THE JURISDICTION

| | | |
|---|---|---|
| State of Texas, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| v. | § | |
| | § | |
| The City of San Antonio; Ron Nirenberg, in | § | BEXAR COUNTY, TEXAS |
| his official capacity as Mayor of the City of | § | |
| San Antonio; Erik Walsh, in his official | § | |
| capacity as City Manager of the City of San | § | |
| Antonio, | § | 407th JUDICIAL DISTRICT |
| *Defendants*. | § | |

## <u>DEFENDANTS' PLEA TO THE JURISDICTION</u>

TO THE HONORABLE COURT:

Defendants—the City of San Antonio (hereinafter the "City"); Ron Nirenberg, in his official capacity as the City's Mayor; and Erik Walsh, in his official capacity as the City Manager—file this Plea to the Jurisdiction seeking dismissal of Texas's claim against Defendants for lack of subject-matter jurisdiction because this lawsuit is not ripe for adjudication.

## I.    INTRODUCTION

Texas's lawsuit seeks an advisory opinion about the permissible use of $100,000 allocated to the City's Reproductive Justice Fund. With no evidentiary support, Texas claims the City "is using taxpayer dollars to fund an illegal abortion-procurement scheme." (Orig. Pet. at 1.) In reality, as Texas's own petition concedes, the City has merely approved a procurement process "for reproductive justice health care to support downstream reproductive and sexual healthcare services which may include out of state travel" for abortion care. (Orig. Pet., Ex. 1, at 18; *see also* Ex. A, April 3, 2025 Ordinance).[1] Any money from the Reproductive Justice Fund will be spent through

---

[1] Exhibit 1 to Texas's Petition and Application for Temporary Restraining Order and Injunctive Relief contains an unsigned version of the April 3, 2025 Ordinance. Defendants attach the signed version of the April 3, 2025 Ordinance to their Plea at Exhibit A and cite to that exhibit throughout the remainder of the Plea.

contracts with applicant organizations. (*Id.*) No organizations have applied for the funds, no organizations have submitted applications outlining plans for how they intend to use the funds, and the City has not executed any contracts with organizations for disbursement of the funds, much less to an organization that intends to use the funds for "an illegal abortion-procurement scheme." (Orig. Pet. at 1.)

Texas's entire lawsuit is thus premised on a series of uncertain future events that may not occur as anticipated or may not occur at all. Because this case relies on a series of layered, speculative possibilities, Texas's claims are not ripe for adjudication. Accordingly, the Court must grant Defendants' Plea to the Jurisdiction and dismiss this case for lack of subject-matter jurisdiction.

## II. RELEVANT BACKGROUND FACTS

This is the second time a Reproductive Justice Fund authorized by the City has been prematurely challenged by parties adamant that they can predict the outcome of a multi-step procurement process. Texas's lawsuit, like the previous lawsuit, is built on nothing more than surmise and speculation about how the dollars from the Reproductive Justice Fund will ultimately be spent and should, like the prior lawsuit, be dismissed for lack of subject-matter jurisdiction.

### A. The prior related lawsuit—*San Antonio Family Association et al. v. City of San Antonio et al.*—was properly dismissed for lack of subject-matter jurisdiction.

On September 14, 2023, the San Antonio City Council passed a budget for Fiscal Year 2024 that allocated $500,000 to a Reproductive Justice Fund. Before the multi-step procurement process ever played out, the San Antonio Family Association ("SAFA") and various individual taxpayers (together "*SAFA* Plaintiffs") filed a lawsuit speculating about the purpose of the fund and the organizations that the *SAFA* Plaintiffs hypothesized would ultimately benefit from it, (hereinafter the "*SAFA* suit.") (Ex. B, *SAFA* 3d Am. Pet.) Specifically, the *SAFA* Plaintiffs insisted

4902-8221-3430

that the Reproductive Justice Fund would "provide grants to organizations that pay the travel costs of pregnant women who leave the state" for abortion care, (*id.* at 1–2), and asked the court to declare that the City may not provide any money through the Reproductive Justice Fund to any organization in Texas that funds abortion travel or self-managed abortions in Texas and to enjoin the City from providing taxpayer money to any organization for those purposes, (*id.* at ¶¶ 32, 38.)

At the time the *SAFA* Plaintiffs filed their lawsuit, the City had made no determination about how the dollars from the Reproductive Justice Fund would be spent and no funds had been allocated to any organization, much less to an organization that intended to use the funds to assist with out-of-state abortion travel or self-managed abortions in Texas. The procurement process was ongoing and subject to multiple steps that had yet to occur. Because the *SAFA* suit relied entirely on a series of layered, speculative possibilities, Defendants filed a plea to the jurisdiction, requesting dismissal on standing and ripeness grounds, which the trial court granted. (Ex. C, *SAFA* PTJ; Ex. D, Order granting PTJ.)

The ultimate outcome of the City's procurement process only emphasized the necessity of waiting for a ripe controversy. Of the ten applicants that applied for money from the Reproductive Justice Fund, only four applicants satisfied Metro Health's evaluation criteria. None of those four applicants proposed assisting with abortion-related services as part of their packages. (Orig. Pet., Ex. 1, at 25.) Instead, the four applicants proposed using the funds for myriad other reproductive health care services. (*Id.* at 15.) On November 21, 2024, the City Council voted to authorize contracts with those four organizations. (*Id.*) Through those contracts, the four organizations provide the following reproductive health care services for San Antonio citizens: doula training, high school education on sexually transmitted infections (STIs), STI testing, contraception, workshops on healthy pregnancies and sexual and reproductive health, and wraparound prenatal

4902-8221-3430

care services including doula, acupuncture, and mental health services. (*Id.* at 15-16.) Not a single penny from the Reproductive Justice Fund was allocated for abortion travel or self-managed abortions in Texas. (*Id.*) In other words, the *SAFA* Plaintiffs misread the tea leaves.

**B.** **The City has authorized an expedited procurement process for an additional $100,000 for downstream reproductive justice services.**

On February 28, 2025, San Antonio's Community Health Committee was briefed on a request to allocate an additional $100,0000 to a Reproductive Justice Fund for downstream services that were not met through the previously awarded $500,000. (Ex. A, April 3, 2025 Ordinance at 1.) The Community Health Committee voted to forward this request to a future A Session for City Council consideration. (*Id.*)

To gauge interest in the new solicitation, the San Antonio Metropolitan Health District ("Metro Health") invited the original ten organizations that previously applied for money from the Reproductive Justice Fund to attend a virtual meeting on March 20, 2025. (*Id.*) Metro Health then sent an interest form to those ten organizations, asking whether they would be interested in applying for funding to support downstream services for reproductive justice, which could include assistance with travel to states where abortion care remains legal, or other downstream services, such as home pregnancy tests, emergency contraception, subsidized doulas, STI testing and treatment, or transportation to prenatal care. (*Id.* at 1; *see also* Orig. Pet., Ex. 1, at 22.) While nine organizations expressed interest in applying for the additional funding, only four of them expressed any interest in using that funding to assist with out-of-state abortion travel. (Ex. A, April 3, 2025 Ordinance at 2; Orig. Pet., Ex. 1, at 29.) And one of those four organizations conditioned its interest on receiving legal protection from the City. (*Id.*) Metro Health then requested direction from the City Council about whether to proceed with an expedited procurement process. (Ex. A, April 3, 2025 Ordinance, at 2.)

4

4902-8221-3430

On April 3, 2025, the City Council passed an Ordinance, which approved an expedited procurement process to solicit, review, and approve proposals from organizations interested in providing downstream services to support reproductive and sexual healthcare. (*Id.* at 1-4.) According to the Ordinance, proposals for downstream services "may include" assistance with out-of-state travel for abortion care. (*Id.* at 2.) Based on guidance from the City Council, Metro Health developed a timeline for a solicitation and review process. That timeline is as follows.

First, in mid-April 2025, Metro Health will initiate a request for proposals—meaning, that Metro Health will solicit applications from organizations interested in providing "downstream services to support reproductive and sexual healthcare," as authorized by the Ordinance. (*Id.*; Orig. Pet., Ex. 1, at 31.) Applicant proposals "may include" assistance with out-of-state abortion travel or other downstream services. (Ex. A, April 3, 2025 Ordinance, at 2.) Only the original ten applicants that previously applied for money from the Reproductive Justice Fund are eligible to apply for the additional $100,000 in funding. (Orig. Pet., Ex. 1, at 26.)

The solicitation process will take approximately 30 days. (*Id.*) Once Metro Health receives applicant proposals, it will evaluate and score those proposals against various criteria. (*Id.* at 27.) Metro Health anticipates it will not complete that evaluation and scoring process until mid-June 2025. (*Id.* at 31.) At the end of June, Metro Health will present the results of its evaluation and scoring process to the City Council for its consideration. (*Id.*) After reviewing the results of Metro Health's procurement process, the City Council will decide, through a public vote, whether to execute contracts with the organizations endorsed by Metro Health. (*Id.*; Ex. E, Jacob Aff. at ¶ 5.) That vote will occur during an "A Session," (Ex. E, Jacob Aff. at ¶ 5), which is subject to the Texas Open Meetings Act, and thus requires that the City post public notice of the meeting 72 hours before it occurs. Tex. Gov't Code § 551.043. Implementation of any contracts for downstream

4902-8221-3430

**0040**

reproductive health care services approved by the City Council and, accordingly, fund disbursement, will not occur (if at all) until the Summer of 2025. (Ex. E, Jacob Aff. at ¶ 5.)

### C. This second lawsuit is based on surmise and speculation.

On April 7, 2025—four days after the City Council voted to authorize the expedited procurement process detailed above—Texas filed a lawsuit seeking to enjoin the City from "spending taxpayer money on support for out-of-state abortions, including travel for out-of-state abortions." (Orig. Pet. at 9). Texas's only claim is that the City's allocation of $100,000 to the Reproductive Justice Fund violates the Gift Clause of the Texas Constitution. (*Id.* at ¶¶ 14-23.) The alleged Gift Clause violation is premised on Texas's assumption that the City is spending (or will ultimately spend) the $100,000 allocated to the Reproductive Justice Fund on "out-of-state abortions."[2] (*Id.* at ¶ 16.) Texas seeks a declaration that Defendants "are violating the state constitution's gift clause by spending taxpayer money on support for out-of-state abortions, including travel for out-of-state abortions." (*Id.* at 9.)

Like the *SAFA* suit, Texas's lawsuit is premised on a series of assumptions about how a multi-step procurement process will play out. The procurement process for the $100,000 has only just begun. (Ex. E, Jacob Aff. at ¶ 4.) No amount of the $100,000 allocated *to the Reproductive Justice Fund* has been allocated to a specific organization or to a specific reproductive health service, like assistance with obtaining a legal abortion out of state. The City Council has merely authorized the multi-step procurement process detailed above. (Ex. A, April 3, 2025 Ordinance.) At this stage, it is impossible to know whether any organizations will apply for funding to assist with out-of-state abortion travel as opposed to the myriad other downstream services highlighted

---

[2] Texas alleges that the City has already "allocated $100,000 to fund the procurement of abortions," (Orig. Pet. ¶ 35), but then elsewhere acknowledges, citing to the Ordinance, that the City has merely "approved" an expedited procurement process and that the implementation of any programming is not scheduled until Summer 2025, (*id.* at ¶¶ 31-32).

6

as priorities by Metro Health. (Orig. Pet., Ex. 1, at 22.) It is possible that the City will never execute a contract with any organization related to out-of-state abortion travel. Texas's entire lawsuit is thus contingent upon a set of undeveloped facts that may never unfold as Texas predicts they will.

The City has not entered into a single contract with any organizations related to the $100,000 allocated to the Reproductive Justice Fund or released any amount of that money. (Ex. E, Jacob Aff. at ¶ 5.) And it cannot do so before a multi-step procurement process unfolds that involves a solicitation of applications, an evaluation of those applications, and ultimately City Council approval of contracts with successful applicants by public vote—a process that Texas's own petition acknowledges will not conclude until Summer 2025. (Orig. Pet., Ex. 1, at 31.) For these reasons, Texas's claims are not ripe for adjudication and this Court accordingly lacks subject-matter jurisdiction. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020) ("For a court to have subject matter jurisdiction over a case, the plaintiff's claims must be ripe. Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented.") (cleaned up).[3]

Because Texas's lawsuit is a blatant request for an advisory opinion, untethered to a live controversy, Defendants respectfully request that this Court grant Defendants' Plea to the Jurisdiction and dismiss this case for lack of subject-matter jurisdiction.

### III.     LEGAL STANDARD FOR PLEA TO THE JURISDICTION

"The absence of subject-matter jurisdiction may be raised by a plea to the jurisdiction." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). "A plea to the jurisdiction 'may

---

[3] "A plaintiff bringing suit under the Uniform Declaratory Judgments Act (UDJA) must still properly invoke the trial court's subject matter jurisdiction." *Sw. Elec. Power Co.*, 595 S.W.3d at 683. "'[A] declaratory judgment will only declare the rights, duties, or status of the parties in an otherwise justiciable controversy." *Verney v. Abbott*, No. 03-05-00064-CV, 2006 WL 2082085, at *9 (Tex. App.—Austin July 28, 2006, no pet.) (internal citations omitted).

7

challenge the pleadings, the existence of jurisdictional facts, or both.'" *Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 205 (Tex. 2020) (quoting *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018)). "[W]hen a plea to the jurisdiction challenges the existence of jurisdictional facts," as Defendants' Plea does here, the court "look[s] beyond the pleadings and consider[s] evidence submitted by the parties 'when necessary to resolve the jurisdictional issues raised.'" *Id.* "For a plea that challenges the existence of jurisdictional facts," the court's standard of review "generally mirrors that of a traditional summary judgment: a plaintiff must raise a genuine issue of material fact to overcome the challenge to the trial court's jurisdiction." *Id.* "[I]f the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004); *see also State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007) ("[I]f the relevant undisputed evidence negates jurisdiction, then the plea to the jurisdiction must be granted."). The "plaintiff must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained." *Quested v. City of Houston*, 440 S.W.3d 275, 280 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

"A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. Thus, "the plea should be decided without delving into the merits of the case." *Id.* A trial court may properly hear evidence as necessary to determine the jurisdictional questions at issue. *Id.* at 555. In doing so, a trial court should "confine itself to the evidence relevant to the jurisdictional issue." *Id.*

4902-8221-3430

To resolve this Plea to the Jurisdiction, the Court need not (and indeed should not) wade into Texas's past or present abortion laws.[4] Instead, it need only determine whether Texas's claim under the Gift Clause is ripe for adjudication. If, after examining the pleadings and evidence relevant to the jurisdictional issue, the Court concludes that Texas's suit is not ripe, the Court must grant Defendants' Plea to the Jurisdiction and dismiss the case for lack of subject-matter jurisdiction. *See Patterson v. Planned Parenthood of Houston & Se. Texas, Inc.*, 971 S.W.2d 439, 444 (Tex. 1998) (dismissing case for want of jurisdiction on ripeness grounds).

## IV.    ARGUMENT & AUTHORITIES

Texas's lawsuit is déjà vu all over again. Like the *SAFA* case, Texas's entire case is premised on a premonition about how each step of the City's multi-step procurement process will unfold. Courts do not have subject-matter jurisdiction to give advisory opinions based on hypothetical facts that have not yet come to pass. Because Texas's petition alleges only a hypothetical future controversy—not a dispute ripe for judicial review—it must be dismissed, like the *SAFA* case, for lack of subject-matter jurisdiction.

---

[4] Defendants, of course, adamantly maintain that their conduct in regard to the Reproductive Justice Fund was undertaken in absolute good faith and in accordance with the law. Texas's insistence that its current abortion statutes prohibit assisting Texans with traveling out of state to obtain abortions that are legal in those states is meritless. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 346 (2022) (Kavanaugh, J., concurring) ("[M]ay a State bar a resident of that State from traveling to another State to obtain an abortion? In my view, the answer is no based on the constitutional right to interstate travel."). Texas's criminal jurisdiction does not reach beyond its borders, and it cannot punish what its residents do lawfully in another State. *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State."); *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of [a State] to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted. . .  and upon the preservation of which the Government under the Constitution depends."). But resolution of those issues is not before the Court in ruling on this Plea to the Jurisdiction.

9

**0044**

## A. Texas's speculative suit is not ripe for adjudication.

"Ripeness is one of several categories of justiciability." *Perry v. Del Rio*, 66 S.W.3d 239, 249 (Tex. 2001). "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Patterson*, 971 S.W.2d at 443. This is because courts are not empowered to give advisory opinions, and may not award relief based on "a hypothetical situation which might or might not arise at a later date." *Camarena v. Tex. Emp. Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988).

Ripeness thus focuses on whether the case involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Patterson*, 971 S.W.2d at 442. "The constitutional roots of justiciability doctrines such as ripeness . . . lie in the prohibition on advisory opinions," but "[t]he concerns addressed by the ripeness doctrine encompass more than a question of constitutional prohibition." *Id.* at 442-43. "The doctrine has a pragmatic, prudential aspect that is directed toward conserving judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Id.* (internal quotations omitted). "Litigation based upon hypothetical possibility rather than concrete fact is apt to be poor litigation." *Id.* "The demand for specificity, therefore, stems from a judicial desire for better lawmaking." *Id.*

"Seeking a declaration of rights under the Uniform Declaratory Judgments Act," as Texas does here, "is not sufficient to avoid the ripeness doctrine." *Texas Comm'n on Env't Quality v. Guadalupe Cnty. Groundwater Conservation Dist.*, No. 04-15-00433-CV, 2016 WL 1371775, at *4 (Tex. App.—San Antonio Apr. 6, 2016, no pet.). "This act is merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions." *Id.* "A declaratory judgment action

10

may be considered premature if governmental proceedings which will impact the parties' respective rights remain pending." *Id.* at *3.

### 1.  Texas's suit depends on the resolution of hypothetical facts and events that have not yet come to pass.

Texas's core contention is that the City has violated the Gift Clause because it is "using taxpayer dollars to fund out-of-state abortions." (Orig. Pet. at ¶ 16.) But Texas's own petition and publicly available information demonstrate that no amount of the $100,000 at issue has been spent on out-of-state abortion travel. (*See* Orig. Pet. at ¶¶ 31-32 ("The City of San Antonio is initiating the procurement process in mid-April with implementation of this illegal program scheduled for Summer 2025"); *see also id.* at Ex. 1, p. 31 (outlining the procurement process schedule) (cleaned up).) The $100,000 allocated to the Reproductive Justice Fund can only be disbursed through executed contracts with organizations that apply for the fund and perform favorably against Metro Health's evaluation criteria. (Ex. E, Jacob Aff. at ¶ 5.) The solicitation and application process just began—Metro Health has yet to review, much less select, any organization to present to the City Council for a vote. (Ex. E, Jacob Aff. at ¶¶ 4-5; *see also* Orig. Pet. at ¶¶ 31-32, Ex. 1 at 31.)

Texas's entire lawsuit is thus contingent upon a set of undeveloped facts that must unfold precisely as Texas predicts they will. An organization must apply for money from the Reproductive Justice Fund; that organization must submit a proposal to use the money to assist women with abortion travel rather than with the myriad other downstream reproductive health care needs identified as priorities by Metro Health; that organization must then meet all city procurement, contracting, and audit criteria; Metro Health must identify that organization as a potential recipient of the fund; the City Council must vote to approve a contract with that organization, and Metro Health must then execute a contract with that organization. (Ex. E, Jacob Aff. at ¶¶ 4-5.) Finally, after that full process plays out, the program can be implemented. (*Id.* at ¶ 5.) To allege that all

4902-8221-3430

these steps will unfold as Texas predicts is nothing more than reading tea leaves and the very definition of "a speculative, remote injury that may not come to pass." *Perez*, 653 S.W.3d at 197.

It is impossible to predict how a multi-step process, particularly one involving nonparties, will ultimately unfold. This uncertainty is precisely why Texas courts routinely find declaratory judgment actions are not ripe when they are contingent upon the results of an application or approval process. *See, e.g.*, *Texas Comm'n on Env't Quality*, 2016 WL 1371775, at *4 (holding plaintiff's declaratory judgment action was unripe because it was "unknown whether TCEQ will actually issue Post Oak's permit"); *Save Our Springs All. v. City of Austin*, 149 S.W.3d 674, 683–85 (Tex. App.—Austin 2004, no pet.) (holding the court lacked jurisdiction to grant a declaratory judgment that a development agreement was invalid because no permit had yet been issued); *City of Anson v. Harper*, 216 S.W.3d 384, 390, 394–95 (Tex. App.—Eastland 2006, no pet.) (holding plaintiffs' declaratory judgment action was not ripe to the extent it sought an adjudication of the parties' rights if a permit were to be granted by TCEQ: "What might happen if the City's permit application is approved does not present a ripe controversy").

Because Texas's lawsuit is premised on a set of hypothetical facts that might not ever come to pass, it is unripe and must be dismissed for lack of subject-matter jurisdiction.[5]

---

[5] That Texas brings its lawsuit pursuant to the UDJA makes no difference. "The UDJA does not extend a trial court's jurisdiction, and a litigant's request for declaratory relief does not confer jurisdiction on a court or change a suit's underlying nature." *Verney*, 2006 WL 2082085, at *9. Indeed, "a declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Sw. Elec. Power Co.*, 595 S.W.3d at 685 (quoting *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995)). The "future-looking nature of UDJA suits does not remove the requirement that the court must have subject matter jurisdiction over the suit—that is, that the parties must have standing, and a ripe, justiciable controversy must exist." *Id.*; *see also City of Dall. v. Albert*, 354 S.W.3d 368, 378 (Tex. 2011) (citations omitted) (explaining that the UDJA "does not enlarge a court's jurisdiction; it is a procedural device for deciding cases already within a court's jurisdiction").

4902-8221-3430

**2. Texas seeks an advisory opinion about the legality of a disbursement under the Gift Clause.**

Texas seeks a declaration that Defendants are "violating the state constitution's gift clause by spending taxpayer money on support for out-of-state abortions." (Orig. Pet at 9.) But the City has not spent any taxpayer money on "support for out-of-state abortions." As Texas's petition concedes, the City has merely "approved" and "initiat[ed] the procurement process" detailed above. (*Id.* at ¶¶ 31-32.) That process may or may not result in the execution of contracts with organizations for assistance with travel out of state for legal abortion care. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 853 (Tex. 2000) ("Neither this Court, nor the trial court, has the power to counsel a legal conclusion on a hypothetical or contingent set of facts"). Given this uncertainty, any pronouncement the Court could make on the legality of the City's expenditures under the Gift Clause would be nothing more than "an impermissible advisory opinion." *Id.*

On this point, *Zimmerman v. City of Austin*, 620 S.W.3d 473, 487 (Tex. App.—El Paso 2021), *review granted, opinion vacated on other grounds*, 658 S.W.3d 289 (Tex. 2022), is instructive. In that case, Don Zimmerman, an Austin resident sued the City of Austin and its City Manager, asserting, among other things, that the City had violated the Gift Clause in approving a budget for its upcoming fiscal year that allocated $150,000 to fund entities providing or facilitating logistical and support services for Austin residents seeking abortion care. *Id.* at 477. The El Paso Court of Appeals concluded that Zimmerman's Gift Clause claim was not ripe for review because "the City had not yet taken any of the steps necessary under the terms of the Budget Provision to begin making disbursements to an abortion-assistance organization." *Id.* at 487. Like the procurement process at issue here, the City of Austin could not spend any of the allotted $150,000

13

**0048**

until a multi-step process played out.[6] None of those steps had been taken at the time Zimmerman filed suit and it was "possible that [Austin Public Health] would never receive any applications from qualified organizations meeting the criteria set forth in the Budget Provision, and that no social services contracts would ever be signed." *Id.* While Zimmerman did not have to "wait until an expenditure [was] actually made" before he could assert a Gift Clause violation, he had to "at least wait until there [was] more certainty that [an expenditure] [would] be made, or in other words, he [had to] wait until the proposed expenditures [were] not contingent on hypothetical events that may never take place." *Id.* And, as the court explained, "[t]he ripeness inquiry [was] particularly relevant" in the context of Zimmerman's Gift Clause claim because the City "can defend the expenditure if it: '(1) serves a legitimate public purpose; and (2) affords a clear public benefit received in return.'" *Id.* (quoting *Texas Mun. League Intergovernmental Risk Pool v. Texas Workers' Comp. Comm'n.*, 74 S.W.3d 377, 383 (Tex. 2002)). The terms of the ultimate contracts with the entities that applied for funding (if any) "could well inform those two issues" and no organizations had applied for the funding, much less been selected after review. *Id.* Any pronouncement from the Court about the legality of a possible expenditure would be impermissibly advisory. *Id.* at 488.

Texas's Gift Clause claim is similarly unripe and the declaration it seeks merely advisory. Like the procurement process in *Zimmerman*, the procurement process at issue here consists of multiple steps that have yet to occur. And, if past is prologue, it is possible that Metro Health will

---

[6] Before the City of Austin could make any expenditures, Austin Public Health ("APH") was "required to put out and publicize an 'RFA' (a Request for Application) soliciting applications from qualified abortion-assistance organizations. Thereafter, if it received any bids, APH would then hold a 'bidders conference' at which applications from qualified organizations would be scored; if any bids were accepted at that time, the City would then be required to negotiate a social service contract with any chosen organization(s), after which the City Council would need to approve any proposed contracts before they could be finalized." *Id.*

14

not receive any applications for out-of-state abortion travel from qualified organizations meeting its selection criteria. In that case, the City would never approve contracts with any organizations for out-of-state abortion travel, the activity at the heart of Texas's Gift Clause challenge. As in *Zimmerman*, Texas is asking the Court to "wade into a policy dispute regarding the legality of the City's proposed expenditures when in fact those expenditures may never be made." *Id.* at 488. "[U]nless and until the City enters into a contract obligating it to disperse funds to an abortion-assistance organization, [Texas's] lawsuit in which [it] challenges the legality of any such disbursement under the Gift Clause, is not ripe for review, as any pronouncement [the court] could make on the legality of the expenditures—which may in fact never be made—would be an advisory opinion, which would not only violate the Constitution, but would be an unpractical and unwise use of our judicial resources." *Id.*

Ultimately, this case is a perfect example of the pragmatic problems associated with litigating claims that are not ripe. Predicting the future here is both impossible and a waste of judicial resources. It is impossible at this point to determine which organizations will apply for the $100,000 allocated to the Reproductive Justice Fund, what proposals those organizations will submit, which organizations will meet city procurement, contracting, and audit criteria, and which organizations (if any), the City will select to receive the money. Through its premature lawsuit, Texas is asking the Court to not only predict the future but to ignore that the last time plaintiffs prematurely challenged a Reproductive Justice Fund authorized by the City—certain that the City Council would ultimately execute contracts with organizations that would assist with out-of-state abortion travel—those plaintiffs guessed wrong. Advisory opinions based on hypothetical, undeveloped facts are of course impermissible, but against the backdrop of the *SAFA* suit, the opinion Texas seeks from this Court would be both impermissible and ahistorical.

4902-8221-3430

### 3. In pushing an unripe lawsuit, Texas asks the Court to impermissibly intervene in the legislative process.

Texas's request that the Court "prohibit[] Defendants from spending taxpayer money on support for out-of-state abortions" before the City's procurement and approval process has run its course impermissibly intrudes on the legislative process and thus the separation of powers. (Orig. Pet. at 9.) "The constitutional roots of justiciability doctrines such as ripeness, as well as standing and mootness, lie in the prohibition on advisory opinions, which in turn stems from the separation of powers doctrine." *Patterson*, 971 S.W.2d at 442. "[R]ipeness law limits the ability of courts to intrude excessively on the policymaking domains of the politically accountable branches of government." *Id.* at 443 (internal quotations omitted). "[A]voiding premature litigation prevents courts from entangling themselves in abstract disagreements, while allowing other branches of government and governmental agencies to perform their functions unimpeded." *Save Our Springs All. v. City of Austin*, 149 S.W.3d 674, 683 (Tex. App.—Austin 2004, no pet.); *see also Patterson*, 971 S.W.2d at 443 (explaining that avoiding premature litigation "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties").

Here, Texas's unripe lawsuit asks the Court to impermissibly interfere with the City Council's deliberative process. Before any money from the challenged Reproductive Justice Fund can be spent, Metro Health will first have to complete a procurement process, and then the City Council must approve—through votes cast during a public City Council meeting (i.e., through an ordinance)—the execution of contracts with the recipients of the $100,000 from the Reproductive Justice Fund. In pushing its lawsuit before this process unfolds, Texas is essentially asking the Court to enjoin the legislative process in violation of longstanding separation-of-powers principles. *See, e.g.*, *City of Cleveland v. Keep Cleveland Safe*, 500 S.W.3d 438, 449 (Tex. App.—Beaumont

4902-8221-3430

**0051**

2016, no pet.) ("The separation of powers also limits the ability of a court to issue a permanent injunction that enjoins a City from exercising the powers inherent in the legislative process. We have three separate branches of government, and 'no one of them, and least of all the judicial department, should attempt to exceed the limits set about it and invade by such interference the domain of another.'" (quoting *Dallas v. Couchman*, 249 S.W. 234, 239 (Tex. Civ. App.—Dallas 1923, writ ref'd))).[7]

If, after the legislative decision-making process unfolds, Texas is dissatisfied with the City's ultimate decision about how to use some or all of the $100,000 allocated to the Reproductive Justice Fund, Texas can come into court at that time to make its case. And it will have plenty of time to do so. Money from the Reproductive Justice Fund can only be spent through executed contracts. (Ex. E, Jacob Aff. at ¶5.) The City Council will vote to approve contracts with specific organizations (if any) at a public meeting, subject to the 72-hour notice requirement under the Texas Open Meetings Act. Tex. Gov't Code § 551.043. Metro Health does not expect to execute contracts with those organizations (if any) until the end of June 2025. There is no risk that any money from the challenged Reproductive Justice Fund will have gone out the door before Texas can seek court intervention. Because the City's procurement process has only just begun, that time is not now, and asking the Court to intervene before that procurement process can even play out is an impermissible request infringing upon longstanding separation of powers principles.

---

[7] *See also In re Spiritas Ranch Enters., L.L.P.*, 218 S.W.3d 887, 900 (Tex. App.—Fort Worth 2007, no pet.) ("Restraining passage of an ordinance is a legislative act, and such restraint cannot be exercised by the courts."); *City of Port Isabel v. Pinnell*, 207 S.W.3d 394, 417 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.) (same); *City of Monahans v. State ex rel. Cook*, 348 S.W.2d 176, 179 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e.) (same).

17

## V. CONCLUSION & PRAYER

For all the reasons set forth above, Defendants respectfully request that the Court grant their Plea to the Jurisdiction, dismiss Texas's suit without prejudice, and grant Defendants any further relief—both at law and in equity—to which they may be entitled.

Respectfully submitted,

SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701-2589
(512) 495-6300
(512) 495-6399 Fax

By:  */s/ Kennon L. Wooten*
      Kennon L. Wooten
      State Bar No. 24046624
      kwooten@scottdoug.com
      Lauren Ditty
      State Bar No. 24116290
      lditty@scottdoug.com

CITY OF SAN ANTONIO
Office of the City Attorney
Litigation Division
International Center
203 S. St. Mary's St., 2nd Floor
San Antonio, Texas 78205
(210) 207-8940
(210) 207-4357 Fax
Deborah Lynne Klein
Deputy City Attorney
State Bar No. 11556750
deborah.klein@sanantonio.gov

**Attorneys for Defendants**

18

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on April 24, 2025, a true and correct copy of the foregoing was electronically served on Plaintiffs' counsel of record, in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure.

*/s/ Kennon L. Wooten*
Kennon L. Wooten

4902-8221-3430

**0054**

# EXHIBIT A

ORDINANCE 2025-04-03-0224

**AUTHORIZING AN EXPEDITED PROCUREMENT FOR REPRODUCTIVE JUSTICE HEALTH CARE TO SUPPORT DOWNSTREAM REPRODUCTIVE AND SEXUAL HEALTHCARE SERVICES WHICH MAY INCLUDE OUT OF STATE TRAVEL.**

\* \* \* \* \*

**WHEREAS,** the City issued an initial Request for Proposal (RFP) on June 24, 2024, for the selection of multiple community-based organizations to promote Reproductive Justice through community capacity-building, health care navigation and reproductive and sexual healthcare services; and

**WHEREAS,** through the RFP, the City sought contracts to bolster "upstream" and "midstream" drivers of reproductive health through education, trainings, collaborations and outreach, as well as provide free "downstream" culturally and linguistically appropriate direct services to residents in geographic scarcity areas and/or to populations most in need in San Antonio; and

**WHEREAS,** in public health, the term "upstream" refers to policy approaches that have potential to affect large populations, compared to "downstream," individual needs and "Midstream" approaches fall somewhere in between; and

**WHEREAS,** on November 21, 2024, City Council authorized agreements with four agencies in response to the RFP and through the agreements, contractors provide doula training, high school education on sexually transmitted infections (STIs), STI testing, contraception including long-acting reversible contraception, workshops on healthy pregnancies and sexual and reproductive health, and wraparound prenatal care services including doula, acupuncture and mental health services for a combined value of $499,179.24; and

**WHEREAS,** on February 28, 2025, the Community Health Committee was briefed on a request for a new Reproductive Justice Fund solicitation to provide an additional $100,000.00 to fund downstream services that could include travel out of State; and

**WHEREAS,** the Community Health Committee ultimately voted to forward this request to a future A Session for City Council consideration; and

**WHEREAS,** to gauge interest in a new solicitation to provide downstream services, the original 10 proposers were invited to a virtual meeting held March 20, 2025; and

**WHEREAS,** an Interest Form was sent to all 10 original proposers asking whether they would be interested in pursuing a new funding opportunity specific to downstream services for Reproductive Justice; and

**0056**

WHEREAS, questions posed on the Interest Form were whether the organizations would have interest in pursuing an additional funding opportunity for downstream services, and whether they would have interest in pursuing an additional funding opportunity specific to out of State travel for abortion-related care; and

WHEREAS, all 10 firms responded with nine of the 10 indicating interest in an additional funding opportunity for downstream services; and

WHEREAS, three firms indicated interest in an additional funding opportunity limited to out of State travel with one additional firm indicating interest if the City were to provide legal protection for the organization; and

WHEREAS, Metro Health requests City Council provide direction on whether to proceed with an expedited procurement for an additional $100,000.00 to support downstream services for reproductive health care which may include out of State travel; and

WHEREAS, the proposed additional services would supplement the four contracts worth $499,179.24 awarded by City Council on November 21, 2024; **NOW THEREFORE**:

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF SAN ANTONIO:**

**SECTION 1.** A Reproductive Justice Fund expedited procurement for downstream services to support reproductive and sexual healthcare services which may include out of State travel is hereby authorized. The City Manager or designee, or the Director of the San Antonio Metropolitan Health District or designee, is authorized to execute any and all documents to effectuate the solicitation referenced in this ordinance.

**SECTION. 2** The $100,000 to support the expedited Reproductive Justice Fund solicitation to fund downstream services are available in Metro Health's FY 2025 General Fund Budget. Staff recommendations of funding reallocations will come back to Council for consideration at the time of award.

**SECTION 3.** The financial allocations in this Ordinance are subject to approval by the Deputy Chief Financial Officer, City of San Antonio. The Deputy Chief Financial Officer may, subject to concurrence by the City Manager or the City Manager's designee, correct allocations to specific Cost Centers, WBS Elements, Internal Orders, General Ledger Accounts, and Fund Numbers as necessary to carry out the purpose of this Ordinance.

**SECTION 4.** This Ordinance is effective immediately upon the receipt of eight affirmative votes; otherwise, it is effective ten days after passage.

**0057**

MH
04/03/25
Item No. 5

**PASSED AND APPROVED** this 3rd day of April 2025.

M A Y O R

Ron Nirenberg

ATTEST:

Debbie Racca-Sittre, City Clerk

APPROVED AS TO FORM:

Andrew Segovia, City Attorney

**0058**



**2025-04-03-0224**

5. Ordinance authorizing an expedited procurement for Reproductive Justice Health Care to support downstream reproductive and sexual healthcare services which may include out-of-state travel. [Erik Walsh, City Manager; Claude A. Jacob, Director, Health]

Councilmember Viagran moved to Approve. Councilmember Castillo seconded the motion The motion prevailed by the following vote:

**Aye:** Nirenberg, Kaur, McKee-Rodriguez, Viagran, Castillo, Cabello Havrda
**No:** Rocha Garcia, Alderete Gavito, Pelaez, Courage, Whyte

# Exhibit B

| | |
|---|---|
| **San Antonio Family Association**; **Texas Right to Life**; **Texas Leadership Coalition**; **Texans for Fiscal Responsibility**; **Bexar County Republican Party**; **Allied Women's Center of San Antonio**; **San Antonio Coalition for Life**; **Texas Eagle Forum**; **Unite San Antonio**; **Patrick Von Dohlen**; **Michael R. Knuffke**; **Daniel J. Petri**; **K. Jason Khattar**; **Susan Bayne**; **Aileen Boone**; **Kevin Choate**; **Marilyn Choate**; **Elizabeth Anne Comeaux**; **Paul Julienne Comeaux**; **Sonia Cantoral**; **Eli Danze**; **Alice Davis**; **Dennis Dewine**; **Robert Gonzalez**; **Sandra Kaye Kiolbassa**; **Agustín McLamb-Quiñones**; **Alma Medrano**; **David Moore**; **David Nelson**; **Aloys Joseph Notzon**; **Anna Rojas**; **Philip Trickett**; **Doris Walsh**; **Von Dohlen Knuffke Financial Group Inc.**; **Khattar Law Office**; **Hartzheim Petri CPA**, | IN THE DISTRICT COURT |
| Plaintiffs, | |
| v. | BEXAR COUNTY, TEXAS |
| **City of San Antonio**; **Ron Nirenberg**, in his official capacity as mayor of the city of San Antonio; **Erik Walsh**, in his official capacity as city manager of the city of San Antonio, | |
| Defendants. | 438th JUDICIAL DISTRICT |

## PLAINTIFFS' THIRD AMENDED PETITION

The San Antonio city council recently enacted a budget for fiscal year 2024 that forces city taxpayers to contribute $500,000 to a "Reproductive Justice Fund." This fund will provide grants to organizations that pay the travel costs of pregnant women

who leave the state to abort their unborn children, and the defendants intend to give this taxpayer money to abortion-assistance organizations that pay for abortion travel.[1] The organizations that lobbied for this budgetary provision and hope to obtain this taxpayer money include Jane's Due Process, Avow, the Buckle Bunnies Fund, Sueños Sin Fronteras, and the Lilith Fund for Reproductive Equity. Many of these organizations facilitate or subsidize out-of-state abortions performed on Texas residents, and Jane's Due Process has already announced that it intends to use the money it receives from the city's Reproductive Justice Fund to pay the travel costs of minors who leave the state for an abortion.[2] The Buckle Bunnies Fund also aids or abets illegal self-managed abortions in Texas. *See* Exhibit 2.

The plaintiffs bring suit to enjoin the city and its officials from providing taxpayer money to any organization that pays for abortion travel or that procures elective abortions for Texas residents. It is a criminal offense to engage in conduct in Texas that "procures" a drug-induced abortion—even when the abortion is performed out of state—so long as the procuring conduct occurs within the state of Texas. *See* article 4512.1, Revised Civil Statutes (attached as Exhibit 1); Tex. Penal Code § 1.04(a)(1). It is also a crime to give money to organizations that violate the state's abortion laws

---

1. The city of San Antonio's adopted budget for fiscal year 2024 is available at https://www.sanantonio.gov/portals/0/files/budget/fy2024/Adopted-Budget-2024.pdf (last visited on March 25, 2024). The "Reproductive Justice Fund" is discussed on pages 7, 66, and 161 of this .pdf file. The allegations that the city "will" provide grants to organizations that pay the travel costs of pregnant women who leave the state to abort their unborn children, and that the defendants "intend" to give this taxpayer money to abortion-assistance organizations that pay for abortion travel, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. *See* Tex. Civ. Prac. & Rem. Code § 10.001(3).
2. *See* David Lynch, *Anti-abortion groups sue City of San Antonio over $500,000 Reproductive Justice Fund*, kens5.com, available at http://bit.ly/3RNqfcZ (attached as Exhibit 5) (reporting that Jaymie Cobb, the Interim Executive Director of Jane's Due Process, "said they were anticipating using the money from the city to help fund travel for teenage girls seeking an abortion out of the state.").

by "procuring" drug-induced abortions, as any donation aids or abets the criminal activities of those organizations even if it is earmarked for non-abortion purposes. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010). Any grant of taxpayer money to criminal organizations that violate the state's abortion laws is an *ultra vires* act that must be enjoined, regardless of how the recipient organization intends to use the money.

## DISCOVERY CONTROL PLAN

1. The plaintiffs intend to conduct discovery under Level 3 of the rules set forth in Rule 190 of the Texas Rules of Civil Procedure.

## PARTIES

2. Plaintiffs Patrick Von Dohlen, Michael R. Knuffke, Daniel J. Petri, K. Jason Khattar, Roberto Aguilar, Susan Bayne, Aileen Boone, Kevin Choate, Marilyn Choate, Elizabeth Anne Comeaux, Paul Julienne Comeaux, Sonia Cantoral, Carlos Cortez, Dina Cortez, Eli Danze, Alice Davis, Dennis Dewine, Robert Gonzalez, Sonja Heldt Harris, John William Harris Jr., Sandra Kaye Kiolbassa, Agustín McLamb-Quiñones, Alma Medrano, David Moore, David Nelson, Aloys Joseph Notzon, Anna Rojas, Philip Trickett, and Doris Walsh are individuals who pay taxes to the city of San Antonio. Most of these individuals also reside in the city of San Antonio.

3. Plaintiffs Von Dohlen Knuffke Financial Group Inc., Khattar Law Office, and Hartzheim Petri CPA are business entities that operate in San Antonio and pay taxes to the city of San Antonio.

4. Plaintiffs San Antonio Family Association, Texas Right to Life, Texas Leadership Coalition, Texans for Fiscal Responsibility, Bexar County Republican Party, Allied Women's Center of San Antonio, San Antonio Coalition for Life, Texas Eagle Forum, and Unite San Antonio are organizations whose members include taxpayers of San Antonio.

5. Defendant city of San Antonio is a legal government entity as defined in Texas Government Code § 554.001. It may be served with citation by serving Mayor Ron Nirenberg through the city of San Antonio, located at City Hall, 100 Military Plaza, San Antonio, Texas 78205.

6. Defendant Ron Nirenberg is the mayor of the city of San Antonio. He may be served at his office at City Hall, 100 Military Plaza, San Antonio, Texas 78205. He is sued in his official capacity as mayor of the city of San Antonio.

7. Defendant Erik Walsh is the city manager of the city of San Antonio. He may be served at his office at City Hall, 100 Military Plaza, San Antonio, Texas 78205. He is sued in his official capacity as city manager of the city of San Antonio.

## JURISDICTION AND VENUE

8. The Court has subject-matter jurisdiction under the Texas Constitution, Article V, § 8, as the amount in controversy exceeds the minimum jurisdictional limits of the court exclusive of interest. The plaintiffs seek relief that can be granted by courts of law or equity.

9. The Court has jurisdiction over the plaintiffs' request for injunctive relief against defendants Nirenberg and Walsh because they are acting *ultra vires* by providing taxpayer money to abortion-assistance organizations that violate the state's abortion statutes, thereby aiding or abetting the criminal activities of these organizations. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 368–69 (Tex. 2009); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

10. The Court has jurisdiction over the plaintiffs' request for declaratory relief against defendants Nirenberg and Walsh and the city of San Antonio because the Declaratory Judgment Act waives governmental immunity in lawsuits challenging the validity of a provision in the city's budget. *See* Tex. Civ. Prac. & Rem. Code §§ 37.004,

37.006; *Texas Lottery Commission v. First State Bank of DeQueen*, 325 S.W.3d 628 (2010); *Texas Education Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994).

11. Plaintiffs Patrick Von Dohlen, Michael R. Knuffke, Daniel J. Petri, K. Jason Khattar, Susan Bayne, Aileen Boone, Kevin Choate, Marilyn Choate, Elizabeth Anne Comeaux, Paul Julienne Comeaux, Sonia Cantoral, Eli Danze, Alice Davis, Dennis Dewine, Robert Gonzalez, Sandra Kaye Kiolbassa, Agustín McLamb-Quiñones, Alma Medrano, David Moore, David Nelson, Aloys Joseph Notzon, Anna Rojas, Philip Trickett, Doris Walsh, Von Dohlen Knuffke Financial Group Inc., Khattar Law Office, and Hartzheim Petri CPA are taxpayers of the city of San Antonio. Each of them has standing to seek declaratory and injunctive relief against these allegedly unlawful expenditures of public funds. *See Bland Independent School District v. Blue*, 34 S.W.3d 547, 556 (Tex. 2000) ("[A] taxpayer has standing to sue in equity to enjoin the illegal expenditure of public funds, even without showing a distinct injury.").

12. Many of the plaintiffs listed in paragraph 11 reside in the city of San Antonio, and each of those resident plaintiffs pays taxes to the city that are assessed on their property-tax bill (if they own their home) and their utility bills.

13. The property taxes that the plaintiffs pay are used to fund the city of San Antonio's annual budget, including its budget for fiscal year 2024, as well as the $500,000.00 that the city has allocated toward the "Reproductive Justice Fund" in its FY 2024 budget. According to the city of San Antonio's website, property-tax collections account for 29.7% of the city's annual operating revenues. *See* http://bit.ly/3TDuoCo (last visited on March 25, 2024) (attached as Exhibit 6).

14. The taxes that the plaintiffs pay on their utility bills are also used to fund the city of San Antonio's annual budget, including its budget for fiscal year 2024, as well as the $500,000.00 that the city has allocated toward the "Reproductive Justice Fund" in its FY 2024 budget. According to the city of San Antonio's website, collections from taxes paid to CPS Energy account for 27.8% of the city's annual operating

revenues. *See* http://bit.ly/3TDuoCo (last visited on March 25, 2024) (attached as Exhibit 6).

15. Plaintiffs San Antonio Family Association, Texas Right to Life, Texas Leadership Coalition, Texans for Fiscal Responsibility, Bexar County Republican Party, Allied Women's Center of San Antonio, San Antonio Coalition for Life, and Unite San Antonio have associational standing to sue the defendants because: (a) at least one of their members owns real estate in the city of San Antonio and pays property taxes to the city that are being used to fund the city's FY2024 budget and its Reproductive Justice Fund, and would therefore have standing to sue in their own right; (b) the interests that they seek to protect in this litigation are germane to their organization's purpose; and (c) neither the claims asserted nor the relief requested requires the participation of their individual members in the lawsuit. *See Abbott v. Mexican American Legislative Caucus*, 647 S.W.3d 681 (Tex. 2022).

16. Protecting the sanctity of innocent human life at all stages is one of the key organizational purposes of plaintiffs San Antonio Family Association, Texas Right to Life, Texas Leadership Coalition, Bexar County Republican Party, Allied Women's Center of San Antonio, San Antonio Coalition for Life, and Unite San Antonio. The interests that these plaintiffs seek to protect in this litigation are germane to this organizational purpose.

17. Plaintiff Texans for Fiscal Responsibility is an independent educational non-profit organization that seeks to curb wasteful government spending such as the Reproductive Justice Fund, which exists to transfer taxpayer money to pro-abortion groups that support elected Democrats in the San Antonio city government. The interests that Texans for Fiscal Responsibility seeks to protect in this litigation are germane to this organizational purpose.

18. Only one of the named plaintiffs needs to establish standing, as each of the plaintiffs is seeking the same declaratory and injunctive relief against the defendants. *See Patel v. Texas Dep't of Licensing & Regulation*, 469 S.W.3d 69, 77–78 (Tex. 2015).

19. At least one or more the named individual plaintiffs, including Paul and Elizabeth Comeaux, own real estate in San Antonio and pay property taxes to the city of San Antonio, which are being used to fund the city's FY2024 budget and its Reproductive Justice Fund. A redacted copy of plaintiffs' Paul and Elizabeth Comeaux's recent property-tax bill and notice of appraised value is attached as Exhibit 7 to the petition. Plaintiffs Paul and Elizabeth Comeaux are members of plaintiff San Antonio Family Association.

20. Many other plaintiffs, in addition to plaintiffs Paul and Elizabeth Comeaux, own real estate in San Antonio and pay property taxes to the city of San Antonio, which are being used to fund the city's FY2024 budget and its Reproductive Justice Fund.

21. The plaintiffs have taxpayer standing regardless of whether the city is currently in the process of spending taxpayer money illegally, as taxpayers have standing to challenge the legality of proposed illegal expenditures before they occur. *See Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001) ("A taxpayer may maintain an action solely to challenge *proposed* illegal expenditures" (emphasis added)). Indeed, the courts have made clear that a taxpayer has standing to restrain either an ongoing or future expenditure of public funds that he alleges to be unlawful. *See, e.g., Bandera Independent School District v. Hamilton*, 2 S.W.3d 367, 369 (Tex. App.—San Antonio 1999, pet. denied) (taxpayers may challenge "future illegal expenditures of funds"). The plaintiffs need not allege or prove that the defendants were actually engaged in the allegedly unlawful expenditures at the moment they filed their petition.

22. The defendants intend to give some or all of the $500,000.00 in taxpayer money that was allocated to the Reproductive Justice Fund to abortion-assistance organizations such as Jane's Due Process, Avow, the Buckle Bunnies Fund, and the Lilith Fund for Reproductive Equity, each of which violates Texas's criminal abortion laws as explained in paragraphs 28–45, *infra*.[3]

23. Even if the defendants do not currently intend or have not yet decided to award any of the $500,000.00 in the Reproductive Justice Fund to abortion-assistance organizations such as Jane's Due Process, Avow, the Buckle Bunnies Fund, and the Lilith Fund for Reproductive Equity, there is at least a "substantial risk" that the defendants will do so, and a substantial risk of future injury is sufficient to confer standing on plaintiffs who seek prospective relief. *See Texas Ass'n of Business v. Texas Air Control Board*, 852 S.W.2d 440, 447 (Tex. 1993) ("A substantial risk of injury is sufficient"); *Grassroots Leadership, Inc. v. Texas Dep't of Family & Protective Services*, 646 S.W.3d 815, 820 (Tex. 2022) ("[A] substantial risk may satisfy the concrete-injury requirement for injunctive relief" (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435–36 (2021); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). This substantial risk exists because: (a) The abortion-assistance organizations described in this petition lobbied for the creation of the Reproductive Justice Fund and have publicly stated that they hope to obtain taxpayer money from it; (b) Jane's Due Process has publicly stated that it intends to use the taxpayer money that it receives from the city's Reproductive Justice Fund to pay the travel costs of minors who leave the state for an abortion;[4] and (c) The city and its officials refuse to disavow the

---

3. The allegation that the defendants "intend" to give some or all of the $500,000.00 in taxpayer money that was allocated to the Reproductive Justice Fund to abortion-assistance organizations such as Jane's Due Process, Avow, the Buckle Bunnies Fund, and the Lilith Fund for Reproductive Equity, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. *See* Tex. Civ. Prac. & Rem. Code § 10.001(3).

4. *See* note 2, *supra*.

possibility that abortion-assistance organizations will receive taxpayer money from the Reproductive Justice Fund and use it to fund abortion travel.

24. To have taxpayer standing, the plaintiffs need only to allege and not show that the defendants will act illegally if they give taxpayer money to abortion-assistance organizations. *See Perez v. Turner*, 653 S.W.3d 191, 200–01 (Tex. 2022) ("The key showing required by our precedent on taxpayer standing is that the public funds are being expended on an *allegedly* illegal activity. . . . We d[o] not require the plaintiffs, as a prerequisite to standing, to demonstrate that the *allegedly* illegal activity was *actually* illegal. That merits-related inquiry is not a proper part of a standing analysis" (citations and internal quotation marks omitted)).

25. The Court has personal jurisdiction over each of the defendants.

26. Venue is proper because a substantial portion of the events giving rise to the claims occurred in Bexar County, Texas. *See* Tex. Civ. Prac. & Rem. Code §§ 15.002, 15.003, 15.005, 15.035.

27. The plaintiffs bring their claims exclusively under state law and expressly disclaim any federal cause of action or any reliance on federal law that would trigger subject-matter jurisdiction under 28 U.S.C. § 1331 or any other statute that would provide for subject-matter jurisdiction in federal district court.

### CLAIM NO. 1:
**The Texas Abortion Statutes Outlaw And Criminalize The Provision Of Money To Organizations In Texas That "Procure" Drug-Induced Abortions, Even If The Procured Abortion Occurs Out Of State**

28. The law of Texas provides:

> If any person shall designedly administer to a pregnant woman *or knowingly procure to be administered with her consent any drug or medicine*, or shall use towards her any violence or means whatever externally or internally applied, *and thereby procure an abortion*, he shall be confined in the penitentiary not less than two nor more than five years . . .

West's Texas Civil Statutes, article 4512.1 (1974) (emphasis added) (attached as Exhibit 1).

29.  This statute imposes felony criminal liability on any person who: (1) "procures" any drug or medicine to be administered to a pregnant woman with her consent; and (2) thereby "procures" an abortion. If any part of the "procurement" activity occurs within Texas, then the act is criminal even if the abortion that has been "procured" takes place outside the state. *See* Tex. Penal Code § 1.04(a)(1) ("Texas has criminal jurisdiction to prosecute when . . . either the conduct or a result that is an element of the offense occurs inside this state"); *see also* Black's Law Dictionary (11th edition) ("procure *vb.* (14c) 1. To obtain (something), esp. by special effort or means. 2. To achieve or bring about (a result).").

30.  Every Texas-based abortion fund or abortion-assistance organization that "procures" drug-induced abortions for pregnant women, including Jane's Due Process, Avow, the Buckle Bunnies Fund, and the Lilith Fund for Reproductive Equity, is a criminal organization, even if the abortions that they "procure" occur out of state, so long as any part of their "procurement" activities occur within Texas.

31.  Any grant of taxpayer money to Jane's Due Process, Avow, the Buckle Bunnies Fund, and the Lilith Fund for Reproductive Equity violates article 4512.1, because it aids or abets the criminal activities of these organizations. *See* Tex. Penal Code § 7.02(a)(2). That includes grants to these organizations even if the money is earmarked for non-abortion purposes, because any such grant aids and abets their criminal activities by freeing up money and resources for their "procurement" of drug-induced abortions. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

32.  The Court should declare that the city's "Reproductive Justice Fund" may not be used to provide money to any organization in Texas that "procures" drug-induced abortions, including Jane's Due Process, Avow, the Buckle Bunnies Fund,

and the Lilith Fund for Reproductive Equity, regardless of the intended use of the funding. Any such grant of taxpayer money is an *ultra vires* act that must be enjoined.

## CLAIM NO. 2:
### The Texas Abortion Statutes Outlaw And Criminalize The Provision Of Money To The Buckle Bunnies Fund, Which Aids And Abets Illegal Self-Managed Abortions in Texas

33. The Buckle Bunnies Fund, which lobbied for the creation of the "Reproductive Justice Fund" and hopes to obtain taxpayer money from it, aids or abets illegal self-managed abortions in Texas. *See* Iris Dimmick, *Abortion access advocates face imposters, legal threats as trigger law nears*, San Antonio Report (August 1, 2022), https://bit.ly/3R6S3ad (attached as Exhibit 2) ("[T]he Buckle Bunnies Fund . . . helps Texans access and pay for abortions. That includes . . . guiding women through their self-managed abortions").

34. Self-managed abortion has been illegal in Texas for more than a century and was never constitutionally protected under *Roe v. Wade*, 410 U.S. 113 (1973), even though the woman who self-aborts cannot be charged with a crime. *See Crissman v. State*, 245 S.W. 438, 438 (Tex. Crim. 1922).

35. Any person who aids or abets a self-managed abortion in Texas, other than the pregnant woman who self-aborts, commits the crime of murder. *See* Tex. Penal Code §§ 1.07, 19.02(b) (defining the offense of murder to include the intentional killing of "an unborn child at every stage of gestation from fertilization until birth."); *see also* Texas Penal Code § 19.06(1) (exempting "the mother of the unborn child" from murder charges in response to a self-managed abortion). Aiding or abetting a self-managed abortion in Texas also violates the state's criminal abortion laws. *See* Tex. Health & Safety Code § 170A.002.

36. The Buckle Bunnies Fund is a criminal organization, as is every other organization that aids or abets self-managed abortions in Texas.

37. Any grant of taxpayer money to the Buckle Bunnies Fund violates the state's abortion laws and the murder statute, because it aids or abets the criminal activities of this organization. *See* Tex. Penal Code § 7.02 (a)(2). That includes grants to Buckle Bunnies that are earmarked for non-abortion purposes, as any such grant aids and abets the fund's criminal activities by freeing up money and resources for assisting illegal self-managed abortions in Texas. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

38. The Court should declare that the "Reproductive Justice Fund" may not be used to provide any money to any organization in Texas that aids or abets self-managed abortions in Texas, including the Buckle Bunnies Fund, regardless of the intended use of the funding. Any such grant of taxpayer money is an *ultra vires* act that must be enjoined.

## CLAIM NO. 3:
### The Texas Abortion Statutes Outlaw And Criminalize The Provision Of Money To Organizations That Aid Or Abet Drug-Induced Abortions If Either Of The Two Abortion Pills Is Swallowed In Texas

39. Many out-of-state abortion providers dispense abortion-inducing drugs to Texas residents. *See, e.g.*, Jada Yuan, *The New Mexico Provider Trying to Save Abortion for Texas Women*, Washington Post (May 10, 2022) (attached as Exhibit 3), available at https://wapo.st/3Es1Gxg (last visited on March 25, 2024).

40. Some of these Texas residents who obtain abortion drugs from out-of-state providers ingest each of the two abortion drugs (mifeprex and misoprostol) in a state where abortion remains legal, and are instructed to do so by their providers.

41. But some of these patients return home after receiving the drugs and complete the abortion process in Texas, either by swallowing the second drug (misoprostol) in Texas or expelling the unborn child in Texas. *See, e.g.*, Shefali Luthra, *'I would wish this on absolutely no one': How three women dealt with pregnancy in the year*

*since Texas' six-week abortion ban*, The 19th (August 29, 2022) (attached as Exhibit 4), available at https://bit.ly/3fLntWd (last visited on March 25, 2024).

42. Anyone who aids or abets an abortion of this sort has violated the state's criminal abortion laws and the murder statute, which impose criminal liability on abortion funders and facilitators if any part of the abortion process occurs within Texas. *See* Tex. Penal Code § 1.04(a)(1) ("Texas has criminal jurisdiction to prosecute when . . . either the conduct or a result that is an element of the offense occurs inside this state").

43. Every abortion fund or abortion-assistance organization that aids or abets drug-induced abortions in which the pregnant woman completes the abortion process in Texas is a criminal organization, even if the drugs are dispensed by an out-of-state abortion provider.

44. Any grant of taxpayer money to Jane's Due Process, Avow, the Buckle Bunnies Fund, Sueños Sin Fronteras, and the Lilith Fund for Reproductive Equity violates the state's abortion laws and the murder statute, unless those organizations disavow an intent to facilitate any criminal abortion in which the pregnant woman completes the abortion process in Texas.

45. The Court should declare that the "Reproductive Justice Fund" may not be used to provide any money to any organization in Texas that aids or abets drug-induced abortions in which the pregnant woman completes the abortion process in Texas, either by swallowing the second drug (misoprostol) in Texas or expelling the unborn child in Texas. Any such grant of taxpayer money is an *ultra vires* act that must be enjoined.

## CLAIM NO. 4:
## The Reproductive Justice Fund Violates The State Constitution's Gift Clause

46. The establishment of the Reproductive Justice Fund also violates the state constitution's gift clause, which is codified at article III, section 52(a) of the Texas Constitution.

47. The gift clause provides, in relevant part:

> Except as otherwise provided by this section, the Legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever, or to become a stockholder in such corporation, association or company. However, this section does not prohibit the use of public funds or credit for the payment of premiums on nonassessable property and casualty, life, health, or accident insurance policies and annuity contracts issued by a mutual insurance company authorized to do business in this State.

Tex. Const. art. III, § 52(a); *see also Bullock v. Calvert*, 480 S.W.2d 367, 369 (Tex. 1972) ("[U]nder Art. 3, §§ 51 and 52 of the Constitution there may be no grant of public money for private individuals or associations.").

48. The Supreme Court of Texas has interpreted the gift clause to allow transfers of public funds to private entities so long as the payment: "(1) serves a legitimate public purpose; and (2) affords a clear public benefit received in return." *Texas Municipal League Intergovernmental Risk Pool v. Texas Workers' Compensation Commission*, 74 S.W.3d 377, 383 (Tex. 2002). Neither of these requirements is satisfied.

49. To determine whether the city's payment of public funds to abortion-assistance organizations serves "legitimate public purpose," a court must find that the city has: "(1) ensure[d] that the statute's predominant purpose is to accomplish a public purpose, not to benefit private parties; (2) retain[ed] public control over the funds to ensure that the public purpose is accomplished and to protect the public's investment; and (3) ensure[d] that the political subdivision receives a return benefit." *Id.* at 384.

The Reproductive Justice Fund fails this test. The "predominant purpose" of these expenditures is to benefit private parties: the abortion-assistance organizations and the pregnant women who travel out of state to kill their unborn children.[5]

50. The grant of money to these abortion-assistance organizations also fails to provide a "clear public benefit in return." *Id.* at 383. There is no "clear public benefit" from providing taxpayer subsidies to organizations that help women abort their pregnancies in another state.

51. Because the provision in the city's budget establishing the Reproductive Justice Fund is "inconsistent with" article III, section 52(a) of the Texas Constitution, it should be declared invalid under the Uniform Declaratory Judgment Act.

52. And because the city's officials are violating article III, section 52(a) of the Texas Constitution by providing taxpayer money to abortion-assistance organizations, their expenditures of taxpayer money are *ultra vires* and must be enjoined.

## CAUSES OF ACTION

53. The plaintiffs bring their claims for relief under the Uniform Declaratory Judgment Act. They also bring suit under *City of El Paso v. Heinrich*, 284 S.W.3d 366, 368–69 (Tex. 2009), which authorizes *ultra vires* claims against public officials who act in violation of state law.

54. The plaintiffs do not contend that the Texas Penal Code or the abortion and murder statutes on which they rely establish a private right of action or give them standing to sue anyone who violates those laws. *See Spurlock v. Johnson*, 94 S.W.3d 655 (Tex. App.—San Antonio 2002, no pet.) ("[T]he Texas Penal Code does not

---

5. The allegation that the "predominant purpose" of these expenditures is to benefit abortion-assistance organizations and pregnant women who travel out of state to abort is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. *See* Tex. Civ. Prac. & Rem. Code § 10.001(3).

create private causes of action"). The plaintiffs' standing comes from *Bland Independent Sch. Dist. v. Blue*, 34 S.W.3d 547, 556 (Tex. 2000), which gives taxpayers "standing to sue in equity to enjoin the illegal expenditure of public funds," and their causes of action come from the UDJA, which gives private citizens a cause of action to sue municipalities that enact invalid or unconstitutional ordinances, as well as *Heinrich*, which gives private citizens a cause of action to sue public officials who act *ultra vires* by violating state law. The budgetary provision establishing the Reproductive Justice Fund is invalid—and the actions of city officials are *ultra vires* and unlawful—*because* they violate and are "inconsistent with" a state-law criminal prohibition, but that does not immunize an allegedly unlawful expenditure of taxpayer funds from judicial review.

## DEMAND FOR JUDGMENT

The plaintiffs demand the following relief:

a.  a declaration that the provision in the city's budget establishing the Reproductive Justice Fund is invalid because it is "inconsistent with . . . the general laws enacted by the Legislature of this State" under article XI, section 5 of the state constitution;

b.  a declaration that the provision in the city's budget establishing the Reproductive Justice Fund is invalid because it violates the state constitution's gift clause;

c.  a declaration that the Reproductive Justice Fund may not be used to provide any taxpayer money to Jane's Due Process, Avow, the Buckle Bunnies Fund, the Lilith Fund for Reproductive Equity, or any other organization in Texas that "procures" drug-induced abortions, aids or abets self-managed abortions in Texas, or aids or abets drug-induced abortions in which the pregnant woman swallows either of the two abortion-inducing drugs in Texas, or expels her unborn child in Texas;

d.  a temporary and permanent injunction that prohibits the defendants from providing any taxpayer money to Jane's Due Process, Avow, the Buckle Bunnies Fund, Sueños Sin Fronteras, the Lilith Fund for Reproductive Equity, or any organization in Texas that "procures" drug-induced abortions, aids or abets self-managed abortions in Texas, or aids

or abets drug-induced abortions in which the pregnant woman swallows either of the two abortion-inducing drugs in Texas, or expels her unborn child in Texas;

e.     an award of nominal and compensatory damages;

f.     an award of costs and attorneys' fees; and

g.     all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

JOHN C. SULLIVAN
Texas Bar No. 24083920
JACE YARBROUGH
Texas Bar No. 24110560
S|L Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, Texas 75104
(469) 523-1351 (phone)
(469) 613-0891 (fax)
john.sullivan@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

Dated: March 25, 2024

 /s/ Jonathan F. Mitchell 
JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

I certify that on March 25, 2024, I served this document through the electronic filing manager upon:

Kennon L. Wooten
Lauren Ditty
Scott Douglass & Mcconnico LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701-2589
(512) 495-6300 (phone)
(512) 495-6399 (fax)
kwooten@scottdoug.com
lditty@scottdoug.com

*Counsel for Defendants*

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Plaintiffs*

# Exhibit 1

# West's Texas Statutes and Codes

Volume 4 SUPERSEDED

## REVISED CIVIL STATUTES

Articles 2461 to 5561

ST. PAUL, MINN.
WEST PUBLISHING CO.

COPYRIGHT © 1974

By

WEST PUBLISHING CO.

deformity or injury, by any system or method, or to effect cures thereof.

2. Who shall diagnose, treat or offer to treat any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or to effect cures thereof and charge therefor, directly or indirectly, money or other compensation; provided, however, that the provisions of this Article shall be construed with and in view of Article 740, Penal Code of Texas [1] and Article 4504, Revised Civil Statutes of Texas as contained in this Act.

[1925 P.C.; Acts 1949, 51st Leg., p. 160, ch. 94, § 20(b); Acts 1953, 53rd Leg., p. 1029, ch. 426, § 11.]

[1] See, now, article 4504a.

### Art. 4510b. Unlawfully Practicing Medicine; Penalty

Any person practicing medicine in this State in violation of the preceding Articles of this Chapter shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than Fifty Dollars ($50), nor more than Five Hundred Dollars ($500), and by imprisonment in the county jail for not more than thirty (30) days. Each day of such violation shall be a separate offense.

[1925 P.C.; Acts 1939, 46th Leg., p. 352, § 10.]

### Art. 4511. Definitions

The terms, "physician," and "surgeon," as used in this law, shall be construed as synonymous, and the terms, "practitioners," "practitioners of medicine," and, "practice of medicine," as used in this law, shall be construed to refer to and include physicians and surgeons.

[Acts 1925, S.B. 84.]

### Art. 4512. Malpractice Cause for Revoking License

Any physician or person who is engaged in the practice of medicine, surgery, osteopathy, or who belongs to any other school of medicine, whether they used the medicines in their practice or not, who shall be guilty of any fraudulent or dishonorable conduct, or of any malpractice, or shall, by any untrue or fraudulent statement or representations made as such physician or person to a patient or other person being treated by such physician or person, procure and withhold, or cause to be withheld, from another any money, negotiable note, or thing of value, may be suspended in his right to practice medicine or his license may be revoked by the district court of the county in which such physician or person resides, or of the county where such conduct or malpractice or false representations occurred, in the manner and form provided for revoking or suspending license of attorneys at law in this State.

[Acts 1925, S.B. 84.]

## CHAPTER SIX ½. ABORTION

Article
4512.1 Abortion.
4512.2 Furnishing the Means.
4512.3 Attempt at Abortion.
4512.4 Murder in Producing Abortion.
4512.5 Destroying Unborn Child.
4512.6 By Medical Advice.

### Art. 4512.1 Abortion

If any person shall designedly administer to a pregnant woman or knowingly procure to be administered with her consent any drug or medicine, or shall use towards her any violence or means whatever externally or internally applied, and thereby procure an abortion, he shall be confined in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled. By "abortion" is meant that the life of the fetus or embryo shall be destroyed in the woman's womb or that a premature birth thereof be caused.

[1925 P.C.]

### Art. 4512.2 Furnishing the Means

Whoever furnishes the means for procuring an abortion knowing the purpose intended is guilty as an accomplice.

[1925 P.C.]

### Art. 4512.3 Attempt at Abortion

If the means used shall fail to produce an abortion, the offender is nevertheless guilty of an attempt to produce abortion, provided it be shown that such means were calculated to produce that result, and shall be fined not less than one hundred nor more than one thousand dollars.

[1925 P.C.]

### Art. 4512.4 Murder in Producing Abortion

If the death of the mother is occasioned by an abortion so produced or by an attempt to effect the same it is murder.

[1925 P.C.]

### Art. 4512.5 Destroying Unborn Child

Whoever shall during parturition of the mother destroy the vitality or life in a child in a state of being born and before actual birth, which child would otherwise have been born alive, shall be confined in the penitentiary for life or for not less than five years.

[1925 P.C.]

### Art. 4512.6 By Medical Advice

Nothing in this chapter applies to an abortion procured or attempted by medical advice for the purpose of saving the life of the mother.

[1925 P.C.]

# Exhibit 2


August is National Immunization Awareness Month

FOR MORE INFO


SAN ANTONIO REPORT

NONPROFIT JOURNALISM FOR AN INFORMED COMMUNITY

GOV & POLITICS

# Abortion access advocates face impostors, legal threats as trigger law nears

 by **Iris Dimmick**
August 1, 2022

Buckle Bunnies Fund co-founder Makayla Montoya Frazier, center, attends a press conference hosted by San Antonio Councilwoman Teri Castillo (D5). Castillo and other council members proposed a resolution condemning Texas' abortion ban and recommending that no city funds be used to investigate criminal charges related to the ban. Credit: Scott Ball / San Antonio Report

Amid the hundreds of pending requests for assistance from or to volunteer with the abortion access fund she co-founded,

0084

Makayla Montoya Frazier knows there could be a trap lurking behind every phone call or text.

"There are definitely people who are trying to catch us right now," said Montoya Frazier of the **Buckle Bunnies Fund**, which helps Texans access and pay for abortions. That includes paying for transportation to a state where abortion is still legal, sharing information about abortion pills and guiding women through their self-managed medication abortions.

Some are contacting Buckle Bunnies posing as either someone who needs an abortion or as a potential volunteer in attempts to gather evidence for criminal charges or a civil case against the fund, Montoya Frazier and/or other volunteers, she said.



San Antonio Water System | CONNECT H₂O

a new, SMARTER way to save money *and* water

GET CONNECTED ▶▶▶

How does she know?

"It's pretty obvious" given the answers — or non-answers — she gets when she asks certain questions, she said. "People, like, either can't answer them or they just won't."

Montoya Frazier declined to say what kinds of questions she asks that are impostor giveaways. "Because the services that we provide are so wraparound [and intimate], it's usually pretty easy to weed out who's real and who's not real."

She's well aware of the risks that come with the work Buckle Bunnies does. Because of them, most Texas nonprofit abortion access funds have stopped distributing money and clinics in the state have stopped providing abortions.

But not the Buckle Bunnies.

"If we're scared of lawsuits, then nobody gets care," Montoya Frazier said.



TEXAS BIOMEDICAL
RESEARCH INSTITUTE
HEALTH STARTS WITH SCIENCE

Science that Inspires.
Science that Delivers.
Science that Heals.

LEARN MORE >

## Layers of criminal, civil consequences

0085

Abortion access advocates face an unprecedented, murky legal landscape crafted by Republican lawmakers and anti-abortion activists. There are several layers of laws — new and old — that restrict abortion in Texas and prescribe high punishments for providers.

After the U.S. Supreme Court struck down Roe v. Wade last month, the Texas Supreme Court allowed the state to enforce its 1925 abortion ban, which exposes anyone who helps someone get an abortion to fines and lawsuits. So far, there haven't been any reports of criminal charges brought under the 1925 law.

Texas' "trigger law," which will ban nearly all abortions starting on Aug. 25 in the wake of Roe V. Wade being overturned, will add criminal charges for doctors who could face life in prison and fines up to $100,000 for an illegal abortion.

It does not criminalize people who receive abortions, and it allows narrow exceptions to save the life of the mother or to prevent "substantial impairment of major bodily function."

Bexar County District Attorney Joe Gonzales and other DAs across the state have said they **won't pursue prosecutions** under the 1925 law or the coming trigger law.

Securing medication for abortions via telehealth or mail was already illegal in Texas when **new penalties** went into effect in December 2021 that added jail time and a fine of up to $10,000 for anyone who prescribes the pills by those means.

**Senate Bill 8** from the 2021 legislative session will also remain in effect. That law, titled the Texas Heartbeat Act, allows anyone to sue someone accused of providing an abortion or assisting in any way after six weeks of pregnancy — before most women know they are pregnant.

"Any person who was complicit in these illegal abortions — including [provider] Whole Woman's Health employees, volunteers, and donors, and anyone who aided or abetted these illegal abortions in any manner, apart from the formerly pregnant woman upon whom the illegal abortion was performed — is equally liable under the Texas Heartbeat Act and equally guilty of murder," wrote attorney Jonathan Mitchell, the former solicitor general of Texas and architect of Senate Bill 8, in a recent court filing.

SB 8 is being challenged in court by abortion access funds, a process that will likely take years to wind through the appeals process.

The risk of abortion funds and clinics being prosecuted by "politically motivated" district attorneys is "very real," said Elizabeth Myers, an attorney who represents several abortion access funds, including Lilith Fund, which like Buckle Bunnies serves all of Texas.

Until each law is reviewed by a court — either through a court declaration or a criminal prosecution — the legal landscape of abortion is in limbo, she said.

"The problem with the [criminal prosecution] option is that it requires that you subject yourself to the immediate harm of the criminal justice system," Myers said. "And that's a lot to ask."

That threat of immediate harm has caused most abortion providers and assistance funds to halt their work.

"I don't think there's a point where we've lost all hope," Lilith Fund board member Vanessa Martinez told the San Antonio Report. "We're looking at ways that we can continue to help Texans in need. We know that it can't include abortion access at this point in time, but that doesn't mean that we're not going to try to find ways to assist."

**0086**

The Lilith Fund's **hotline** remains active three days a week.

"It's still open for people to get First Amendment-protected information on where else they can go for resources," said Erika Galindo, organizing program manager for Lilith Fund in San Antonio. "We're hoping to slowly — as we're figuring it out — unveil some of the next steps of what this might look like, but we do know that we're walking a very fine line."

The fund has launched the **Texas Abortion Hype Squad**, a program that trains volunteers to spread the word about how people can access abortion.

"It's our duty to protect each other by giving each other accurate information," Galindo said.

Protesters demonstrate in downtown San Antonio following the Supreme Court's decision in June to overturn Roe v. Wade.
Credit: Nick Wagner / San Antonio Report

## 'Fear campaign'

Abortion access funds are not going away, Myers said. "They've just pivoted their operations a bit until they get clarity that they can return to everything that they were doing before."

Until then, they'll have to deal with legal threats. SB 8 author Mitchell has already filed numerous petitions in an attempt to get testimony and other evidence about abortion procedures or assistance that may have been illegal.

Those petitions are "a continuation of the fear campaign that started several years ago," Myers said, and they're not being done by Mitchell.

Buckle Bunnies Fund has received such a petition from former Big Spring Mayor Shannon Thomason, Montoya Frazier said. Under Thomason in 2020, Big Spring essentially **outlawed abortion within city limits**.

Montoya Frazier said she's also received two cease-and-desist letters this year that demand Buckle Bunnies halt operations. She said these "intimidation tactics" are designed to get Buckle Bunnies to stop its work.

Because the fund's founders have chosen to continue, they're at greater risk than funds that have stopped.

Montoya Frazier acknowledges the increased emotional toll this work now takes, work that still brings her a deep sense of satisfaction.

"It's so stressful. I just want to do my job," she said. "I have to take all these other tiny steps, which means I'm taking time [away from] helping people."

**MORE FROM SAN ANTONIO REPORT**

**Bexar County budget proposal keeps the current tax rate, ignores sheriff's bid for more deputies**
by **Andrea Drusch**

**Progressive group raising $25 million to boost Democrats this November and beyond**
by **Patrick Svitek, The Texas Tribune**

**CPS Energy has found its CEO**
by **Lindsey Carnett**



© 2022 Nonprofit journalism for an informed community.
Proudly powered by Newspack by Automattic

# Exhibit 3

# The New Mexico Provider Trying to Save Abortion for Texas Women

This 73-year-old physician is on a mission to make his clinic a refuge for women's health care on the border

By Jada Yuan

May 10, 2022 at 12:07 p.m. EDT

Franz Theard plies his trade in the sunniest of shadow worlds. His innocuously named Women's Reproductive Clinic of New Mexico is hidden in plain sight, down a slope in a strip mall, neighboring a Subway and a State Farm office, in a border town of a border town. It's less than a mile from the Texas state line, amid the sprawl of El Paso, which is itself a crossing to Ciudad Juárez in old Mexico, as folks here call it, surrounded by fireworks stores and delicious tacos and the desert beyond.

Here, this 73-year-old Haitian American OB/GYN and abortion provider sits in windowless exam rooms,

handing patients pills to end their pregnancies, skirting Texas law by a trick of New Mexico geography. (And, if the protesters stationed outside during all business hours are to be believed, charting his path to hell.) He is alone on the southern edge of America, at the westernmost corner of the country's second biggest state. And if *Roe v. Wade* is overturned, Theard soon may be one of the only abortion providers in the western United States.



How George Floyd Spent His Final Hours

Agony, Endurance and Escape: Ukraine in Pictures

"You're going to go to your favorite hospital and blame the cramps on — tell them you're having a miscarriage," Theard (pronounced thay-ARD) told 32-year-old mother of three Cynthia Mena, explaining that she'd need a shot of medication because pregnancy termination can trigger her blood type to create antibodies that could attack future pregnancies. "Just don't tell them about the pill. I recommend that you don't," Theard went on. "They'll treat you like you killed Jesus or something." (Texas is full of antiabortion OB/GYNs who often shame their patients, Theard explained.)

Gov. Greg Abbott (R) has been an unstoppable force behind Texas's S.B. 8, a.k.a. the "Heartbeat Act," a law imposing some of the tightest abortion restrictions in the country. Ever since it went into effect in September, Theard's clinic has had an influx of patients from East Texas who've suddenly found themselves without options in their own state. Many of them, like Mena, went to clinics in big cities like Dallas, Houston, Austin or San Antonio, only to get turned away because a gestational heartbeat could be detected on an ultrasound, which usually happens around six weeks — often before most women know they're pregnant. Providers have been incentivized to stick to the law, because it also contains provisions for people to sue anyone — from providers to Uber drivers — who "aids and abets" an illegal abortion.

Theard thought S.B. 8 would go the way of 2013's H.B. 2, which banned abortion after 20 weeks and which

**0091**

Abbott (then Texas's attorney general) fought tirelessly to keep in place, before it was struck down by the U.S. Supreme Court in 2016. "We figured the same thing was going to happen. They were just rattling their sabers. I felt confident that this can't last," said Theard. "It doesn't make any sense, people putting bounties on doctors. But it's here and it looks like it's gonna stay."

Now he's made it his mission to persuade the women of East Texas to come west instead of going to Oklahoma, Louisiana, Kansas or Arkansas — all states with mandatory 24- to 72-hour waiting periods, and where getting an appointment may take two to three weeks because of the sudden increased demand from Texas. And in some of those states, the laws are getting increasingly more strict. "Thank God we're in New Mexico," which has some of the most liberal abortion laws in the country, says Theard. That demand will only increase if *Roe v. Wade* is overturned and Texas bans abortion outright, as is expected.

Just because Texas is making it almost impossible to get an abortion doesn't mean demand is down. Studies released in March showed that the law didn't stop Texas women from getting abortions — they just went out of state. Last year, Theard says, his clinic treated 1,845 abortion patients, in the middle of the pandemic. And that's before S.B. 8 started driving patients his way. In April he did 260 abortions, up 85 from the same month last year; half were from East Texas. Theard estimates that 95 percent of all of his patients are Hispanic.

Theard opened his office on weekends to make it easier for patients to come from East Texas and got his staff on board with the cause. "I don't need the money, to be honest with you," he told me, when I visited his clinic on a Saturday in late March. Fliers supporting Beto O'Rourke in his governor's race against Abbott were displayed around the waiting room. "People ask me, 'What's your goal? What do you want to do? I am so left-wing, liberal Democrat. I would like for Santa Teresa, New Mexico, to be almost like continuing getting abortion pills in El Paso — to be known as the exception to the S.B. 8 rule in Texas. Anybody who gets pregnant, you don't really have to leave the state of Texas to get your pill." (Technically, you do have to leave Texas.)

To that end, he's offering incentives, like rolling the tax New Mexico charges for the procedure into a flat $700 fee, or the free abortions he offered on International Women's Day in March and on Armed Forces Day in May. For those traveling long distances, he offers $100 to $150 back as a fuel rebate, on a discretionary basis and if the journey seems like a financial hardship. ("If you tell me you flew in your private jet, I don't give you a refund," he says.)

Mena, who works in accounts receivable for a tire company, had her third child just a year ago and recently found out that her husband cheated on her. She doesn't want to add another child to the mix. And when a clinic in Dallas turned her down, she found Theard on Google and decided it was worth driving 10 hours from Irving, Tex., to see him. All told, she'll have spent more than $1,400: $700 for the procedure, and the rest for gas, two days of a rental car and one night in a hotel. She's a fan of Theard's — but not of the new law. "I was very disappointed and angry, and it's not fair," she said. "Because I had to go all the way to another state so I can get a service that I need."

0092

Inside Theard's waiting room on that March Saturday, 14 patients sat in silence, accompanied by their sisters, mothers or female friends, staring at their phones or at the soundless Scott Bakula procedural playing on TV. Because the staff recognizes how uncomfortable and taboo this all is, they call patients into their appointments with numbers, not by name. "We have patients that come, like, with all these insecurities, nervous," says medical assistant Rocio Negrete. "They're afraid to say the 'abortion' word. When they call, they're like, 'I have a situation. I don't know how to say it.' "

Since the new law, that fear has gotten worse. "We do have some patients that come in like, 'No one's gonna arrest me, right? No one's gonna be outside waiting for me?' " says medical assistant Elizabeth Hernandez. They also worry that they're going to get arrested on their way back to Texas, or when they go to the pharmacy for prescriptions for antibiotics and pain medication.

Theard has wire-rimmed glasses, a warm smile surrounded by a salt-and-pepper goatee, and a penchant for dark humor that seems to put his patients immediately at ease. He asks them where they're from, what they do, and subtly peppers in questions about their partners — and parents, if they're younger — to make sure no one is forcing them to have this procedure. He often urges patients to use birth control or a different method if theirs failed them. (His favorite sign-off: "Don't be a repeat customer. We love you, but don't come back.")

He immigrated to Washington, D.C., from Haiti in 1964, when he was 15, the biracial son of a German mother (a secretary) and Haitian father (government statistician). He was admitted to Catholic University that summer without a high school diploma and with minimal ability to speak English. (He spoke only French and German but later picked up English from watching horror films and American football.) Medical school at George Washington University allowed him to defer fighting in the Vietnam War.

He figured out early on that he wanted to be an OB/GYN specializing in high-risk pregnancies. "People don't die, more or less," he explains about his preference. "Usually it's a happy experience, and I've always enjoyed working with women."

Abortions, which Theard started doing in 1973 during his residency at what is now MedStar Washington Hospital Center in D.C., were a natural extension. *Roe v. Wade* had just been decided by the Supreme Court that January, and all of Theard's medical idols not only had their own abortion practices but were teaching him how to perform the procedure.

He had been a young man when abortion wasn't legal and had seen his friends taking their girlfriends up to New York to get abortions from Haitian doctors who were "charging them a lot of money because they were taking a big risk," he says. "But once *Roe vs. Wade* became the law, I mean, I've never seen clinics so busy. Just like when you discovered the birth control pill. It was a big demand."

He continued doing abortions on a military base in Frankfurt, Germany, after the Army held him to his

deferred draft. A fellowship at the William Beaumont Army Medical Center brought him to El Paso. He left the Army to open his OB/GYN practice downtown in 1983, and an abortion clinic followed the next year. The New Mexico clinic came in 2010, both because Theard anticipated the overturn of *Roe* and because he couldn't stand the paperwork and "constant harassment" connected with performing abortions in Texas; he closed the El Paso clinic last year. In Texas, he would get fined constantly for technicalities, deal with surprise inspections and have to pay for patient literature ("with stupid stuff like 'abortion causes breast cancer' ") that the state demanded he pass out.

Following a nasty bout of covid-19 late last year, he retired from doing surgical abortions, which means the closest place to get one is four hours north in Albuquerque. He's too old, he says, but a lot of the decision is emotional. "I mean, imagine crushing something and taking it out. It's not pleasant," he says. "It's heartbreaking to a certain extent. Honestly, I didn't like to do it. I hate to admit it to myself. It's not just because I'm getting old. I just didn't want to deal with it. It was hard." He did it for 34 years.

Still, he continues to do medical abortions. "It feels satisfying to be able to help people who are desperate — and they are desperate — to get something done," he says. "And I can't understand why the other OB/GYNs don't feel the same way. It's part of what we do. I think abortion is woman's care."

s the last patient filed out on Saturday afternoon, Theard was getting a rundown from his nursing staff about the man they'd had to call the police on that morning. "I've seen that scenario before," Theard said. "We haven't had one of those guys in a while."

For once, Theard wasn't the target of anyone's rage. An agitated young man in a tracksuit had stormed into the women-only waiting area at least three times demanding to see his wife, who was in the treatment rooms. She had come out to placate him and returned to the back, only to have him storm in again. Soon, they were outside, locked in a screaming match.

"He was angry, blamed her for having an affair," said Theard, who had managed to give her a sonogram and then refunded all her money. The last time they had called the police, a man and his wife were both hauled to jail, and then they sued Theard for wrongful arrest, a case that was dismissed.

Outside the clinic, five protesters handed out brochures reading "Pray for Unborn Babies." A parked van was offering free ultrasounds — a technique for persuading the undecided. As I got out of my car, I was peppered with questions about what Jesus would think of what I was doing, until a distinguished and wiry older gentleman named Juan Carlos, who serves as security, ushered me inside.

"I know them all," Theard says of the protesters, some of whom trade hellos with him. He's fine with them asking to talk to any woman who seems undecided. "I don't have any problems with that," he says. "I mean, if a patient can be swayed that way, then she didn't want to have the abortion."

Once or twice a month, one man will place dozens of signs all the way down the street. "The signs are, like,

really, really ugly. There's one, 'This is what's for lunch: shredded baby,' " says Hernandez. Or they'll compare the clinic to Auschwitz or condemn Theard by name. The man has hung baby dolls in the trees and left doll parts and baby shoes at the clinic's door.

The clinic is in regular contact with the FBI. It's ostensibly for the staff's protection; Theard believes they are simultaneously being surveilled. He installed security cameras on the FBI's guidance. "I think it helps, and the girls like it because if somebody gets irate, there's a camera in the waiting area and they know they really can be documented," he says.

He doesn't wear a bulletproof vest, and never has, even though clinics were bombed in the 1980s, and doctors were shot and killed in the mid-'90s and late 2000s. Sometimes people would come into the clinic to cast a curse; staff once caught someone with white powder trying to perform some kind of ritual. In the '80s, members of a group called Operation Rescue would block the entrance to Theard's clinic in downtown El Paso, pulling women as they tried to enter, telling Theard they knew where he lived.

And they did know where he lived. They'd come to his house and march around his cul-de-sac for hours on end, terrifying his first wife, and daughter and son, who were 7 and 8 at the time. "It was not a pleasant time, so to speak," he says. "But my two kids who bore the brunt of the stress are, thank God, liberal Democrats like me." The last time it happened was three years ago: Someone chalked his driveway with antiabortion messages like "baby killer."

In a way, he respects their stamina. "*Roe* was a liberation for my generation, but then we got lazy. We weren't forceful enough," he says. While there have been street demonstrations since the leaked Supreme Court draft decision, Theard says that since the early '90s, he has never seen an abortion rights person ("not even a crazy one") outside his clinic to counter the antiabortion demonstrators. "A lot of blah-blah, but no on-the-ground support. They did not walk the walk. It's just like everybody's so scared."

He worries that he's part of a dying breed. Everyone he knows who owns an abortion clinic in Texas is 70 or older. "We're all baby boomers," he says. "It's important, but I can't find a young doctor who wants to do it." He worries about what will happen when he's gone and hopes someone who can do surgical abortions will move to the area. "I don't have a plan B," he says. "I'm recruiting."

*Jada Yuan is a Washington Post staff writer.*

# Exhibit 4

Abortion

# 'I would wish this on absolutely no one': How three women dealt with pregnancy in the year since Texas' six-week abortion ban

To mark the first anniversary of SB 8 going into effect, The 19th spoke with Texans who sought an abortion in this past year. Each has a different story. But all shared

**0097**

similar sentiments: anger, sorrow, frustration and fear.

Tiff found out she was

**Shefali Luthra**
Health Reporter



**Published**      August 29, 2022, 4:13 a.m. PT

pregnant on New Year's Day.

Her period was three days late, just enough to suspect that something was off. Still, when she saw the two pink lines, she was shocked.

She was 16. She didn't know what to do or what would happen with her parents, whom she describes as conservative. "I was like, 'Oh my God. This is it. I'm not going to have a place to live. They're going to kick me out,'" she recalled.

**0098**

Tiff, whose full name has been withheld to protect her privacy, wanted an abortion. She went to a gynecologist, who told her she was five weeks and five days pregnant. Since September 1, 2021, Texas law has banned abortion past six weeks of pregnancy.

Her parents didn't approve of abortion as an option. And because she is a minor, state law required that they would have to sign off on any abortion, unless she could get a state judge to deem her mature enough to decide for herself — a process that could take weeks.

With all of those factors at play, it was all but impossible to get an abortion in Texas. Tiff, who lives just outside of Houston, could theoretically have tried to go out of state — but getting the funds to do that would've required convincing her parents. She also considered trying to find abortion pills online. But if none of those options worked, she would give birth shortly after her 17th birthday — still a child herself, living at home.

# A newsletter you can relate to

Storytelling that represents you, delivered to your inbox.

you@example.com  →

I agree to <u>the terms</u>

"I promised myself when I was younger that I would absolutely never raise a kid in my house with my parents," she said. "I just don't feel like I can give the baby what he needs to have a good life."

September 1 will mark one year since Texas became the first state to ban most abortions. The state's law, known as Senate Bill 8, was without precedent. Rather than criminal punishment, it relied on civil litigation — anyone who "aided or abetted" an illegal abortion could be sued for $10,000. That novel structure allowed it to stay in effect even with Roe v. Wade in place.

Six weeks is an incredibly short window: Because of how pregnancies are dated — people learn they have conceived at the first missed menstrual period, at which point they are already technically four weeks pregnant — the law gave people two weeks at the most to get a legal abortion in the state of Texas.

SB 8 offered a first glimpse into a world without Roe, which for nearly five decades protected the federal right to an abortion. It also provided an early clue that the current Supreme Court, which upheld the Texas abortion ban, might be prepared to overturn the 1973 case. So this summer, when five of the court's justices struck down Roe — giving states the power to directly and completely outlaw abortion — health care providers, policy researchers and legal experts across the country already had a sense for just how seismic the impact would be. In Texas, they had already seen a trial run.

In the past year, the law's impact has been expansive. Clinics in nearby states — Oklahoma, Kansas, New Mexico, Colorado and Louisiana — reported a surge in new patients traveling from Texas. Wait times for an abortion ballooned, jumping from a few days to as long as four weeks. The law even inspired copycat legislation in other states, including a law in Oklahoma that took Texas' punitive structure and applied it to virtually all abortions. That ban took effect in May, banning abortion in yet another state two months before Roe would be overturned.

READ NEXT: The midterms' big issues — abortion and the economy — are supercharged in Nevada's Senate race

In 2020, the last full year before SB 8 took effect, Texas recorded about 55,000 abortions performed in the state — the third most in the country, behind only Florida and New York. In 2021, the state recorded closer to 50,000, and the number of abortions performed in September, October, November and December — after the law took effect — fell by about half compared to the previous months in the year. Data from the first three months of 2022, the latest available, shows the number of abortions never picked up; each month, about half as many abortions were performed in state compared to the same timespan a year prior. As of March, about 1,400 people in Texas were traveling out of state for an abortion each month. The number of people requesting medication abortion pills from Aid Access, a European medical service, tripled, research suggests.

The landscape for Texans with unintended pregnancies has completely changed. While some successfully got an abortion in a clinic — either in their home state, or after traveling hundreds of miles to another — countless other did not. Some tried to induce abortions at home with medication abortion. Still others carried their unwanted pregnancies to term.

The 19th spoke with three Texas women who sought an abortion in this past year. Each has a different story. But all shared similar sentiments: anger, sorrow, frustration and fear.

"I would wish this on absolutely no one," Tiff said.

After learning she was pregnant, Tiff tried for months to find an abortion. But she worried that leaving the state for a procedure could open her up to prosecution when she came home. (It would not.) Her parents' disapproval made it even harder to consider leaving the state for an abortion.

Tiff looked online for any website that might help her find medication abortion pills. She posted on Reddit, asking for advice. One of her friends gave her mugwort, an herb commonly used by people trying to induce abortions but that evidence suggests is ineffective. She may have tried other herbs, too, she said, but those months are such a blur that it's hard to remember.

At five months pregnant, Tiff was hospitalized due to concerns about her mental health brought on, she said, by the stress of her pregnancy. It was only then that the reality set in. She was pregnant. There was no way she was getting an abortion. And in a few months, she would have a child.

On August 11, Tiff, 17, gave birth to a son. Her parents are supportive. Her ex-boyfriend is not. Even now, with a weeks-old baby boy, it's hard for Tiff to fathom what she has been through.

She loves her baby. "But I still ideally would have had that abortion," she said.

Minors like Tiff have faced a particularly onerous burden. In Texas, people younger than 18 were required to obtain parental consent before they could get an abortion. If their parents were unwilling to provide that, the minor could appeal to a judge in a process known as "judicial bypass" to argue that they were mature enough to get the procedure.

That process could take days or even weeks depending on where in the state someone lived and how quickly the court moved, said Irma Garcia, the client services manager for Jane's Due Process, a Texas advocacy group that helps minors who are seeking abortions. Those delays could mean missing the six-week window. Unless their parents offered consent, people younger than 18 were typically unable to get approved for an abortion under the Texas law, Garcia said.

And for most, traveling out of state — neighboring New Mexico, for instance, does not require parental notification or consent for minors to get an abortion — wasn't viable, either. Teens were less likely to have the money, resources and privacy to take multi-day trips without their parents or caretakers knowing.

"Many minors cannot safely get out of the house and maintain confidentiality," Garcia said. "This was a full abortion ban for many youth in Texas."

Things are only more difficult now. Since June 24, when Roe was overturned, Texas has begun enforcing a law banning virtually all abortions. Clinics have closed their doors, with some making plans to relocate to neighboring states. Texas' abortion funds — nonprofit organizations that help people pay for abortions — have stopped covering those costs. And many of the states people in Texas once turned to — Oklahoma, Arkansas, Louisiana and Mississippi — have banned abortions in most circumstances.

"The last year was certainly incredibly difficult for abortion providers, for people needing abortions, for the people who were supporting them," said Kari White, an associate professor at the University of Texas at Austin and the lead investigator of the Texas Policy Evaluation Project, which has studied the impact of Texas' six-week abortion ban. "The circumstances are just far poorer now with no in-state abortion being available, and many out-of-state options being shut off, and financial assistance really being curtailed."

(CHANELLE NIBBELINK FOR THE 19TH)

Those neighboring states were critical, said Kaleigh, a Dallas resident. (Kaleigh has told few people about the abortion and requested her full name be withheld.) The 29-year-old took a pregnancy test this past April after she missed her period twice and battled daily nausea. She'd been putting it off, she said — she and her boyfriend weren't ready to be parents. She was scared of what she would see.

Kaleigh knew about the six-week abortion ban. So she opened her computer and searched the internet for "pregnancy clinics." One kept appearing at the top of her search list. So she made an appointment, and that Tuesday showed up for her sonogram at the Prestonwood Pregnancy Center, a crisis pregnancy center in the Dallas suburb of Richardson. (The center did not respond to multiple requests for comment.)

"All they did was just asked me about why I was trying to … get an abortion. 'Do you want to see your baby?'" she recalled.

After the sonogram was complete, they showed her pictures, she said, and gave her a critical piece of information: Kaleigh was eight weeks pregnant. She could not get an abortion in Texas.

Kaleigh and her boyfriend were on the same page. They could drive to another state for an abortion — they had a car, and they had the money. They could work remotely if needed. So she started calling clinics. She tried some in Texas, just in case somehow, they might make an exception. When none could see her, she called the three abortion providers then operating in Louisiana. The earliest appointment she could get wouldn't be for three weeks.

She couldn't bear the idea of being pregnant that long.

Finally, Kaleigh found something: a clinic in Sunland Park, New Mexico, just a mile from the Texas border city El Paso. The drive was nine hours, and they could see her that Friday. So on Thursday night, she and her boyfriend drove west. The next morning, she got two pills at the clinic: mifepristone to take there and misoprostol to take at home.

The abortion was a relief, but Kaleigh couldn't stop thinking about what it took to get it. Ten years ago, at age 19, she'd had an abortion. Then, like in April, she'd found out at eight weeks pregnant.

In 2012, though, she could legally get an abortion in Texas. Per state law, she still had to make multiple visits to the clinic. The process took about a week in total, but she didn't have to worry about driving for hours across state lines, potentially navigating morning sickness while in transit.

"It was just so much more difficult to figure out how to safely do this, you know?" she said. "It wasn't a problem 10 years ago. Since the six-week ban, it's like a totally different place."

"I feel like the world hates women," she added. "How can we not take it that way?"

SB 8 is technically still on the books. But it's now no longer the dominant abortion ban in the state.

Since Roe was overturned, the Texas government began enforcing an abortion ban that predates Roe, one originally passed in the 1800s. It prohibits all abortions, with a narrow exception if the abortion is needed to save the pregnant person's life. This past Thursday, the state's trigger ban also took effect. That law replaces a near-total abortion ban with one that also makes abortion a felony, punishable with lifetime imprisonment and a fine of up to $100,000.

"I think it is probably more confusing now than it was a year ago," said White, the UT professor. "There are essentially no services here. With the exception of New Mexico facilities, and depending on what part of Texas you live in, facility-based abortion services are not nearby."

Instead, she said, people seeking abortions may try to induce them on their own, through what is called self-managed abortions. Some may use ineffective mechanisms, like certain herbs or vitamin C supplements. Others may do so through dangerous means, such as inflicting physical trauma on themselves.

(CHANELLE NIBBELINK FOR THE 19TH)

Abortion providers and reproductive rights advocates are instead trying to help people access mifepristone and misoprostol, the medication abortion pills that people can safely take from their homes. It's a process that requires knowing someone who can help people safely access authentic, accurately labeled pills.

Maria, also from Dallas, learned she was pregnant in January. Between her vomiting and abdominal pain, she thought she had a terrible stomach bug until she showed up at the hospital and was given a pregnancy test. (Maria is her middle name; she requested her full name be withheld because her family does not approve of the procedure.)

Maria, 27, was five weeks along when she found out. The hospital staff congratulated her, but she didn't want to be pregnant.

Theoretically, she could have made it to an abortion clinic. But her immigration status is tenuous. Would going to a clinic in Texas show up on her record? Could it jeopardize her ability to live in the United States? Her immigration concerns meant she couldn't travel out of state, either. She viewed self-managing as her only option.

She texted a woman she knew, someone who worked in reproductive health advocacy. That person had helped Maria six years ago, when she had her first abortion. They connected her with someone else who was based in Texas and could mail her abortion pills. By the time the pills reached Maria's house, she was six weeks pregnant.

READ NEXT: [The midterms' big issues — abortion and the economy — are supercharged in Nevada's Senate race](#)

When the first pills came, they were broken. Maria couldn't use them. When a second set of pills arrived she was seven weeks pregnant. She had heard stories about medication abortions — there could be hours of pain, and a good amount of blood. People had told her that if she needed to go to the hospital, she should just tell them she had miscarried; theoretically, no one would know the difference. But Maria was still afraid. What if someone in the hospital suspected she had an abortion? What if she was arrested anyway?

"I was just really freaked out. I was really scared," she said.

She took the pills alone in her apartment; the person who had gotten her pregnant didn't support her getting an abortion, and she didn't feel able to tell her friends or family. The pain from her abortion lasted two whole days — at some points, Maria said, "I thought I wanted to die." Even once the pain abated, her bleeding continued about a month longer. She felt awful, but she couldn't tell anyone.

"People were like, 'You look really pale.' I knew why I was pale," she said. "I was like, 'Oh, I'm weak, 'I haven't had water or eaten well.'"

Maria's body has recovered. But still, she rarely tells people she knows about the abortion. When she has talked about it, it's because she wants other people with experiences like hers to know that they're not alone.

As she has watched abortion rights erode in Texas, that kind of awareness feels even more critical, she said.

"I'm not the only one," she said. "There's a lot of girls wanting to have an abortion. And they're just scared."

**The 19th**

The 19th is a 501(c)(3) tax-exempt organization. Our stories are free to republish in accordance with these guidelines.

# Exhibit 5

LOCAL NEWS

# Anti-abortion groups sue City of San Antonio over $500,000 Reproductive Justice Fund

The city's lead attorney, meanwhile, says no decisions have been finalized over how $500,000 set aside for the fund will be used.



Author: **David Lynch (KENS 5)**
Published: **4:26 PM CDT October 17, 2023**
Updated: **11:13 PM CDT October 17, 2023**



SAN ANTONIO — Eight organizations, most of them based in San Antonio, have filed a lawsuit against the city over a controversial $500,000 line item in its recently approved budget intended to support nonprofits providing reproductive care.

The so-called Reproductive Justice Fund was established in September as city leaders were putting the final touches on next year's $3.7 billion operating budget. One City Council member, Marc Whyte, cited the fund when he voted against the budget on Sept. 14, while Councilman Jalen McKee-Rodriguez said it was his hope the money would be used to cover travel expenses for out-of-state abortions amid Texas' crackdown on the procedures.

Sponsored Links

**Heart Surgeon Begs Americans: "Stop Eating This Type Of Bread"**

There are certain "healthy" breads that you would have never guessed could be the cause of your fatigue.

Gundry MD

Watch Now

The new lawsuit, filed on Tuesday by the San Antonio Family Association (SAFA), Texas Right to Life and other groups, alleges San Antonio is breaking the law by engaging "in conduct in Texas that 'procures' a drug-induced abortion, even when the abortion is performed out of state." It's believed to be the first lawsuit targeting San Antonio over the Reproductive Justice Fund.

"The women and families of San Antonio who are facing a crisis pregnancy, and local taxpayers trying to make end's meet, to not deserve to be victims of city officials," SAFA board member Patrick Von Dohlen said in a statement.

The president of Texas Right to Life, John Seago said the fund will give money to criminal organizations.

"Those organizations are on record as breaking Texas law and so there's no way San Antonio can partner with them for any good," Seago said.

Interim Executive Director of the organizations cited in the lawsuit, Jane's Due Process, Jaymie Cobb said they were anticipating using the money from the city to help fund travel for teenage girls seeking an abortion out of the state.

"We're ready to fight, we're not going to stop fighting," Cobb said.

In February, a federal judge ruled Texas abortion funds who pay for travel and procedures out of state were likely safe from criminal prosecution.

However, Seago said he hopes a judge determines the actions of organization's like Jane's Due Process are illegal.

"We're asking this judge to go ahead and look at that and see that these activities from these organizations are actually illegal," Seago said.

District 10 councilman Marc Whyte called the lawsuit predictable. He was the only councilmember to abstain from voting on the city's annual budget after opposing the fund. He told KENS 5, that city government has no place in funding access to abortions.

0119



**Forget Spider-Sense! iPhone local Awareness Feature Gives You REAL-LIFE UPDATES!**

FEATURED BY

City officials responded by calling it "unfortunate" that taxpayer money will be used to fight the lawsuit.

"The facts are that a decision has not been made on how that money will be used," City Attorney Andy Segovia said in a statement. "The City Council will have an open work session to discuss the use of the funds that will be managed by the city's Metro Health Department. The funds will be distributed in accordance with state and federal laws."

>**Read the full complaint below:**



| | |
|---|---|
| Download this PDF | 1 of 52 |

Texans for Fiscal Responsibility, Bexar County Republicans, the Allied Women's Center of San Antonio, San Antonio Coalition for Life and United San Antonio are listed as co-plaintiffs in the lawsuit, along with 28 individuals. Mayor Ron Nirenberg and City Manager Erik Walsh are listed as codefendants.

The suit seeks an injunction blocking the city from providing money to abortion rights groups including Jane's Due Process and the Buckle Bunnies Fund, as well as compensatory damages and a declaration that the Reproductive Justice Fund violates state law.

**Related Articles**

0120

San Antonio City Council establishes Reproductive Justice Fund

>TRENDING ON KENS 5 YOUTUBE:



Suspect arrested after man found dead inside trash can; B...

## Here Are 23 Of The Coolest Gifts For Stocking Stuffers 2023

23 Hottest Cool Gifts For Holiday 2023 You'll Regret Not Getting Before They Sell Out

Best Tech Trend | Sponsored

Learn More

## 30+ Coolest Gifts Nobody Would Think Of

Trending Gifts | Sponsored

## Heart Surgeon Begs Americans: "Stop Eating This Type Of Bread"

There are certain "healthy" breads that you would have never guessed could be the cause of your fatigue.

Gundry MD | Sponsored

Watch Now

## Here Are 23 Of The Coolest Gifts For 2024

23 Hottest Cool Gifts For 2024 You'll Regret Not Getting Before They Sell Out

Best Tech Trend | Sponsored

Learn More

## Target Shoppers Say This Drugstore Wrinkle Cream Is Actually Worth It

BrunchesNCrunches | Sponsored

## Wildest Divorce Stories

Moneywise.com | Sponsored

Click Here

## Nationally-ranked San Antonio athlete puts on eye-popping performance

KENS

# Exhibit 6



# Exhibit 7



# ALBERT URESTI, MPA, PCAC
## Bexar County Tax Assessor - Collector

**\*\* IMPORTANT NOTICE \*\***

## 2022 REAL PROPERTY

**17638-004-0290**
**(ACCOUNT NUMBER)**

10/06/2022
19013

**LEGAL DESCRIPTION:**

**OWNER:**
COMEAUX PAUL J & ELIZABETH

SAN ANTONIO TX

**ACREAGE:** 00001.2228

**LOCATION**

| | APPRAISED VALUE | | | CAP VALUE | HOMESTEAD VALUE | | NON-QUAL VALUE |
|---|---|---|---|---|---|---|---|
| LAND | 82,450 | IMPR | 185,410 | 223,330 | 267,860 | | |

| AGR. MKT VALUE | PROD VALUE | | ASSESSED VALUE |
|---|---|---|---|
| | | | 267,860 |

| TAXING UNIT | EXEMPTIONS O65 | HOM | | | TAXABLE VALUE | TAX RATE | TAX AMOUNT |
|---|---|---|---|---|---|---|---|
| ROAD AND FLOOD | 0 | 56,572 | 0 | 0 | 166,758 | .02366800 | 20.99 |
| ALAMO COMM COLLEGE | 30,000 | 0 | 0 | 0 | 193,330 | .14915000 | 145.75 |
| HOSPITAL DISTRICT | 30,000 | 0 | 0 | 0 | 193,330 | .27623500 | 534.05 |
| BEXAR COUNTY | 50,000 | 53,572 | 0 | 0 | 119,758 | .27633100 | 231.22 |
| SA RIVER AUTHORITY | 5,000 | 10,714 | 0 | 0 | 207,616 | .01836000 | 38.12 |
| CITY - SAN ANTONIO | 85,000 | 26,786 | 0 | 0 | 111,544 | .54161000 | 350.15 |
| NORTHSIDE ISD | 23,330 | 40,000 | 0 | 0 | 160,000 | 1.1901000 | 1,092.01 |

**TAXES FOR 2022:** **$2,412.29**

*pd 10-25-2022 # 1665*

TAXES MAY BE PAID BY E-CHECK OR CREDIT CARD VIA THE INTERNET AT WWW.BEXAR.ORG/TAX OR BY PHONE AT 1-888-852-3572.
IF YOU BELIEVE THIS STATEMENT WAS MAILED TO YOU IN ERROR, PLEASE CALL OUR OFFICE AT (210) 335-2251.
YOUR TAX FREEZE IS IN PLACE FOR THE COMMUNITY COLLEGE DISTRICT, COUNTY, SCHOOL, AND CITY (NOT ALL CITIES PARTICIPATE).

**ASSESSMENT RATIO FOR ALL UNITS IS 100%. SEE BACK OF STATEMENT OR NEWSLETTER FOR IMPORTANT TAX INFORMATION.**

0125

**BEXAR APPRAISAL DISTRICT**
**411 N. FRIO, P.O. BOX 830248**
**SAN ANTONIO, TX 78283-0248**

Phone: (210) 224-2432    Fax: (210) 242-2453

DATE OF NOTICE: April 3, 2023

#BWNCTVY
#0166465005#
240448  1 AV 0.471******AUTO**5-DIGIT 78251 5DG  2 FT 1030

‖‖‖‖‖‖‖‖‖‖‖‖‖

**Property ID: 664650 - 17638-004-0290**

COMEAUX PAUL J & ELIZABETH

SAN ANTONIO TX

Account#: 664650
Ownership %: 100.00
Geo ID: 17638-004-0290
Legal:

Legal Acres:
Situs: SAN ANTONIO, TX
Owner ID:
EFile PIN:

**\*\*\* THIS IS NOT A TAX BILL \*\*\***

Dear Property Owner,
We have appraised the property listed above for the tax year 2023. As of January 1, our appraisal is outlined below.

| Appraisal Information | Last Year - 2022 | Proposed - 2023 |
|---|---|---|
| Market Value of Improvements (Structures / Buildings, etc.) | 185,410 | 141,750 |
| Market Value of Non Ag/Timber Land | 82,450 | 149,680 |
| Market Value of Ag/Timber Land | 0 | 0 |
| Market Value of Personal Property/Minerals | 0 | 0 |
| Total Market Value | 267,860 | 291,430 |
| Productivity Value of Ag/Timber Land | 0 | 0 |
| Appraised Value | **223,330** | **245,663** |
| Homestead Cap Value excluding Non-Homesite Value (i.e. Ag, Commercial) | 223,330 | 245,663 |
| Exemptions   (DV - Disabled Vet; DP-Disabled Person; HS-Homestead; OV65-Over 65) | HS, OV65 | HS, OV65 |

| 2022 Exemption Amount | 2022 Taxable Value | Taxing Unit | 2023 Proposed Appraised Value | 2023 Exemption Amount | 2023 Taxable Value |
|---|---|---|---|---|---|
| 56,572 | 166,758 | *BEXAR CO RD & FLOOD | 245,663 | 61,286 | 184,377 |
| 15,714 | 207,616 | SA RIVER AUTH | 245,663 | 16,657 | 229,006 |
| 30,000 | 193,330 | *ALAMO COM COLLEGE | 245,663 | 30,000 | 215,663 |
| 30,000 | 193,330 | UNIV HEALTH SYSTEM | 245,663 | 30,000 | 215,663 |
| 103,572 | 119,758 | *BEXAR COUNTY | 245,663 | 108,286 | 137,377 |
| 111,786 | 111,544 | *CITY OF SAN ANTONIO | 245,663 | 114,143 | 131,520 |
| 63,330 | 160,000 | *NORTHSIDE ISD | 245,663 | 63,330 | 182,333 |

The difference between the 2018 appraised value and the 2023 appraised value is 50.32%.

An (\*) indicates a tax ceiling exists for the taxing unit.

**The governing body of each unit decides whether or not property taxes will increase.  The appraisal district only determines the value of your property.**
***The Texas Legislature does not set the amount of your local taxes.  Your property tax burden is decided by your locally elected officials, and all inquiries concerning your taxes should be directed to those officials.***

If you qualified your home for an age 65 and older or disabled person homestead exemption for school taxes, the school taxes on that home cannot increase as long as you own and live in that home. The tax ceiling is the amount that you pay in the year that you qualified for the 65 and older or disabled person exemption. The school taxes on your home may not go above the amount of the ceiling, unless you improve the home (other than normal repairs and maintenance).

Beginning August 7th, visit Texas.gov/PropertyTaxes to find a link to your local property tax database where you can easily access information regarding your property taxes, including information regarding the amount of taxes that each entity that taxes your property will impose if the entity adopts its proposed tax rate. Your local property tax database will be updated regularly during August and September as local elected officials propose and adopt the property tax rates that will determine how much you pay in property taxes.

To file a protest, complete the notice of protest form following the instructions included in the form and no later than the deadline below, mail or deliver the form to the appraisal review board at the following address: Bexar Appraisal Review Board * PO Box 830248 * San Antonio, TX 78283-0248

| | |
|---|---|
| **Deadline for filing a protest:** | **May 15, 2023** |
| **Location of Hearings:** | **411 N FRIO ST** |
| **ARB will begin hearings:** | **June 5, 2023** |

Included are copies of the following documents published by the Texas Comptroller of Public Accounts: (1) Property Taxpayer Remedies; (2) Notice of Protest; and (3) Exemption Description List.

Property owners who file a notice of protest with the appraisal review board (ARB) may request an informal conference with the appraisal district to attempt to resolve disputes prior to a formal ARB hearing. In counties with populations of 1 million or more, property owners may request an ARB special panel for certain property protests. Contact your appraisal district for further information.

Michael Amezquita, Chief Appraiser

**0126**

# EXHIBIT C

FILED
1/30/2024 6:44 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Tammy Williams
Bexar County - 438th District Court

CAUSE NO. 2023CI22459

| | | |
|---|---|---|
| San Antonio Family Association; Texas Right to Life; Texas Leadership Coalition; Texans for Fiscal Responsibility; Bexar County Republican Party; Allied Women's Center of San Antonio; San Antonio Coalition for Life; Texas Eagle Forum; Unite San Antonio; Patrick Von Dohlen; Michael R. Knuffke; Daniel J. Petri; K. Jason Khattar; Susan Bayne; Aileen Boone; Kevin Choate; Marilyn Choate; Elizabeth Anne Comeaux; Paul Julienne Comeaux; Sonia Cantoral; Eli Danze; Alice Davis; Dennis Dewine; Robert Gonzalez; Sandra Kaye Kiolbassa; Agustín McLamb-Quiñones; Alma Medrano; David Moore; David Nelson; Aloys Joseph Notzon; Anna Rojas; Philip Trickett; Doris Walsh; Von Dohlen Knuffke Financial Group Inc.; Khattar Law Office; Hartzheim Petri CPA,<br>*Plaintiffs*,<br>v.<br><br>The City of San Antonio; Ron Nirenberg, in his official capacity as mayor of the City of San Antonio; Erik Walsh, in his official capacity as city manager of the City of San Antonio,<br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br><br><br><br>BEXAR COUNTY, TEXAS<br><br><br><br><br>438th JUDICIAL DISTRICT |

## DEFENDANTS' PLEA TO THE JURISDICTION

TO THE HONORABLE COURT:

Defendants—the City of San Antonio (hereinafter the "City"); Ron Nirenberg, in his official capacity as the City's Mayor; and Erik Walsh, in his official capacity as the City Manager—file this Plea to the Jurisdiction seeking dismissal of all Plaintiffs' claims in the above-

1

**0128**

referenced matter for lack of subject-matter jurisdiction because Plaintiffs[1] lack standing and their claims are not ripe for adjudication.

## I.    INTRODUCTION

Plaintiffs' lawsuit seeks an advisory opinion about the permissible use of a line item in the City's Fiscal Year 2024 budget—the Reproductive Justice Fund. With no evidentiary support, Plaintiffs claim the City plans to use the Reproductive Justice Fund to fund "criminal organizations" that Plaintiffs contend pay the travel costs of pregnant women who leave the state for abortion care or aid and abet self-managed abortions in Texas. In reality, as Plaintiffs concede, the City has made no determination about how the dollars from the Reproductive Justice Fund will be spent and no funds have been allocated to any organization, much less to an organization whose members have been convicted of any crime.

Plaintiffs' lawsuit—built on nothing more than surmise and speculation about the intended use of the Reproductive Justice Fund—is not justiciable because Plaintiffs lack standing and their claims are not ripe for adjudication. Accordingly, the Court must dismiss Plaintiffs' case for lack of subject-matter jurisdiction.

## II.    BACKGROUND

The San Antonio City Council passed a budget for Fiscal Year 2024 that allocates $500,000 to a Reproductive Justice Fund. (Pls.' Am. Pet. at 1). Plaintiffs' lawsuit attempts to criminalize the City's creation of the Reproductive Justice Fund by speculating about the purpose of the fund and

---

[1] Plaintiffs include San Antonio Family Association, Texas Right to Life, Texas Leadership Coalition, Texans for Fiscal Responsibility, Bexar County Republican Party, Allied Women's Center of San Antonio, San Antonio Coalition for Life, Texas Eagle Forum, and Unite San Antonio (the "Organization Plaintiffs"); Patrick Von Dohlen, Michael R. Knuffke, Daniel J. Petri, K. Jason Khattar, Susan Bayne, Aileen Boone, Kevin Choate, Marilyn Choate, Elizabeth Anne Comeaux, Paul Julienne Comeaux, Sonia Cantoral, Eli Danze, Alice Davis, Dennis Dewine, Robert Gonzalez, Sandra Kay Kiolbassa, Agustín McLamb-Quiñones, Alma Medrano, David Moore, David Nelson, Aloys Joseph Notzon, Anna Rojas, Philip Trickett, Doris Walsh (the "Individual Plaintiffs"); and Von Dohlen Knuffke Financial Group Inc., Khattar Law Office, and Hartzheim Petri CPA (the "Business Plaintiffs").

2

**0129**

the organizations that Plaintiffs hypothesize will ultimately benefit from it. Specifically, Plaintiffs contend that the Reproductive Justice Fund "will provide grants to organizations that pay the travel costs of pregnant women who leave the state" for abortion care. (*Id.* at 1–2). Plaintiffs insist that any organization that assists pregnant Texans in traveling out of state for abortion care is a "criminal organization," and that any hypothetical grant of taxpayer money to such organizations "aids or abets the criminal activities of these organizations." (*Id.* at ¶ 20).

Plaintiffs contend they have standing as taxpayers to enjoin the City from "providing any taxpayer money" through the Reproductive Justice Fund to organizations Plaintiffs have dubbed "criminal organizations." Plaintiffs ask the Court to declare that the City may not provide any money through the Reproductive Justice Fund to any organization in Texas that funds abortion travel or "aids or abets self-managed abortions in Texas" and to enjoin the City from providing taxpayer money to any organization for that purpose. (*Id.* at ¶¶ 21, 27, 34).

The Court lacks subject-matter jurisdiction to hear this case because the Plaintiffs lack standing and Plaintiffs' claims are not ripe for adjudication. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 553–54 (Tex. 2000) ("Standing is a prerequisite to subject-matter jurisdiction, and subject-matter jurisdiction is essential to a court's power to decide a case.");[2] *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020) ("For a court to have subject matter jurisdiction over a case, the plaintiff's claims must be ripe. Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented.") (cleaned up). Plaintiffs contend they have standing as

---

[2] "A plaintiff bringing suit under the Uniform Declaratory Judgments Act (UDJA) must still properly invoke the trial court's subject matter jurisdiction." *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020). "Although private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority, a declaratory judgment will only declare the rights, duties, or status of the parties in an otherwise justiciable controversy." *Verney v. Abbott*, No. 03-05-00064-CV, 2006 WL 2082085, at *9 (Tex. App.—Austin July 28, 2006, no pet.) (internal citations omitted).

3

taxpayers to seek declaratory and injunctive relief against Defendants, but they fail to plead sufficient facts to establish that they or any of their members pay taxes that fund the Reproductive Justice Fund or that the City is actually expending money on an alleged illegal activity—the two requirements of taxpayer standing. Relatedly, Plaintiffs' claims regarding the alleged use of the Reproductive Justice Fund are not ripe for adjudication because the City has yet to make a determination about how the fund will be spent. Because this lawsuit is a blatant request for an advisory opinion, untethered to a live controversy, Defendants respectfully request that this Court grant Defendants' Plea to the Jurisdiction and dismiss this case for lack of subject-matter jurisdiction.

### III.    LEGAL STANDARD FOR PLEA TO THE JURISDICTION

"The absence of subject-matter jurisdiction may be raised by a plea to the jurisdiction." *Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. "A plea to the jurisdiction is a dilatory plea, the purpose of which is to defeat a cause of action without regard to whether the claims asserted have merit." *Id.* Thus, "the plea should be decided without delving into the merits of the case." *Id.* A trial court may properly hear evidence as necessary to determine the jurisdictional questions at issue. *Id.* at 555. In doing so, a trial court should "confine itself to the evidence relevant to the jurisdictional issue." *Id.*

To resolve this Plea to the Jurisdiction, the Court need not (and indeed should not) wade into the State of Texas's past or present abortion laws.[3] Instead, it need only determine (1) whether Plaintiffs have standing to pursue their claims and (2) whether Plaintiffs' claims are ripe for

---

[3] Defendants, of course, adamantly maintain that their conduct in regard to the Reproductive Justice Fund budget item was undertaken in absolute good faith and in accordance with the law and that Plaintiffs' accusations of criminal conduct are unwarranted. *See, e.g.*, Defs.' Original Answer at 2 ("Plaintiffs either do not know or disregard that the Reproductive Justice Fund was designated with the understanding that it will be expended in compliance with governing law."). But resolution of those issues is not before the Court in ruling on this Plea to the Jurisdiction.

adjudication. If, after examining the pleadings and evidence relevant to the jurisdictional issues, the Court concludes that Plaintiffs lack standing or that Plaintiffs' claims are not ripe, the Court must grant Defendants' Plea to the Jurisdiction and dismiss the case for lack of subject-matter jurisdiction. *Farmers Texas Cnty. Mut. Ins. Co. v. Beasley*, 598 S.W.3d 237, 241 (Tex. 2020) ("If, after examining the pleadings and any undisputed standing evidence, the court concludes that standing does not exist, the case must be dismissed."); *Patterson v. Planned Parenthood of Houston & Se. Texas, Inc.*, 971 S.W.2d 439, 444 (Tex. 1998) (dismissing case for want of jurisdiction on ripeness grounds).

## IV.    ARGUMENT & AUTHORITIES

### A.    Plaintiffs do not have standing to challenge the Reproductive Justice Fund.

"Standing is a constitutional prerequisite to maintaining suit in either federal or state court." *Williams v. Lara*, 52 S.W.3d 171, 178 (Tex. 2001). "In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 154 (Tex. 2012). "Under Texas law, as under federal law, the standing inquiry begins with the plaintiff's alleged injury." *Id.* at 155. "The plaintiff must be *personally* injured—he must plead facts demonstrating that he, himself (rather than a third party or the public at large), suffered the injury." *Id.* An association also has standing to sue on behalf of its members, but only when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Abbott v. Mexican Am. Legislative Caucus, Texas House of Representatives*, 647 S.W.3d 681, 690–91 (Tex. 2022). "In other words,

5

associational standing requires establishing everything that an individual plaintiff would have to establish, plus satisfying additional burdens that apply only to associational standing." *Id.* at 691.

Therefore, it is generally the case that "a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts." *Andrade v. Venable*, 372 S.W.3d 134, 136 (Tex. 2012). "Unless standing is conferred by statute, a plaintiff must show that he has suffered a particularized injury distinct from the general public." *Id.* "This is because '[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review." *Id.* (quoting *Bland Indep. Sch. Dist*, 34 S.W.3d at 555). "Thus, standing doctrines reflect in many ways the rule that neither citizens nor taxpayers can appear in court simply to insist that the government and its officials adhere to the requirements of law.'" *Id.* at 136–37 (cleaned up).

"However, under Texas law, a narrow, judicially-created exception exists: a taxpayer has standing to sue to enjoin the illegal expenditure of public funds, and need not demonstrate a particularized injury." *Id.* at 137. "Implicit in this rule are two requirements." *Id.* (citing *Williams*, 52 S.W.3d at 179). To be entitled to taxpayer standing, the plaintiff must show "(1) that the plaintiff is a taxpayer; *and* (2) that public funds are expended on the allegedly illegal activity." *Id.* (emphasis added). Notwithstanding this narrow exception, "[a] taxpayer plaintiff, like any other plaintiff, carries the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction." *Id.* at 138. The Texas Supreme Court has called taxpayer suits seeking to enjoin the illegal expenditure of public funds pursuant to this narrow exception "drastic" and has "required a plaintiff pursuing one to 'bring himself strictly within the established rules.'" *Perez v. Turner*, 653 S.W.3d 191, 199 (Tex. 2022), *reh'g denied* (Oct. 21, 2022) (quoting *Osborne v. Keith*, 142 Tex. 262, 177 S.W.2d 198, 200 (1944)).

6

Underpinning the taxpayer standing doctrine is the understanding that "governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review." *Williams*, 52 S.W.3d at 180 (cleaned up). Therefore, in assessing whether a plaintiff is entitled to taxpayer standing, courts consider the burden such suits place on government entities alongside the need to protect the public from the illegal expenditure of public funds. *E.g.*, *Perez*, 653 S.W.3d at 199. Specifically, a court must ask itself whether the plaintiff's claim "is the kind of claim to which the rationale underlying taxpayer standing applies . . . : protecting the public from the illegal expenditure of public funds without hampering too severely the workings of the government." *Id.*

Plaintiffs fail to satisfy either taxpayer standing requirement: they have neither shown that they pay taxes that fund the Reproductive Justice Fund nor that the City is spending or even plans to spend taxpayer money on an alleged illegal activity. *Williams*, 52 S.W.3d at 179. Plaintiffs thus have not carried their burden to establish that they have taxpayer standing to challenge the Reproductive Justice Fund, and their case must be dismissed for lack of subject-matter jurisdiction.

**1.     Requirement 1: Plaintiffs have not pleaded facts showing that they—or any of their members—pay taxes that fund the Reproductive Justice Fund.**

"With regard to the first requirement, the [Texas] [S]upreme [C]ourt has held that not all taxpayers have standing." *Teneyuca v. Bexar Cnty. Performing Arts Ctr. Found.*, No. 04-11-00488-CV, 2012 WL 2053534, at *2 (Tex. App.—San Antonio June 6, 2012, no pet.)."[W]hether the plaintiff has taxpayer standing depends upon the type of tax he or she claims to have paid." *Id.* (citing *Williams*, 52 S.W.3d at 179). For example, the Texas Supreme Court has determined that the payment of sales tax and rent are insufficient to confer taxpayer standing, even if the rent is used to pay the landlord's property taxes. *Williams*, 52 S.W.3d at 179–80. Moreover, an attenuated

7

relationship between the plaintiff's tax payments and the funding of the complained-of-activity will not suffice. *Scarbrough v. Metro. Transit Auth. of Harris Cnty.*, 326 S.W.3d 324, 335 (Tex. App.—Houston 2010, pet. denied); *Teneyuca*, 2012 WL 2053534 at *3; *see also Williams*, 52 S.W.3d at 179 ("[T]he connection between paying rent and her status as a taxpayer is too attenuated to confer taxpayer standing on her."). To obtain taxpayer standing, the plaintiff must demonstrate how their tax dollars are being used to fund the complained-of activity. *Teneyuca*, 2012 WL 2053534 at *3 ("[Plaintiffs] cannot argue that any of their ad-valorem taxes are being used to fund the complained-of activity. We hold [Plaintiffs'] payment of ad-valorem taxes is not sufficient to confer taxpayer standing in this case.").

Plaintiffs contend that each of the Individual and Business Plaintiffs listed in paragraph 11 of their First Amended Petition has standing to challenge the Reproductive Justice Fund because each of them "resides in the city of San Antonio, and each of them pays taxes to the city that are assessed on their property-tax bill (*if they own their home*) and their utility bills." (Pls.' Am. Pet. at ¶ 12) (emphasis added). Plaintiffs then provided Defendants with utility, cable, and internet bills for a handful of Individual Plaintiffs and a Bexar County property tax bill for a home in San Antonio owned by Individual Plaintiffs Elizabeth Anne and Paul Julienne Comeaux (together "the Comeauxs").[4] As a preliminary matter, Individual and Business Plaintiffs cite no authority for the proposition that paying a utility, cable, or internet bill confers taxpayer standing.[5] Accordingly,

---

[4] Plaintiffs also provided a print-out of the Bexar CAD page for a property in San Antonio owned by the Dewine Family Revocable Trust, but that document does not indicate whether Plaintiff Dennis Dewine paid the property taxes owed on that property.

[5] It is also unclear what taxes Plaintiffs intend to rely on with respect to these bills. CPS Energy bills include assessments for "State & Local Sales Taxes" and "City Services," but the payment of sales tax is insufficient to confer taxpayer standing, *Williams*, 52 S.W.3d at 180, and the "City Services Fee" is for solid waste collection and park services, which has nothing to do with the Reproductive Justice Fund. (Ex. A, "How to Read a CPS Energy Bill"). Money paid to Spectrum, a cable and internet company, goes to a private company, not the City, and any sales taxes assessed on those bills would be insufficient. *Williams*, 52 S.W.3d at 180.

8

Individual and Business Plaintiffs appear to rest their case for standing on the property taxes paid by the Comeauxs. *See Patel v. Texas Dep't of Licensing & Regul.*, 469 S.W.3d 69, 77 (Tex. 2015) ("[W]here there are multiple plaintiffs in a case, who seek injunctive or declaratory relief (or both), who sue individually, and who all seek the same relief[,] the court need not analyze the standing of more than one plaintiff—so long as that plaintiff has standing to pursue as much or more relief than any of the other plaintiffs.") (cleaned up).

Although it appears that the Comeauxs pay property taxes on a home they own in San Antonio, Plaintiffs have not alleged a relationship between the payment of those property taxes and the Reproductive Justice Fund. Specifically, Plaintiffs have not pleaded any facts indicating that the Comeauxs' property taxes are being used to fund the Reproductive Justice Fund. Absent a nexus between the taxes Plaintiffs pay and the Reproductive Justice Fund, Individual and Business Plaintiffs lack standing to challenge the Reproductive Justice Fund based on their taxpayer status. *See Teneyuca*, 2012 WL 2053534 at *3 (noting that Plaintiffs' payment of ad-valorem taxes was insufficient to confer taxpayer standing because "ad-valorem taxes [were] not being used to fund the project at issue"); *see also Scarbrough*, 326 S.W.3d at 336 (explaining that the payment of property taxes was insufficient to confer taxpayer standing because the plaintiff's property taxes were not "being used to fund the complained of-activity").

The Organizational Plaintiffs likewise fail to establish standing to sue on behalf of their members. Specifically, they cannot rely on associational standing because they have not pleaded facts to establish: (1) that their members would otherwise have standing to sue in their own right and (2) that the interests they seek to protect are germane to the organizations' purpose. *Mexican Am. Legislative Caucus, Texas House of Representatives*, 647 S.W.3d at 691. With respect to the first requirement, Organizational Plaintiffs contend that "at least one of their members resides in

9

and pays taxes to the city of San Antonio and would have standing to sue in their own right." (Pls.' Am. Pet. at ¶13). But Organizational Plaintiffs lack standing for the same reason the Individual and Business Plaintiffs lack standing: they have not alleged a nexus between a specific member's tax payments and the Reproductive Justice Fund. Moreover, "to establish associational standing, general references to members are usually insufficient." *Mexican Am. Legislative Caucus, Texas House of Representatives*, 647 S.W.3d at 692. "The mere likelihood that some member of an association would have individual standing has never been enough." *Id.* at 693. Organizational Plaintiffs fail to identify a specific member, *id.* at 693–694; the type of tax he or she claims to have paid, *Williams*, 52 S.W.3d at 179; or how the tax is "used to fund the complained-of activity," *Teneyuca*, 2012 WL 205353 at *3. In failing to identify a specific member that would otherwise have taxpayer standing to sue in their own right, Organizational Plaintiffs have also not satisfied the first requirement for associational standing. *Mexican Am. Legislative Caucus, Texas House of Representatives*, 647 S.W.3d at 690–91.

Organizational Plaintiffs' likewise fail to meet the second requirement of associational standing: that the interests each organization seeks to protect are germane to its purpose. "[T]o satisfy this element, the interest that is germane to the organization's purpose must also relate to the interest by which its members would have standing to sue in their own right." *Id.* at 694 (cleaned up). Organizational Plaintiffs plead no facts related to their purpose, how the interests they seek to protect through this litigation are germane to that purpose, or how their members' interests that give them individual standing are germane to the organizations' purpose. *See id.*

Because Organizational Plaintiffs have not demonstrated that one of their members would have taxpayer standing to sue in their own right or how the interests the Organizational Plaintiffs

10

**0137**

seek to protect are germane to their purpose, they have not satisfied associational standing requirements, and the Court must dismiss their claims for lack of subject-matter jurisdiction.

**2. Requirement 2: Plaintiffs have not established that the City is actually expending funds on the alleged illegal activity.**

Even if Plaintiffs could plead facts sufficient to establish their status as taxpayers, the case still requires dismissal because Plaintiffs have not—and cannot—establish that the City is actually expending taxpayer funds on the activity Plaintiffs contend is illegal. "To be entitled to municipal taxpayer standing, a litigant must prove that the government is actually expending money on the activity that the taxpayer challenges; merely demonstrating that tax dollars are spent on something related to the allegedly illegal conduct is not enough." *Williams*, 52 S.W.3d at 181; *see also Andrade*, 372 S.W.3d at 138 ("[U]nder *Williams*, in order to establish taxpayer standing a plaintiff must plead facts showing that the government is *actually* spending money on the allegedly illegal activity—not on a related legal activity.") (emphasis in original).

Plaintiffs have alleged no facts demonstrating that the City has or is planning to allocate money from the Reproductive Justice Fund to pay for out-of-state abortions or for assistance with self-managed abortions in Texas, the activities Plaintiffs challenge as illegal. Nor could they—the City has made no determination about how the Reproductive Justice Fund will be spent. And no amount of the Reproductive Justice Fund has been allocated to any entity, much less to any of the organizations identified in Plaintiffs' First Amended Petition, a fact Plaintiffs themselves concede. (*See* Pls.' Am. Pet. at 2 ("The organizations that lobbied for this budgetary provision and *hope to obtain* this taxpayer money include Jane's Due Process, Avow, the Buckle Bunnies Fund, Sueños Sin Fronteras, and the Lilith Fund for Reproductive Equity.") (emphasis added)).

Lacking facts, Plaintiffs resort to clairvoyance, insisting that the Reproductive Justice Fund "will provide grants to organizations that pay the travel costs of pregnant women who leave the

11

state" for abortion care, speculating as to which organizations will apply for the funds, and divining which organizations will ultimately receive the funds, all notwithstanding the fact that the City has yet to even determine the use of the funds. (*Id.* at 1-2.) To be entitled to taxpayer standing, Plaintiffs must demonstrate that the City is "actually spending money specifically on the challenged activity." *Andrade*, 372 S.W.3d at 138. At most, Plaintiffs have alleged that the City plans to spend $500,000—.01% of its FY 2024 budget—on the reproductive health of San Antonio residents. Reproductive health care is not synonymous with abortion care, a distinction Plaintiffs conveniently ignore. Plaintiffs have pleaded no facts showing that the City is spending or plans to spend taxpayer money (or any money) through the Reproductive Justice Fund on out-of-state abortion travel or assistance with self-managed abortion in Texas, the challenged "illegal activity." (Pls.' Am. Pet. at 2.). Accordingly, Plaintiffs cannot claim taxpayer standing to challenge the Reproductive Justice Fund.

Plaintiffs appear to contend that they do not need to plead a specific expenditure on an alleged illegal activity because granting any funds to "Jane's Due Process, Avow, the Buckle Bunnies Fund, and the Lilith Fund for Reproductive Equity" "aids or abets" their alleged "criminal activities" "even if the money is earmarked for non-abortion purposes." (Pls.' Am. Pet. at ¶ 20 (citing *Holder v. Humanitarian L. Project*, 561 U.S. 1, 130 (2010)). This assertion not only hinges on myriad unsubstantiated assumptions, but it also ignores the requirements of taxpayer standing. First, Plaintiffs cast Jane's Due Process, Avow, the Buckle Bunnies Fund, and the Lilith Fund as "criminal organizations" engaging in "criminal activities" without reference to any criminal conviction let alone an indictment. Such a characterization not only assumes *ipse dixit* what our criminal justice system demands be proven beyond a reasonable doubt,[6] but it once again ignores

---

[6] Such an unsubstantiated allegation also ignores pleading requirements set forth in statute and rule. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 10.001; Tex. R. Civ. P. 13.

what the Plaintiffs elsewhere in their First Amended Petition concede: the City has made no determination about how the dollars from the Reproductive Justice Fund will be spent or which specific organizations will receive the funds. (*Id.* at 2.) Second, the Texas Supreme Court has categorically held that plaintiffs cannot obtain standing as taxpayers by pleading expenditures on legal activities related to the challenged activities. *E.g.*, *Andrade*, 372 S.W.3d at 138 ("[T]o establish taxpayer standing a plaintiff must plead facts showing that the government is *actually* spending money on the allegedly illegal activity—not on a related legal activity."). It is thus inconsistent with taxpayer standing precedent to contend that Plaintiffs would have standing to challenge the expenditure of funds "earmarked" for general reproductive health care.

Plaintiffs' reliance on *Holder* is unavailing. As a preliminary matter, *Holder* is not a taxpayer standing case—it involved the interpretation of 18 U.S.C. 2339B(a)(1), an anti-terrorism statute that prohibits the "provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity." 561 U.S. at 7. In that case, the plaintiffs wished to provide support for the humanitarian and political activities of two organizations that had been classified as terrorist organizations, but they could not do so for fear of prosecution under the "material-support" statute. *Id.* at 10. The U.S. Supreme Court concluded that 18 U.S.C. 2339(B)(a)(1) was constitutional as applied to plaintiffs' proposed conduct and did not violate freedom of speech. *Id.* at 39. *Holder* did not disturb the Texas Supreme Court's taxpayer standing jurisprudence, which deems the expenditure of taxpayer funds on legal activity related to the challenged illegal activity insufficient to confer taxpayer standing. *Andrade*, 372 S.W.3d at 138. Moreover, the organizations Plaintiffs cite have not been classified as terrorist organizations or convicted of any crime. Most importantly, Plaintiffs allege no facts indicating that the City plans to allocate taxpayer money (or any money) from the Reproductive Justice Fund to the

13

organizations Plaintiffs assert engage in "criminal activity," or that any of the organizations Plaintiffs list would meet the yet-to-be-determined criteria to apply for the funds in the first place. *Holder*, therefore, has no applicability to this (hypothetical) dispute and does not cure Plaintiffs' failure to sufficiently establish that the City "is *actually* spending money on the allegedly illegal activity—not on a related legal activity"—an essential requirement of taxpayer standing. *Andrade*, 372 S.W.3d at 138.

To the extent Plaintiffs intend to argue that they need discovery to substantiate their assertions of criminality, the Court should see that request for the blatant fishing expedition that it is. No amount of discovery changes the basic fact that the City has yet to determine how it will use the Reproductive Justice Fund. Allowing discovery into the activities of a group of organizations whose only tie to this case is Plaintiffs' speculation that they *might someday* apply for funding that they *might someday qualify* for would subject the City and third parties to the burdens of discovery on the basis of hypothetical future events that may not occur at all. Allowing such discovery would not merely be an impermissible fishing expedition—it would condone "an effort to dredge the lake in hopes of finding a fish." *Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995). Moreover, this Court should not condone Plaintiffs' counsel's attempts to obtain in this matter the discovery that Plaintiffs' counsel was denied by a United States District Court in *Fund Texas Choice v. Paxton*, No. 1-22-CV-859-RP (W.D. Tex. 2023).[7]

---

[7] For example, on November 22, 2023, Mr. Mitchell served a subpoena duces tecum on Ms. Makayla Montoya-Frazier, the principal of the Buckle Bunnies Fund, in *Fund Texas Choice v. Paxton*, No. 1-22-CV-859-RP (W.D. Tex. 2023). Pursuant to that subpoena duces tecum, Mr. Mitchell sought discovery for the purpose of, among other things, "uncovering (or attempting to uncover) evidence of criminality and lawbreaking" with respect to the Buckle Bunnies Fund and Ms. Montoya-Frazier. (Ex. B, SB8 Defs.' Resp. to Mot. Protective Order, Dkt. 255, at 8). On December 8, 2022, the court granted Ms. Montoya-Frazier protection from that discovery, and stayed all discovery—including the nearly 1,700 written discovery requests served by Mr. Mitchell—pending further order of the Court. (Ex. C, December 8, 2023 Order, Dkt. 256, at 4.) Two weeks after the Court issued that Order, on December 22, 2023, Mr. Mitchell served third-party subpoenas on the organizations in this matter, seeking depositions and written discovery from Ms. Montoya-Frazier and others. Nonparty discovery sought in this case is nearly identical to the discovery previously sought—and blocked—by the United States District Court in the *Fund Texas Choice* matter. *Compare* Ex. D, *Fund*

14

Because Plaintiffs cannot establish that the City is expending, or even plans to expend, taxpayer money on an allegedly illegal activity, Plaintiffs have not established their standing as taxpayers to challenge the Reproductive Justice Fund, and the Court must dismiss this case for lack of subject-matter jurisdiction.

## B. Plaintiffs' claims are not ripe for adjudication.

Plaintiffs' First Amended Petition also fails to allege a justiciable controversy because their claims are not ripe for adjudication. Plaintiffs' First Amended Petition alleges only a hypothetical future controversy—not a dispute ripe for judicial review—and thus must be dismissed. "Ripeness is one of several categories of justiciability." *Perry v. Del Rio*, 66 S.W.3d 239, 249 (Tex. 2001). "A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Patterson v. Planned Parenthood of Houston & Se. Texas, Inc.*, 971 S.W.2d 439, 443 (Tex. 1998). Ripeness thus focuses on whether the case involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* "The constitutional roots of justiciability doctrines such as ripeness . . . lie in the prohibition on advisory opinions," but "[t]he concerns addressed by the ripeness doctrine encompass more than a question of constitutional prohibition." *Id.* "The doctrine has a pragmatic, prudential aspect that is directed toward conserving judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Id.* (internal quotations omitted). "Litigation based upon hypothetical possibility rather than concrete fact is apt to be poor litigation." *Id.* "The demand for specificity, therefore, stems from a judicial desire for better lawmaking." *Id.*

---

*Texas Choice* RFP No. 22, Dkt. 250-1, at 14 ("Any and all abortion-inducing drugs in your possession or in the possession of the Buckle Bunnies Fund, including mifepristone (also known as mifeprex) and misoprostol"), *with* Ex. E, *SAFA* RFP No. 9 ("Any and all abortion-inducing drugs in your possession or in the possession of the Buckle Bunnies Fund, including mifepristone (also known as mifeprex) and misoprostol."). The Court should not entertain such tactics.

15

As in *Patterson*, this "is precisely the kind of case in which resolution of the claim presented depends on the occurrence of contingent future events that may not occur as anticipated or may not occur at all." *Id.* at 444. Plaintiffs seek to enjoin the City from "providing taxpayer money to any organization that pays for abortion travel or procures elective abortions for Texas residents," (Pls.' Am. Pet. at 2), but the City has yet to decide how the dollars from the Reproductive Justice Fund will be spent. No amount of the Reproductive Justice Fund has been allocated to any entity, much less to any of the organizations identified in Plaintiffs' First Amended Petition. Plaintiffs' claims are thus premised upon the "hypothetical possibility" that the City will decide to allocate money from the Reproductive Justice Fund to some yet-to-be-identified organizations that engage in the abortion-related activities Plaintiffs challenge.[8] *Patterson*, 971 S.W.2d at 443.

Because Plaintiffs' claims "depend[] on contingent or hypothetical facts, or upon events that have not yet come to pass," Plaintiffs' claims are not ripe. *Id.* "[T]o hold otherwise would be the essence of an advisory opinion, advising what the law would be on a hypothetical set of facts." *Id.* at 444. Accordingly, the Court must dismiss Plaintiffs' case on ripeness grounds for lack of subject-matter jurisdiction.[9]

---

[8] More perplexing, Plaintiffs have not even pleaded facts sufficient to establish that any of the organizations they identify by name in their First Amended Petition provide illegal abortion care. For instance, to support their claim that the Buckle Bunnies Fund "aids or abets illegal self-managed abortions in Texas," Plaintiffs point to an August 1, 2022 article addressing the Buckle Bunnies Fund's actions *before* the Trigger Ban took effect on August 25, 2022 (Pls.' Am. Pet. at 7, Ex. 2) And Plaintiffs ignore that Jane's Due Process and the Lilith Fund for Reproductive Equity, two of the allegedly "criminal organizations" identified in their First Amended Petition, sought and obtained a court order enjoining local prosecutors from enforcing the pre-*Roe* law that Plaintiffs rely on in this case to criminalize assistance with out-of-state abortion care. *See Fund Texas Choice*, 658 F. Supp. 3d at 415.

[9] That Plaintiffs bring their lawsuit pursuant to the Uniform Declaratory Judgment Act (UDJA) makes no difference. "The UDJA does not extend a trial court's jurisdiction, and a litigant's request for declaratory relief does not confer jurisdiction on a court or change a suit's underlying nature." *Verney*, 2006 WL 2082085 at *9. Indeed, "a declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Sw. Elec. Power Co.*, 595 S.W.3d at 685 (quoting *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995)). The "future-looking nature of UDJA suits does not remove the requirement that the court must have subject matter jurisdiction over the suit—that is, that the parties must have

16

**C.** **The jurisdictional defects in Plaintiffs' pleading are not curable by amendment.**

"When a plea to the jurisdiction challenges the pleadings, [courts] determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend." *Id.* at 226–227. However, "if the pleadings affirmatively negate the existence of jurisdiction then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.

Here, the Court should grant Defendants' Plea without allowing Plaintiffs an opportunity to amend because the pleadings "affirmatively negate the existence of jurisdiction," and amendment would be futile. *Id.* at 227. Even if Plaintiffs could plead facts to establish a relationship between the taxes a specific plaintiff pays and the Reproductive Justice Fund,[10] Plaintiffs cannot plead that the City is actually expending or even plans to expend taxpayer funds on the alleged illegal activity because the City has yet to determine how the Reproductive Justice Fund will be spent. Indeed, Plaintiffs' First Amended Petition concedes that the City has made no determination about how the dollars from the Reproductive Justice Fund will be spent. (Pls.' 1st

---

standing, and a ripe, justiciable controversy must exist." *Id.*; *see also City of Dall. v. Albert*, 354 S.W.3d 368, 378 (Tex. 2011) (citations omitted) (explaining that the UDJA "does not enlarge a court's jurisdiction; it is a procedural device for deciding cases already within a court's jurisdiction")

[10] It is unlikely that Plaintiffs can cure this deficiency by amendment either. Plaintiffs' Original Petition was bereft of any factual allegations to substantiate their bare conclusion that they are San Antonio taxpayers. Plaintiffs did not specify the type of taxes they paid to the City, or how the payment of those taxes demonstrated a sufficient "personal stake in how public funds are expended to come into court and bring the [City's] actions under judicial review." *Williams*, 52 S.W.3d at 180. Defendants sent Plaintiffs a deficiency letter, outlining their failure to sufficiently plead their status as San Antonio taxpayers for standing purposes. (Ex. F, December 18, 2022 Deficiency Letter). Plaintiffs subsequently amended their petition and still failed to properly plead taxpayer status, as explained more fully in Part IV.1 of this Plea.

17

Am. Pet at 2.) That fact deprives Plaintiffs of taxpayer standing and renders Plaintiffs' claims unripe for adjudication. Because no amount of repleading can cure these jurisdictional defects, the Court should grant Defendants' Plea without granting Plaintiffs the opportunity to amend, and dismiss this case for lack of subject-matter jurisdiction.

## V.    CONCLUSION & PRAYER

For all the reasons set forth above, Defendants respectfully request that the Court grant their Plea to the Jurisdiction, dismiss Plaintiffs' claims with prejudice, and grant Defendants any further relief—both at law and in equity—to which they may be entitled.

**0145**

Respectfully submitted,

SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701-2589
(512) 495-6300
(512) 495-6399 Fax

By:     */s/ Lauren Ditty*
        Kennon L. Wooten
        State Bar No. 24046624
        kwooten@scottdoug.com
        Lauren Ditty
        State Bar No. 24116290
        lditty@scottdoug.com

CITY OF SAN ANTONIO
Office of the City Attorney
Litigation Division
International Center
203 S. St. Mary's St., 2nd Floor
San Antonio, Texas 78205
(210) 207-8940
(210) 207-4357 Fax
Deborah Lynne Klein
Deputy City Attorney
State Bar No. 11556750
deborah.klein@sanantonio.gov
Erica Matlock
State Bar No. 24092418
erica.matlock@sanantonio.gov

**Attorneys for Defendants**

19

0146

## CERTIFICATE OF SERVICE

I certify that, on January 30, 2024, a true and correct copy of the Motion was electronically served on Plaintiffs' counsel of record, in compliance with Rules 21 and 21a of the Texas Rules of Civil Procedure.

/s/ Lauren Ditty
Lauren Ditty

## CERTIFICATE OF CONFERENCE

Counsel has made reasonable efforts to confer with all parties who may be affected by the relief sought in this motion but has been unable to do so.

/s/ Kennon L. Wooten
Kennon L. Wooten

20

**0147**

# EXHIBIT A

**0148**

# How to Read Your Residential Bill

*Bill Front*



**1. Customer Service Address** is the location of the home or facility where you receive energy.

**2. Customer Number** is your specific number for account identification.

**3. Current account balance and due date** is the amount you currently owe, the date it is due, and the amount you will pay if payment is received after the due date.

**4. Your Electric Use** graph shows how much electricity you used over the past 12 months in kilowatt hours (kWh).

**5. Your Natural Gas Use** graph shows your natural gas use over the past 12 months. If you do not have gas service, your statement may include a monthly message here.

**6. Account Comparison Summary** provides data that impacts your energy use for the billing period. Use it to compare your current billing month, last month, and the same month last year.

**7. Billing Summary** is a quick overview that includes: your previous month's balance and payments or adjustments made; current charges for gas and electricity; total charges for additional services from CPS Energy (such as Windtricity or All Nite Security Light); charges from the City of San Antonio (such as Waste Collection Services and Environmental Service Fee); taxes; and total account balance.

**8. Information** box includes important messages or tips for you.

**9. Donate to REAP** (Residential Energy Assistance Partnership). Write in an amount here if you would like to make a tax-deductible donation to help families in need of financial assistance to pay their utility bills. Learn more about REAP at cpsenergy.com/reap

**10. Current Account Balance and Due Date** is the amount you currently owe and the date it is due for payment.

**11. Total Amount Enclosed** is where you fill in the amount of payment you are making on your current bill.

**0149**

# How to Read Your Residential Bill

*Bill Back*

**CPS Energy**
PO Box 2678, San Antonio, Texas 78289-0001

| Customer Number: | 000-0000-000 | 0000000000 |
|---|---|---|

| | |
|---|---|
| Previous Bill | $759.25 |

**1 Payments & Adjustments**

| | |
|---|---|
| Payment 02/18/22 | -$759.25 |
| Security Deposit Interest 07/06/22 | -$0.01 |
| **Subtotal** | **-$759.26** |
| **Balance** | **-$0.01** |

**2 Electric**
**Residential Electric**

| | |
|---|---|
| Service Availability Charge 3 | $9.10 |
| Energy Charge 1,968 kWh x $0.07188 4 | $141.46 |
| Peak Capacity Charge 1,368 kWh x $0.0206 5 | $28.18 |
| Fuel Adjustment 1,968 kWh x $0.01882 6 | $37.04 |
| Regulatory Adj 1,968 kWh x $0.01236 7 | $24.32 |
| Affordability Discount 8 | -$11.67 |
| **Total Electric Bill (Non-Taxable)** | **$228.43** |

**9 Gas**
**General Service**

| | |
|---|---|
| Service Availability Charge 3 | $9.95 |
| Energy Charge 26 ccf x $0.51062 4 | $13.28 |
| Fuel Adjustment 26 ccf x $0.30377 6 | $7.90 |
| Affordability Discount 8 | -$4.47 |
| **Total Natural Gas Bill (Non-Taxable)** | **$26.66** |

**10 City Services** (For any questions, call the city at 210-207-6428.)

| | |
|---|---|
| Solid Waste Fee - Large Cart (1) | $26.76 |
| Environmental Fee-Solid Waste | $1.74 |
| Environmental Fee-Parks | $1.50 |
| **Total City Services (Taxable)** | **$30.00** |

**11 Meter Read Detail (Read=R) (Estimated=E)**

| Electric Meter | Previous | Current | Consumption |
|---|---|---|---|
| #0000000  (R-07/05/2022) | 68612 | 70580 | 1,968 |

| Gas Meter | Previous | Current | Consumption |
|---|---|---|---|
| #0000000  (R-07/05/2022) | 0418 | 0444 | 26 |

Your next scheduled meter read date is Aug 02, 2022 or Aug 03, 2022

**12** Billing Period Jun 02, 2022 - Jul 05, 2022

**1. Payments and Adjustments** show account's previous balance and date of last payment. If the last payment was received past its due date, then a late charge fee is shown and is included in the balance.

**2. Electric** section details your electric charges including Service Availability Charge, Energy Charge, Peak Capacity Charge, Fuel Adjustment Charge, Regulatory Adjustment, and Affordability Discount if enrolled.

**3. Service Availability Charge** covers the cost of metering and billing for your address, regardless of consumption.

**4. Energy Charge** recovers costs for power plants and other infrastructure based on the amount of electricity you use.

**5. Peak Capacity Charge** applies during the months of June through September when an additional charge is applied for every kilowatt hour (kWh) used in excess of 600 kWh. The Peak Capacity Charge covers the higher costs for electricity CPS Energy incurs during summer months when demand for electricity is at its highest.

**6. Fuel Adjustment Charge** is the cost for fuel above the base rate, and it fluctuates monthly based on the prices CPS Energy pays for fuel. The current and thirteen-month Fuel Adjustment Charge Breakdowns are posted on cpsenergy.com/billhelp.

**7. Regulatory Adjustment** shows the state mandated fees and costs associated with the Electric Reliability Council of Texas (ERCOT) grid.

**8. Affordability Discount** helps customers with income at or below 125% of federal poverty guidelines who qualify for a discount on their monthly service charge. Refer to cpsenergy.com/assistance.

**9. Gas** section details your natural gas charges including Service Availability Charge, Energy Charge, Fuel Adjustment Charge and Affordability Discount if enrolled.

**10. City Services** are fees CPS Energy collects for the City of San Antonio's Solid Waste Management Department. Learn more at sanantonio.gov/swmd or by calling 3-1-1.

**11. Meter Read Detail** is information on your meter reading, including the date and whether your meter was read (R) or estimated (E). The date of your next scheduled meter reading is also included.

**12. Billing Period** reflects the starting and ending dates for the current month's bill.

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

|  |  |
|---|---|
| **Fund Texas Choice**, et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>**José Garza**, et al.,<br><br>              Defendants. | Case No. 1:22-cv-00859-RP |

### SB 8 DEFENDANTS' RESPONSE TO MAKAYLA MONTOYA-FRAZIER'S MOTION FOR PROTECTIVE ORDER

Makayla Montoya-Frazier is the founder and principal of the Buckle Bunnies Fund, which has sued five private citizens, known as the SB 8 defendants, for (allegedly) violating its constitutional rights under 42 U.S.C. § 1983.[1] On November 22, 2023, the SB 8 defendants served a subpoena on Montoya-Frazier commanding her to produce documents and appear for a deposition. Montoya-Frazier has moved to quash this subpoena and seeks a protective order, insisting that "no discovery is necessary." Motion, ECF No. 250, at 2. Montoya-Frazier has not met the standards for quashing a subpoena under Rule 45(d)(3) or obtaining a protective order under Rule 26(c). The Court should deny the motion and put a stop to the plaintiffs' incessant and vexatious efforts to thwart discovery.

---

1. The plaintiffs' claim that they are "seek[ing] declaratory and injunctive relief against the SB8 Defendants regarding the constitutionality of SB8" is false. *See* Motion, ECF No. 250, at 3. The plaintiffs are suing the SB 8 defendants over their *conduct*, and they must prove that *the SB 8 defendants* are violating their constitutional rights under 42 U.S.C. § 1983. The plaintiffs cannot "challenge" the constitutionality of SB 8 in the abstract. *See California v. Texas*, 141 S. Ct. 2104, 2114 (2021). The case is not about the "constitutionality of a statute," but the constitutionality of the defendants' behavior.

## I.    A Litigant Is Entitled To Take Discovery Into Any Non-Privileged Matter "Relevant To Any Party's Claim Or Defense" And "Proportional To The Needs Of The Case"

Montoya-Frazier repeats the refrain that the plaintiffs have invoked every time they are served with a discovery request: That the defendants should be categorically barred from taking discovery because (in the plaintiffs' view) "no discovery is necessary." Motion, ECF No. 250, at 2; *see also id*. at 3 ("The discovery sought in the Subpoena is unnecessary."). The rules of civil procedure, however, allow litigants to take discovery on any non-privileged matter that is "relevant to any party's claim or defense" and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). There is no requirement to show that discovery is "necessary," and a plaintiff cannot deny its adversary discovery by pronouncing discovery "unnecessary." The SB 8 defendants are entitled to take discovery on any matter that falls within the scope of Rule 26(b)(1), regardless of whether the plaintiffs think it "necessary," and the SB 8 defendants are not required to justify discovery demands that meet the requirements of Rule 26(b)(1).

Montoya-Frazier is also wrong to deny that discovery is "necessary." The SB 8 defendants have explained many times that they intend to defeat the plaintiffs' standing by showing that: (a) None of the plaintiffs has violated SB 8 in the past; and (b) There are no Texas-licensed physicians willing to perform post-heartbeat abortions in violation of the Texas Heartbeat Act due to the threat of criminal prosecution under the trigger ban and the murder statute. *See* Mitchell Decl., ECF No. 247-1, at ¶ 7. The SB 8 defendants also intend to defeat the plaintiffs' First Amendment claims by proving that they are criminal organizations that violate the abortion laws of Texas and other jurisdictions, including 18 U.S.C. §§ 1461–1462. *See id*. So any discovery request that seeks to uncover evidence that might support either or both of these defenses is "relevant" and "proportional" under Rule 26(b)(1)—and any such discovery request is "necessary" for the defendants to establish a factual basis for their

defenses. The plaintiffs cannot cut off these defenses by preventing the defendants from developing the factual record needed to support their defenses in discovery.[2]

The plaintiffs do not deny that criminal organizations cannot assert First Amendment rights to assemble or associate, and they do not deny that the subpoenaed materials' relevance to whether Buckle Bunnies is a criminal organization. *See* Motion, ECF No. 250, at 3–5 (no discussion of the subpoena's attempt to uncover evidence of criminality). So they cannot deny that the subpoenaed materials are "necessary" for the SB 8 defendants to defend themselves against Buckle Bunnies's First Amendment claims. There is also no evidence in the record showing that Buckle Bunnies Fund has violated SB 8 and exposed itself to private civil-enforcement lawsuits, nor is there any evidence showing that Texas-licensed physicians will resume performing abortions in violation of SB 8 if Buckle Bunnies prevails in this lawsuit. The SB 8 defendants are entitled to prove through discovery that Buckle Bunnies lacks standing because it never violated SB 8 and cannot aid or abet abortions in violation of SB 8 because no Texas-licensed physician will violate the statute. The plaintiffs' suggestion that they have already proven Article III standing is false. *See* Motion, ECF No. 250, at 3–4. This Court has not ruled on whether the plaintiffs have demonstrated Article III standing, and the SB 8 defendants have not yet filed their Rule 12(b)(1) motion.[3]

---

2. The plaintiffs' claim that "[t]he SB8 Defendants have never asserted that they need discovery to respond to Plaintiffs' legal arguments" is outlandish. *See* Motion, ECF No. 250, at 3. The SB 8 defendants have asserted in nearly every discovery-related court filing that they need discovery to respond to the plaintiffs' First Amendment claims, and that they intend prove that the plaintiffs are criminal organizations that have First Amendment rights to assemble or associate. *See* Docket Entry No. 231, at 8–9; Docket Entry No. 247, at 6–7; Docket Entry No. 247-1, at ¶ 7; Docket Entry No. 248 at 7–8; Docket Entry No. 254 at 1–2.

3. The SB 8 defendants will move to dismiss the plaintiffs' claims for lack of subject-matter jurisdiction after the completion of discovery. The plaintiffs' observation that we have not *yet* "challenged this Court's jurisdiction" does not mean that the SB 8 defendants acknowledge the existence of Article III standing or subject-matter jurisdiction. *See* Motion, ECF No. 250, at 1.

The Buckle Bunnies Fund has not produced a shred of evidence showing an injury that is "fairly traceable" to Ashley Maxwell, Mistie Sharp, or Sadie Weldon—even though it is suing them alongside Zach Maxwell and Shannon Thomason. *See Daim-lerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006) ("'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." (citation omitted)). The SB 8 defendants are entitled to develop their own factual record on standing and cannot be limited to the current evidence in record that the plaintiffs and their lawyers submitted.

Discovery from Montoya-Frazier is especially necessary because she has told the media that Buckle Bunnies aids or abets illegal self-managed abortions in Texas. *See* Iris Dimmick, *Abortion access advocates face imposters, legal threats as trigger law nears,* San Antonio Report (August 1, 2022), https://bit.ly/3R6S3ad ("[T]he Buckle Bunnies Fund . . . helps Texans access and pay for abortions. That includes . . . guiding women through their self-managed abortions"). These are criminal acts punishable as murder,[4] and they were criminal acts even before the Supreme Court overruled *Roe v. Wade*, 410 U.S. 113 (1973).[5] But there is no evidence of Buckle Bunnies' criminality in the record; the evidence appears only in hearsay media reports. Discovery from Montoya-Frazier is necessary to get evidence of Buckle Bunnies' involvement in self-managed abortions into the record, so that the defendants can use that evidence to defend against the plaintiffs' First Amendment claims. And if Montoya-Frazier chooses to assert the privilege against self-incrimination at her deposition or in response to the document demands, then the plaintiffs can ask the courts to draw an adverse inference in response to that assertion of privilege. *See United States ex rel.*

---

4.  *See* Texas Penal Code § 1.07; *id.* at § 19.02; *id.* at § 19.06 (murder statute).
5.  *See Roe*, 410 U.S. at 165 ("[T]he State . . . may proscribe any abortion by a person who is not a physician"); *Connecticut v. Menillo*, 423 U.S. 9, 9–10 (1975) (allowing Connecticut to enforce its pre-*Roe* criminal abortion statutes against non-physician abortions).

*Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923) ("Silence is often evidence of the most persuasive character.").

## II.   Montoya-Frazier Fails To Meet The Standard For Quashing A Subpoena Under Rule 45(d)(3)

Rule 45(d)(3) allows courts to quash subpoenas, but only in the circumstances enumerated in Rule 45(d)(A)(i)–(iv) and (B)(i)–(ii). The plaintiffs invoke only Rule 45(d)(3)(A)(iv), which requires a court to quash a subpoena when it "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). But there is nothing "unduly burdensome" about the document requests because each of them is carefully targeted to materials that would show criminal or unlawful activity on the part of Buckle Bunnies.[6] The plaintiffs complain that Requests 13–18 and 20–21 seek documents that pre-date the Texas Heartbeat Act,[7] but self-managed abortion was a crime in Texas even before SB 8,[8] and it is not unduly burdensome to subpoena documents that could show evidence of criminal activity under the law that existed in 2019 and 2020. The plaintiffs complain that Requests 5–18 and 20–22 are not limited to materials relating to procedures performed by a Texas-licensed physician,[9] but these requests are seeking to uncover violations of the state's *criminal* abortion statutes, which extend beyond abortions performed by Texas-licensed physicians. The request to produce abortion-inducing drugs is relevant to whether Montoya-Frazier or Buckle Bunnies is violating 18 U.S.C. §§ 1461–1462 or the Texas laws that restrict distribution of these drugs. *See, e.g.*, Tex. Health & Safety Code § 171.063(a) (prohibiting non-

---

6. The plaintiffs' accusation that we are "just fishing" is groundless. *See* Motion, ECF No. 250, at 5. Montoya-Frazier has publicly admitted that Buckle Bunnies assists illegal self-managed abortions in Texas, and the subpoena is carefully targeted to request only documents and tangible things that might reveal evidence of criminal activity on the part of Buckle Bunnies.

7. *See* Motion, ECF No. 250, at 5.

8. *See* note 5, *supra*.

9. *See* Motion, ECF No. 250, at 5.

physicians from providing abortion-inducing drugs to a pregnant woman for the purpose of inducing an abortion). They are also relevant to Montoya-Frazier's and Buckle Bunnies's involvement in self-managed abortions. And there is nothing "unduly burdensome" about requesting documents that would reveal the identities of "third parties unconnected to this case," or "any officer, employee, volunteer, board member, or donor of Buckle Bunnies Fund," because the SB 8 defendants might want to pursue discovery from those individuals in their efforts to uncover evidence of criminal conduct.

The plaintiffs complain that these document requests will not assist the Court in resolving "venue and standing questions." Motion, ECF No. 250, at 6. But the SB 8 defendants are seeking this evidence to defeat Buckle Bunnies's *First Amendment claims* by showing that Buckle Bunnies is a criminal organization that lacks First Amendment rights to assemble and associate. The SB 8 defendants are also attempting to discover whether Buckle Bunnies has violated SB 8 in the past, because none the SB 8 defendants have any intent of suing Buckle Bunnies (and will submit sworn affidavits to that effect) if Buckle Bunnies never violated SB 8 by aiding or abetting an illegal post-heartbeat abortion performed by a licensed Texas physician.[10] The plaintiffs do not deny that criminal organizations lack First Amendment rights to assemble and associate, so they cannot stop the SB 8 defendants from pursuing materials

---

10. The plaintiffs complain that this is "disingenuous" because "Mr. Maxwell has already accused BBF of violating the law." Motion, ECF No. 250, at 7–8. Mr. Maxwell has never accused Buckle Bunnies of violating SB 8, and self-managed abortions do not violate SB 8 unless a licensed Texas physician was involved. If the evidence shows that Buckle Bunnies has never violated SB 8, then Mr. Maxwell will not sue them and will submit a sworn affidavit to that effect, which will eliminate any Article III case or controversy between the plaintiffs and Mr. Maxwell. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537 (2021); *Davis v. Sharp*, 656 F. Supp. 3d 687 (W.D. Tex. 2023).

that might uncover evidence of criminal behavior that would defeat their First Amendment claims.

Nor is there anything "unduly burdensome" about sitting for a deposition, especially when Montoya-Frazier is the founder and principal of a named plaintiff in this litigation. The plaintiffs complain that the subpoena "does not indicate what the topics of the deposition will be,"[11] but the rules of civil procedure do not require litigants to give deponents advance notice of the topics of questioning. Then the plaintiffs complain that the "topics"—which they do not know, and which they have no way of knowing until the deposition concludes—are "irrelevant to the actual claims in this case." Motion, ECF No. 250 at 6. But the plaintiffs have no idea what Montoya-Frazier will be asked about at her deposition, and they cannot quash the subpoena by asserting powers of divination or assuming that Montoya-Frazier will be asked only about "topics" that the plaintiffs' attorneys attempt to glean from the subpoena. If the plaintiffs fear that answering deposition questions or producing subpoenaed materials might reveal privileged information under the First or Fifth Amendments,[12] then their remedy is to assert the privilege at the deposition or in a privilege log, not to quash the subpoena across the board. And neither Montoya-Frazier nor Buckle Bunnies can even assert a "First Amendment privilege" if they are assisting criminal abortions and murder, as Montoya-Frazier has admitted to the news media—and does not deny in any of her court filings.

The plaintiffs' remaining objections should be rejected out of hand. The discovery sought is not "irrelevant" or "not proportional"[13] because Buckle Bunnies's First Amendment claims turn on whether it is a criminal or law-abiding organization. Nor

---

11. Motion, ECF No. 250 at 5.
12. Motion, ECF No. 250 at 7; *id.* at 8.
13. *See* Motion, ECF No. 250, at 5.

is it "sought for an improper purpose,"[14] as the SB 8 defendants have every right to defend their case and defeat Buckle Bunnies's First Amendment claims by uncovering (or attempting to uncover) evidence of criminality and lawbreaking—especially when Montoya-Frazier has publicly admitted that Buckle Bunnies aids or abets illegal self-managed abortions in Texas. The plaintiffs do not deny that criminal organizations lack a First Amendment right to assemble or associate, so they cannot deny the relevance, proportionality, or good-faith motives of these discovery requests.

### III. Montoya-Frazier Fails To Meet The Standard For A Protective Order Under Rule 26(c)

To obtain a protective order, Montoya-Frazier must show that producing the requested materials and sitting for a deposition would cause her "annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). She must also show "good cause" to justify the issuance of a protective order. *Id.* Montoya-Frazier does not claim that complying with the subpoena would cause her "annoyance," "embarrassment," or "oppression." She claims only that it would be "unduly burdensome." Motion, ECF No. 250, at 6 ("The burden imposed by the Subpoena is undue"). Montoya-Frazier fails to meet the standard for undue burden under Rule 26(c), for the same reasons that she fails to meet that standard under Rule 45(d)(3)(iv). *See* Part II, *supra*.

### IV. Montoya-Frazier's Objections To The Requests For Documents Are Meritless

Montoya-Frazier claims that she objects to producing *any* responsive materials "on the bases of the First Amendment privilege and Fifth Amendment privilege," but she must assert those privilege objections on a document-specific basis and produce a privilege log, as required by Rule 45(e)(2). *See* Fed. R. Civ. P. 45(e)(2) (setting forth the requirements for asserting privilege in response to a subpoena). Claims of privilege

---

14.   *See* Motion, ECF No. 250, at 5.

do not provide a blanket dispensation from responding to a subpoena, and a court cannot assess Montoya-Frazier's claims of privilege unless it has an opportunity to review the allegedly privileged documents in camera. Montoya-Frazier has not even alleged (let alone shown) that every single responsive document is privileged under the First or Fifth Amendment.

Nor is there anything problematic about subpoenaing documents and tangible thing belonging to Buckle Bunnies, as Montoya-Frazier is the founder and sole principal of that organization as has those items in her possession and control. This does not "circumvent" party discovery because the SB 8 defendants would be equally entitled to these materials if they had served the discovery demands directly on Buckle Bunnies. And it remained necessary to serve these production demands on Montoya-Frazier so that the SB 8 defendants could use and consult them during her deposition.

## CONCLUSION

The motion for protective order and motion to quash the subpoena should be denied, and the objections should be overruled.

Respectfully submitted.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: December 7, 2023           *Counsel for SB 8 Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 7, 2023, I served this document through CM/ECF upon:

Jennifer R. Ecklund
Elizabeth G. Myers
Allyn Jaqua Lowell
John Atkins
Elizabeth Rocha
Thompson Coburn LLP
2100 Ross Avenue, Suite 3200
Dallas, Texas, 75201
(972) 629-7100 (phone)
(972) 629-7171 (fax)
jecklund@thompsoncoburn.com
emyers@thompsoncoburn.com
alowell@thompsoncoburn.com
jatkins@thompsoncoburn.com
erocha@thompsoncoburn.com

*Counsel for Plaintiffs*

Alex Wilson Albright
Marcy Hogan Greer
Alexander Dubose & Jefferson LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
(512) 482-9300 (phone)
(512) 482-9303 (fax)
aalbright@adjtlaw.com
mgreer@adjtlaw.com

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for SB 8 Defendants*

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **FUND TEXAS CHOICE, et al.,** | § | |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 1:22-CV-859-RP** |
| **SUSAN R. DESKI, et al.,** | § | |
| *Defendants* | § | |

## ORDER

Before the Court are:

- Plaintiffs' Motion for Protective Order from Defendant Shannon D. Thomason's Discovery Requests, filed September 26, 2023 (Dkt. 219);

- SB 8 Defendants' Motion for Leave to Exceed the 10 Deposition Limit of Rule 30(a)(1)(A)(i), filed October 1, 2023 (Dkt. 224);

- Plaintiffs' Motion for Protective Order From, and Request for Stay Of, Discovery Served by SB8 Defendants, filed October 30, 2023 (Dkt. 235);

- Plaintiff Dr. Ghazaleh Moayedi's Motion for Protective Order from SB8 Defendants' Amended Notice of Deposition, filed November 21, 2023 (Dkt. 246);

- Defendant Mistie Sharp's Motion to Compel, filed November 22, 2023 (Dkt. 247);

- Plaintiff Buckle Bunnies Fund's and Non-party Makayla Montoya-Frazier's Motion for Protective Order, Motion to Quash Subpoena, and Objections to Third-Party Subpoena of Makayla Montoya-Frazier, filed November 30, 2023 (Dkt. 250);

and the associated response and reply briefs. The District Court referred the motions to this Magistrate Judge for disposition, pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Dkt. 239; Text Orders entered November 21, 2023, November 22, 2023, and December 4, 2023.

1

**0163**

## I.    Background

This case concerns the ability of Texas abortion advocates to fund or support abortions that take place outside the state's borders. Plaintiffs challenge the constitutionality of certain Texas statutes criminalizing abortion and Senate Bill 8 ("SB 8"), which authorizes private citizens to bring a civil action in strict liability tort against any person who performs or "aids or abets" certain abortions in Texas. TEX. HEALTH & SAFETY CODE § 171.208. Plaintiffs comprise one physician and several nonprofit Texas abortion funds, including Buckle Bunnies fund, of which non-party movant Makayla Montoya-Frazier is principal. Dkt. 250 at 2. The "SB 8 Defendants"[1] are private Texas citizens who have threatened to enforce SB 8 against certain Plaintiffs for their assistance with in- and out-of-state abortions.

The SB 8 Defendants have served nearly 1,700 written discovery requests on the ten Plaintiffs, a deposition notice on Plaintiff Dr. Ghazaleh Moayedi, and a subpoena duces tecum on Montoya-Frazier. *Id.*; Dkt. 249 at 2 n.1. The remaining defendants do not believe discovery is warranted at this time. Joint Federal Rule 26 Report, Dkt. 237 at 9-10. Plaintiffs and Montoya-Frazier ask the Court to stay the discovery sought by the SB 8 Defendants. They contend that the depositions and discovery requests are irrelevant and disproportionate to the needs of this case because their claims against the SB 8 Defendants are purely legal issues, requiring no discovery to resolve. Plaintiffs also argue that the requests "pose serious threats to core constitutional rights," Dkt. 235 at 10, including by improperly seeking information protected by the First Amendment, Dkt. 243 at 3.

## II.    Analysis

All defendants have filed motions to dismiss this case in its entirety. Dkts. 137, 161-67, 176. All of the motions to dismiss are fully briefed and ripe for adjudication.

---

[1] Shannon D. Thomason, Sadie Weldon, Ashley Maxwell, Zach Maxwell, and Mistie Sharp.

**0164**

Plaintiffs also have filed a motion for summary judgment against the SB 8 Defendants. In their motion, Plaintiffs argue that: "This case presents no material fact issues. SB8 is unconstitutional as a matter of law, and any attempt to enforce its terms against Plaintiffs (or anyone else) is per se invalid. SB8's provisions violate Plaintiffs' due process, equal protection, and First Amendment rights." Dkt. 209 at 16.

The SB 8 Defendants have filed a motion under Rule 56(d) seeking discovery before they respond to Plaintiffs' summary judgment motion, including discovery into Plaintiffs' Article III standing. Dkt. 217 at 1. The Rule 56(d) motion also is fully briefed and ripe for disposition.[2] To obtain discovery under Rule 56(d), the SB 8 Defendants must "set forth a plausible basis for believing that specified facts, susceptible of collection within a reasonable time frame, probably exist and indicate how the emergent facts, if adduced, will influence the outcome of the pending summary judgment motion." *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 366 (5th Cir. 2022) (citation omitted).

"A trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987) (holding that district court properly stayed discovery pending disposition of motion to dismiss); *see also Crain v City of Selma*, 952 F.3d 634, 638-39 (5th Cir. 2020) ("A district court has broad discretion in all discovery matters, and such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse.") (quoting *Moore v. CITGO Ref. & Chems. Co.*, 735 F.3d 309, 315 (5th Cir. 2013)). The Court also has wide discretion to determine whether to grant a motion for protective order under Rule 26(c)(1). *See Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 698 (5th Cir. 2017).

---

[2] Neither the potentially dispositive motions nor the Rule 56(d) motion are referred to this Magistrate Judge. The merits of those motions are not addressed in this Order.

**0165**

There is no question that the pending motions to dismiss raise "preliminary questions that may dispose of the case" in its entirety. *Petrus*, 833 F.2d at 583; Dkt. 237 at 7-8. This Magistrate Judge also finds that Plaintiffs and Montoya-Frazier have shown good cause to issue a protective order because responding to the discovery propounded by the SB 8 Defendants and appearing for deposition at the motion to dismiss stage of this proceeding would subject them to, at a minimum, "undue burden or expense" under Rule 26(c)(1). Accordingly, the Court exercises its "broad discretion and inherent power" to stay discovery pending disposition of all pending motions to dismiss and further order of the Court. *Petrus*, 833 F.2d at 583.

### III.    Conclusion

For these reasons, this Magistrate Judge **GRANTS IN PART** Plaintiffs' Motion for Protective Order from Defendant Shannon D. Thomason's Discovery Requests (Dkt. 219), Plaintiffs' Motion for Protective Order From, and Request for Stay Of, Discovery Served by SB8 Defendants (Dkt. 235), Plaintiff Dr. Ghazaleh Moayedi's Motion for Protective Order from SB8 Defendants' Amended Notice of Deposition (Dkt. 246), and Plaintiff Buckle Bunnies Fund's and Non-party Makayla Montoya-Frazier's Motion for Protective Order, Motion to Quash Subpoena, and Objections to Third-Party Subpoena of Makayla Montoya-Frazier (Dkt. 250) **to the extent that the subpoena served by the SB 8 Defendants is QUASHED and all discovery is STAYED pending further order of the Court.** To be clear, Plaintiffs and Montoya-Frazier need not appear for deposition nor respond to any discovery requests at this time.

Because discovery is stayed, the SB 8 Defendants' Motion for Leave to Exceed the 10 Deposition Limit of Rule 30(a)(1)(A)(i) (Dkt. 224) and Defendant Mistie Sharp's Motion to Compel (Dkt. 247) are **DISMISSED** without prejudice.

4

**0166**

It is **ORDERED** that the Clerk remove this case from this Magistrate Judge's docket and **RETURN** it to the docket of the Honorable Robert Pitman.

**SIGNED** on December 8, 2023.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE

**0167**

EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **FUND TEXAS CHOICE, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Case No. 1:22-cv-00859-RP** |
| **JOSÉ GARZA, in his official capacity as District Attorney of Travis County, Texas, et al.,** | |
| **Defendants.** | |

**PLAINTIFF BUCKLE BUNNIES FUND'S AND NON-PARTY MAKAYLA MONTOYA-FRAZIER'S MOTION FOR PROTECTIVE ORDER, MOTION TO QUASH SUBPOENA, AND OBJECTIONS TO THIRD-PARTY SUBPOENA OF MAKAYLA MONTOYA-FRAZIER**

Makayla Montoya-Frazier ("Ms. Montoya-Frazier") moves to quash and objects to the subpoena duces tecum ("Subpoena") served on her by Defendants Shannon D. Thomason, Sadie Weldon, Ashley Maxwell, Zach Maxwell, and Mistie Sharp ("SB8 Defendants").[1] Plaintiff Buckle Bunnies Fund ("BBF") also moves for protection from the Subpoena.

Plaintiffs added the SB8 Defendants to this case in their Second Amended Complaint (ECF 129). The claims asserted against the SB8 Defendants seek declarations (and any associated injunctive relief the Court deems appropriate) that a Texas state statute – Senate Bill 8 ("SB8") – is unconstitutional or otherwise legally void, and therefore unenforceable. (ECF 129, 79-82). The SB8 Defendants moved to dismiss on two grounds: improper joinder and venue. (ECF 167). That motion has been fully briefed. (ECF 167, 177, 204). The SB8 Defendants have not answered, filed any counterclaims, asserted any affirmative defenses, or challenged this Court's jurisdiction.

Plaintiffs moved for summary judgment on these purely legal claims on September 11,

---

[1] A copy of the Subpoena is attached as Ex. A-1.

**0169**

2023. (ECF 207). Rather than respond to those legal issues, the SB8 Defendants decided to engage in an improper, unnecessary, harassing, and seemingly unending discovery campaign.[2] That campaign now includes serving Ms. Montoya-Frazier (a third party, principal of BBF) with the Subpoena seeking her deposition and a variety of documents. No discovery is necessary, and in particular, no discovery is necessary from Ms. Montoya-Frazier, for the reasons that follow.

## I.     LEGAL STANDARD

A district court must limit discovery if:

> …if the burden or expense of the proposed discovery outweighs its likely benefit considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues … and the importance of the discovery in resolving the issues.

*Nat'l W. Life Ins. Co. v. W. Nat'l Life Ins. Co.*, No. A-09-CA-711 LY, 2010 WL 11569446, at *1 (W.D. Tex. Aug. 26, 2010) (quoting FED. R. CIV. P. 26(b)(2)(C)). A court may "for good cause, issue an order to protect a party … from … oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). The person subpoenaed may also move to quash. FED. R. CIV. P. 45(d)(3). "Courts may further limit discovery under Rule 45(c)(3)(A) which provides … that a court must quash or modify a subpoena that either requires the disclosure of privileged information and/or subjects a person to undue burden." *Nat'l W. Life Ins. Co.*, 2010 WL 5174366, at *2 (citing FED. R. CIV. P. 45(c)(3)(A)(iii)).

A deposition or other discovery may be prohibited as unnecessary where "summary judgment motions could be decided as a matter of law on the basis of the undisputed facts already before the court." *Landry v. Air Line Pilots Ass'n Intern. AFL-CIO*, 901 F.2d 404, 435 (5th Cir. 1990), *opinion modified on other grounds on denial of reh'g* (Apr. 27, 1990). Discovery may also be forbidden where it appears a party is "seeking information in order to find a way to attack"

---

[2] To date, the SB8 Defendants have served 1691 written discovery requests. ECF 236-1; Ex. A.

another party in a manner unrelated to the case before the court. *Alvarado v. State Farm Lloyds*, No. 7:14-CV-166, 2015 WL 12941979, at *4 (S.D. Tex. Jan. 29, 2015).

## II.      ARGUMENT AND AUTHORITIES

### A.      The discovery sought in the Subpoena is unnecessary.

Plaintiffs seek declaratory and injunctive relief against the SB8 Defendants regarding the constitutionality of SB8. (*See* ECF 129, pp. 79-82). The constitutionality of a statute is a question of law. *Miller v. Raytheon Co.*, 716 F.3d 138, 148 (5th Cir. 2013). The SB8 Defendants have never asserted that they need discovery to respond to Plaintiffs' legal arguments. Instead they moved to defer consideration of Plaintiffs' pending summary judgment motion because they claim to need to investigate standing and venue. (*See* ECF 217, pp. 2-3). But the SB8 Defendants need no discovery on these issues from Ms. Montoya-Frazier because (1) the venue arguments are already fully made and briefed,[3] (*see* ECF 167, 177, 204), and (2) BBF's Article III injury is a matter of public record: one of the SB8 Defendants has already threatened BBF with SB8 litigation, and another has already dragged BBF into state court to obtain information to file SB8 lawsuits.

BBF, the only Plaintiff Ms. Montoya-Frazier is affiliated with, has already been injured by Zach Maxwell ("Mr. Maxwell") and Shannon Thomason ("Mr. Thomason") through their attempts to use SB8 as a tool to suppress constitutionally-protected activity and threaten BBF (and anyone who associates with it). Mr. Maxwell filed a petition seeking pre-suit discovery from Ms. Montoya-Frazier (in a state court far from where BBF or Ms. Montoya-Frazier resides) seeking evidence of SB8 violations in order to bring claims to privately enforce the law. (*See* ECF 129-

---

[3] Any discovery that was related to venue would also focus on where the SB8 Defendants' actions happened, or where the Plaintiffs are physically located, neither of which requires an unlimited deposition of Ms. Montoya Frazier or the production of any documents requested in the Subpoena.

31).[4] BBF's injury is not future and conjectural; BBF is harmed by Maxwell's efforts to subject it to discovery, which on its own will violate the organization's First Amendment rights and those of its associates. BFF is also harmed by the omnipresent threat of litigation Maxwell wields through his self-asserted interest in subjecting BFF to SB8 claims. The injury is present, concrete, and particularized, and it is traceable to Mr. Maxwell and his enforcement authority and professed intention to sue under SB8. *Amaru Entm't, Inc. v. Brent*, No. 3:22-CV-2677-B, 2023 WL 3575562, at *3 (N.D. Tex. May 19, 2023) (finding threat of litigation to be sufficiently "specific and concrete" where it already "exists in filed form on the docket.").

BBF (along with the other Plaintiffs and their counsel) has also been threatened with SB8 litigation and subjected to a "litigation hold" obligation in a letter sent by Defendant Thomason. (*See* ECF 129-4). Threats of civil litigation support standing for declaratory relief against the threatener. *Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496, 499 (7th Cir. 2014); *see also Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 897 (5th Cir. 2000) ("The threat of litigation, if specific and concrete, can indeed establish a controversy upon which declaratory judgment can be based.").

SB8 Defendants cannot articulate a legitimate need for the discovery requested in the Subpoena, and it is thus irrelevant, disproportionate, and unduly burdensome. In their motion to defer consideration of Plaintiffs' motion for summary judgment, the only justification given for the continuing discovery demands was that the SB8 Defendants wish to inquire about venue and standing. (ECF 217). The venue question has been fully briefed and is before the Court, and for the reasons given above there is no standing issue to investigate here, nor have the SB8 Defendants filed any motion challenging standing. Ms. Montoya-Frazier's motion to quash, and BBF's motion

---

[4] This pre-suit discovery matter is presently on appeal. *See Makayla Montoya-Frazier v. Zach Maxwell*, Case No. 02-23-00103-CV, in the Second Court of Appeals of the State of Texas. The public filings in the case are publicly available at https://search.txcourts.gov/Case.aspx?cn=02-23-00103-CV&coa=coa02.

**0172**

for protection, should be granted. *Landry*, 901 F.2d at 435 (affirming protective order staying discovery while summary judgment was considered); *Parsons v. Liberty Ins. Corp.*, No. 3:20-CV-1682-K, 2021 WL 11718301, at \*1 (N.D. Tex. June 14, 2021) (granting motion for protective order staying discovery and quashing deposition pending results of summary judgment motion).

**B.    The discovery is irrelevant, unduly burdensome, not proportional to the needs of the case, and sought for an improper purpose.**

The Subpoena itself does not indicate what the topics of the deposition will be and counsel for the SB8 Defendants has refused to provide any information regarding the proposed topics. However, the document requests in the Subpoena show that the SB8 Defendants are just fishing:

- Requests 13-18 and 20-21 request materials dating back to 2019 and 2020,[5] before SB8 or any other challenged abortion restriction became effective, and no information from that period can be relevant.

- Requests 5-18 and 20-22 are not limited to materials relating to procedures performed by a Texas-licensed physician, even though SB8 by its terms only applies where the abortion is performed by a Texas-licensed physician. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 171.201(4) (defining "physician" as "an individual licensed to practice medicine in this state"), 171.204(a) (prohibiting abortions saying "a physician may not"), 171.208 (providing for civil action against person who "aids or abets…an abortion…if the abortion is performed or induced in violation of this subchapter").[6] Ex. A-1. Materials related to procedures that could not possibly violate SB8 are irrelevant.

- Requests 1-21 all at least implicitly (and requests 3, 4, 7, 8, 11, 12, and 15-19 expressly)

---

[5] The Subpoena specifies a timeframe beginning in 2019 unless otherwise stated. Ex. A-1 at 4.
[6] The SB8 Defendants themselves maintain that SB8 can only apply to abortions performed by a Texas-licensed physician. ECF 247, pp. 5-6.

seek the identities of, and information regarding, third parties unconnected to this case, and include such harassing demands as requests for all documents regarding "the sources of financial support" for BBF and "any officer, employee, volunteer, board member, or donor of Buckle Bunnies Fund." All of this is irrelevant – no element of any claim or defense in this case turns on the contents of BBF's donor list, or all documents related to its staff and volunteers.[7]

Based on these document requests and the SB8 Defendants' refusal to narrow the scope of the deposition, BBF and Ms. Montoya-Frazier believe that the deposition will also cover these subjects. *But none of these requests seek information that would assist the Court in resolving any element of the venue and standing questions the SB8 Defendants claim they need discovery to brief.*

The burden imposed by the Subpoena is undue because the topics are irrelevant to the actual claims in this case, the requests are overly broad and lack any reasonable specificity (Requests 1-21 each seek "all documents describing, referring to, concerning, or relating to" each subject matter and sometimes also add "identifying"), and the requests cover time periods of up to four years. *Doe 1 v. Baylor Univ.*, No. 6:16-CV-173-RP-AA, 2020 WL 2220189, at *1 (W.D. Tex. May 7, 2020) (listing relevance, need, breadth, time period, particularity, and burden as the factors for analyzing undue burden); *see also Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) ("A court may find that a subpoena presents an undue burden when the subpoena is facially overbroad."). Preparing and sitting for a deposition and producing documents responsive to these requests after searching, collecting, and reviewing for multiple privileges and constitutional defenses would require substantial time and money, serve no litigation purpose, and

---

[7] Request 22, bizarrely, appears to seek the production of actual abortion-inducing drugs. That, too, is irrelevant to any claim in this case. The constitutionality of SB8 does not turn on whether BBF or anyone else in Texas possesses mifepristone or any of the other items sought.

impose a great burden on Ms. Montoya-Frazier as a witness and on BBF as an interested party.

In addition, forcing Ms. Montoya-Frazier (whether or not in her capacity as a principal of BBF) to disclose information about employees, volunteers, and especially donors and sources of financial information, would injure both her own First Amendment rights to confidentially assemble and associate with others and BBF's First Amendment rights. This Court already held that restrictions on Plaintiffs' ability to assemble, associate, and provide assistance – in the form of direct care and funding or practical support – to pregnant Texans implicate Plaintiffs' First Amendment Rights. (ECF 120 at 19); *see also Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462-63 (1958) (First Amendment prevents compelled disclosure chilling associational rights).[8] Given the threats of criminal liability that Mr. Maxwell, Mr. Thomason, the other SB8 Defendants, and various public officials continue to make, core constitutional rights of BBF's staff, volunteers, and donors would also be impacted by any requirement that Ms. Montoya-Frazier provide unlimited and unmitigated testimony and discovery. *See Cazorla v. Koch Foods of Mississippi, L.L.C.*, 838 F.3d 540, 564 (5th Cir. 2016) (finding that discovery should be limited where the information sought "may have a chilling effect extending well beyond this case, imperiling important public purposes.").

In their Motion to Compel, the SB8 Defendants purport to need discovery to disprove that BBF (and other Plaintiffs) have standing by demonstrating that there is no way they can violate SB8, because – they believe – there is no doctor licensed in Texas willing to provide abortion care to pregnant Texans, and so the law could not be violated. ECF 247, pp. 5-6. This is disingenuous,

---

[8] The Justice Department also recently filed a statement of interest in *Yellowhammer Fund v. Marshall and West Alabama Women's Center, et al., v. Marshall*, explaining that "[t]hese cases demonstrate that, just as a state cannot prohibit the underlying travel, a state also cannot restrict third-party assistance of that travel. 2:23-cv-00450-MHT-KFP, ECF 40, p. 25. Any contrary approach – allowing states to restrict third-party assistance for travel – would threaten to gut the right to travel itself." *Id.*

0175

given that Mr. Maxwell has already accused BBF of violating the law. *E.g.* ECF 129-31. It is also irrelevant, because as Mr. Maxwell's pre-suit discovery petition shows, SB8 enables him to force harmful litigation on BBF and its principals without having to prove that BBF violated the law. In any case, at least one Texas-licensed doctor already *has* testified that she will perform abortion services (in states where it is legal). ECF 86-1 at Tr. 185:3-16; 205:9-207:17; 227:4-228:2.

The SB8 Defendants, and Mr. Maxwell in particular, have also repeatedly stated that they believe Ms. Montoya-Frazier has engaged in criminal behavior. (ECF 129-31). That ongoing threat of criminal liability – which will not be eliminated until this Court enters a final judgment in Plaintiffs' favor on the claims against the DA Defendants – means that Ms. Montoya-Frazier will likely be forced to invoke her rights under the Fifth Amendment if protection is not granted. The Fifth Amendment protects the innocent, too.[9] She cannot be forced to testify about anything (or produce documents) that she "reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972); *see also Wehling v. Columbia Broad. Sys.,* 608 F.2d 1084, 1086 (5th Cir. 1979).

Because the Subpoena seeks irrelevant information, it is clear that its real purpose (consistent with some of the SB8 Defendants' past behavior) is to obtain information that the SB8 Defendants believe could be used to initiate additional litigation or pre-suit discovery against BBF or its donors, volunteers, employees, or associates in other courts. That is not a proper purpose for discovery. *Alvarado*, 2015 WL 12941979, at *4 (limiting discovery where irrelevance and breadth

---

[9] The constitutionally guaranteed protection that the Fifth Amendment provides applies in civil litigation even where there is no criminal charge or investigation pending. *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1087 n.5 (5th Cir. 1979) ("If a party reasonably apprehends a risk of self-incrimination, he may claim the privilege though no criminal charges are pending against him, and even if the risk of prosecution is remote." (citation omitted)).

of requests suggested purpose was to find a way to attack other party).[10]

The Subpoena is s fishing expedition designed to extend the SB8 Defendants' campaign of litigation harassment and intimidation against abortion funds and providers through their common counsel in multiple fora. This is the type of circumstance that warrants protection, particularly where there is no value to the discovery sought. *See Vicari v. Ysleta Indep. Sch. Dist.*, No. EP-06-CA-131-FM, 2006 WL 8434060, at *3 (W.D. Tex. Dec. 12, 2006) (vacating notice of deposition and limiting scope of any deposition); *see also Alvarado*, 2015 WL 12941979, at *4 (quashing deposition notice and subpoena where party's "discovery tactics represent[ed] not merely a fishing expedition but an effort to dredge the lake in hopes of finding a fish.") (cleaned up).

## C.     Ms. Montoya-Frazier also objects to the document requests.

Ms. Montoya-Frazier also objects to the document requests in their entirety pursuant to Rule 45(d)(2)(B). As explained in Section III.A., *supra*, no discovery from Ms. Montoya-Frazier is necessary, and as explained in Section III.B., *supra*, the deposition and discovery requests are irrelevant and unduly burdensome as a whole and individually. Ms. Montoya-Frazier also objects to producing responsive materials on the bases of the First Amendment privilege and Fifth Amendment privilege, again for the reasons given in Section III.B. Ms. Montoya-Frazier incorporates those arguments above as her objections to all the document requests in the Subpoena.

Each and every request also seeks materials belonging to BBF, and not just those belonging privately to Ms. Montoya-Frazier, because the Subpoena defines "you" as including "Makayla Montoya-Frazier and the Buckle Bunnies Fund, including any person authorized to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers." Ex. A-1. Every request

---

[10] Defendants Thomason, Ashley Maxwell, Zach Maxwell, and Weldon have all filed pre-suit discovery petitions seeking information they hope to use to file SB8 lawsuits. (*See* ECF 129-25, 129-26, 129-29, 129-31). In two of those petitions, the basis for seeking discovery was testimony by proposed deponents in other pre-enforcement litigation. (*See* ECF 129-25, ¶ 20; 129-29 ¶ 20.)

is therefore separately objectionable because Rule 45 is not intended to circumvent party discovery. *United States v. Cabelka*, No. 7:16-CV-00126-O-BP, 2017 WL 11814622, at *2 (N.D. Tex. Oct. 5, 2017) ("Rule 45 subpoenas are not meant to circumvent the regular discovery process under Rules 34 and 26."); *Fedorova v. Foley*, No. 1:22-CV-991, 2023 WL 5016652, at *3 (W.D. Mich. Apr. 26, 2023) ("It is improper for a plaintiff to circumvent the discovery process for production of documents … by serving a defendant with a subpoena …"). The SB8 Defendants have served separate discovery requests on BBF, which are the subject of a pending motion for protection (ECF 235), so their attempt to subpoena these same materials from Ms. Montoya-Frazier is improper.[11] For this additional reason Ms. Montoya-Frazier objects to all requests as improper, disproportionate, and unduly burdensome.

For these reasons Ms. Montoya-Frazier seeks the Court's protection and likewise objects to producing any of the materials sought by the Subpoena. Unless and until the SB8 Defendants move the Court to compel production of these materials, and the Court grants that motion in whole or in part, Ms. Montoya-Frazier will not produce any of the requested materials. *See* FED. R. CIV. P. 45(d)(2)(B)(i)-(ii) (setting procedure after objections to subpoenas duces tecum).

### III.    CONCLUSION

Ms. Montoya-Frazier asks that the Court grant her Motion to Quash and sustain her discovery objections under Rule 45(d), and Plaintiff Buckle Bunnies Fund asks that the Court grant its Motion for Protection pursuant to Rule 26(c). Ms. Montoya-Frazier and BBF also respectfully request expedited consideration of these Motions because the Subpoena sets December 8, 2023 as the compliance date. Ms. Montoya Frazier and BBF are filing a related motion for expedited consideration concurrently with the filing of these Motions.

---

[11] The SB8 Defendants' are also ignoring their obligation "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." *See* FED. R. CIV. P. 45(d)(1).

0179

Dated: November 30, 2023                    Respectfully submitted,

By: */s/ Jennifer R. Ecklund*
  Jennifer R. Ecklund
  Texas Bar No. 24045626
  jecklund@thompsoncoburn.com

  Elizabeth G. Myers
  Texas Bar No. 24047767
  emyers@thompsoncoburn.com

  Nicole L. Williams
  Texas Bar No. 24041784
  nwilliams@thompsoncoburn.com

  Allyn J. Lowell
  Texas Bar No. 24064143
  alowell@thompsoncoburn.com

  John P. Atkins
  Texas Bar No. 24097326
  jatkins@thompsoncoburn.com

  Elizabeth B. Rocha
  Texas Bar No. 24127242
  erocha@thompsoncoburn.com

  Sarah E. Hillier
  Texas Bar No. 24130087
  shillier@thompsoncoburn.com

  **THOMPSON COBURN LLP**
  2100 Ross Avenue, Suite 3200
  Dallas, Texas 75201
  Telephone: 972/629-7100
  Facsimile: 972/629-7171

  Alexandra Wilson Albright
  Texas Bar No. 21723500
  aalbright@adjtlaw.com

  Marcy Hogan Greer
  Texas Bar No. 08417560
  mgreer@adjtlaw.com

- 11 -

515 Congress Ave., Suite 2350
Austin, TX 78701-3562
Telephone: 512/482-9300
Facsimile: 512/482-9303

Kevin Dubose
Texas Bar No. 06150500
kdubose@adjtlaw.com
1844 Harvard Street
Houston, TX 77008
Telephone: 713/523-2358
Facsimile: 713/522-4553

Kirsten M. Castañeda
Texas Bar No. 00792401
kcastaneda@adjtlaw.com
8144 Walnut Hill Lane, Suite 1000
Dallas, TX 75231-4388
Telephone: 214/369-2358
Facsimile: 214/369-2359

**ALEXANDER DUBOSE &
JEFFERSON, LLP**

**ATTORNEYS FOR PLAINTIFFS AND FOR
NON-PARTY MAKAYLA MONTOYA-FRAZIER**

- 12 -

0180

**CERTIFICATE OF CONFERENCE**

Pursuant to Federal Rule of Procedure 26(c)(1) and Local Rule CV-7(G), undersigned counsel conferred in good faith with counsel for SB8 Defendants on November 22, 27, and 30, 2023 to discuss the relief sought herein. The parties were unable to resolve these issues. Therefore, SB8 Defendants are opposed to the requested relief.

/s/ Elizabeth G. Myers
Elizabeth G. Myers


**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2023, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.

/s/ Jennifer R. Ecklund
Jennifer R. Ecklund

0181

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FUND TEXAS CHOICE, et al.,

     Plaintiffs,

v.

JOSÉ GARZA, in his official capacity as
District Attorney of Travis County, Texas, et
al.,

     Defendants.

Civil Case No. 1:22-cv-859-RP

## DECLARATION OF ELIZABETH MYERS

STATE OF TEXAS       §

DALLAS  COUNTY       §

1.  My name is Elizabeth G. Myers.  I am over the age of 18, and suffer from no legal or mental disabilities.  I have personal knowledge of, and full capacity to testify about, the facts stated in this Declaration, which is provided as Exhibit A to Plaintiff Buckle Bunnies Fund's and Non-Party Makayla Montoya-Frazier's Motion for Protective Order, Motion to Quash Subpoena, And Objections to Third-Party Subpoena of Makayla Montoya-Frazier.

2.  I am a Partner at Thompson Coburn LLP.  I represent Plaintiffs in the above-captioned matter, and I also represent Makayla Montoya-Frazier, a third party and principal of Buckle Bunnies Fund, who has been subpoenaed for a deposition and document discovery by Defendants Shannon D. Thomason, Sadie Weldon, Ashley Maxwell, Zach Maxwell, and Mistie Sharp (collectively, "SB8 Defendants").  I was served with the original of the exhibit to which I am swearing authenticity in this declaration.

3.  On November 22, 2023, I received via email the SB8 Defendants' subpoena to Ms. Montoya-Frazier, a copy of which is attached hereto as Exhibit A-1.  The only change to the original, as-served version of this document is that I have an appended an exhibit designation page

**0183**

0184

to the beginning of the document.  I personally compared Exhibit A-1 to the original version served to me by Mr. Mitchell, and I certify that, but for the exhibit page, Exhibit A-1 is a true and correct copy of that subpoena.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 30, 2023.**

_____
Elizabeth G. Myers

DECLARATION OF ELIZABETH G. MYERS—PAGE 2

# EXHIBIT A-1

0185

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

<table>
<tr><td>Fund Texas Choice</td><td>)</td><td rowspan="6"></td></tr>
<tr><td align="center">*Plaintiff*</td><td>)</td></tr>
<tr><td align="center">v.</td><td>)</td></tr>
<tr><td>José Garza</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td align="center">*Defendant*</td><td>)</td></tr>
</table>

Civil Action No.   1:22-cv-00859-RP

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:            Makayla Montoya-Frazier

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Fillmore Law Firm<br>201 Main Street, Suite 700<br>Fort Worth, Texas 76102 | Date and Time:<br>12/08/2023 9:00 am |
|---|---|

The deposition will be recorded by this method:    Videotape and stenographic means

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:    See Exhibit A (attached)

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      11/22/2023

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Jonathan F. Mitchell |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*      Mistie Sharp, Sadie Weldon, Ashley Maxwell, Zach Maxwell, and Shannon Thomason  , who issues or requests this subpoena, are:

Jonathan F. Mitchell, 111 Congress Avenue, Suite 400, Austin, Texas, 78701, jonathan@mitchell.law, (512) 686-3940

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**0186**

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:22-cv-00859-RP

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

0187

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**0188**

## EXHIBIT A

## Documents to Be Produced by Makayla Montoya-Frazier

I.   DEFINITIONS AND INSTRUCTIONS FOR REQUESTS FOR PRODUCTION

1. Each request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

2. Unless otherwise indicated, the relevant time period for these requests is from January 1, 2019, to the present.

3. Unless otherwise defined, the terms used should be read and construed in accordance with the English language and the ordinary meanings and definitions attached. You should, therefore: (i) construe the words "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive; (ii) construe the term "including" to mean "including, but not limited to"; and (iii) construe the words "all" and "each" to mean all and each.

The following definitions apply to each of these requests:

- The terms "**Buckle Bunnies Fund**," "**you**" and "**your**" refer to Makayla Montoya-Frazier and the Buckle Bunnies Fund, including any agent or person authorized to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" refers to the act of noting, recording, or preserving any type of information, data, or communication, without regard to the method used to note, record, or preserve such information, data, or communication. The term includes any e-mail or text message.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint

venture, corporation, governmental agency, or other form of legal entity.

- The terms **"identify"** and **"identity,"** when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms **"implement"** and **"implementation"** refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term **"information"** refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms **"person"** and **"persons"** mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term **"record"** means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, documented, or received by Defendant by:

  (A)   handwriting;
  (B)   typewriting;
  (C)   printing;
  (D)   photostat;
  (E)   photograph;
  (F)   magnetic impulse;
  (G)   mechanical or electronic recording;
  (H)   digitized optical image; or
  (I)   another form of data compilation.

- The term **"record"** also includes any communication, including an e-mail or text-message communication.

- The term **"reproduction"** means an accurate and complete counterpart of an original document or record produced by:

    (A)     production from the same impression or the same matrix as the original;
    (B)     photograph, including an enlargement or miniature;
    (C)     mechanical or electronic re-recording;
    (D)     chemical reproduction;
    (E)     digitized optical image; or
    (F)     another technique that accurately reproduces the original.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."

## II.   DOCUMENTS OR TANGIBLE THINGS REQUESTED

**Request No. 1**: Any and all documents describing, referring to, concerning, or relating to abortions provided by a Texas-licensed physician on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 2**: Any and all documents describing, referring to, concerning, or relating to Buckle Bunnies Fund's role in providing, supporting, funding, or facilitating abortions performed by a Texas-licensed physician on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 3**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that Buckle Bunnies Fund consulted or collaborated with in supporting, funding, or facilitating abortions performed by a Texas-licensed physician on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 4**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that aided or abetted an abortion performed by a Texas-licensed physician on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that

occurred while Judge Pitman's injunction was in effect from October 6–8, 2021. This includes the identity of anyone who paid for or reimbursed the costs of the abortion, including insurers, employers of the patient, and abortion funds, and any individual or entity (apart from the pregnant woman upon whom the abortion was performed) that paid for or reimbursed the costs of the abortion in whole or in part. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 5**: Any and all documents describing, referring to, concerning, or relating to abortions in Texas provided by Buckle Bunnies Fund or with Buckle Bunnies Fund's support on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 6**: Any and all documents describing, referring to, concerning, or relating to Buckle Bunnies Fund's role in providing, supporting, funding, or facilitating abortions performed in Texas on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 7**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that Buckle Bunnies Fund consulted or collaborated with in performing supporting, funding, or facilitating abortions performed in Texas on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 8**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that aided or abetted an abortion performed in Texas on or after June 24, 2022, including abortions that occurred while Judge Weems's TRO was in effect from June 28–July 1, 2022. This includes the identity of anyone who paid for or reimbursed the costs of the abortion, including insurers, employers of the patient, and abortion funds, and any individual or entity (apart from the pregnant woman upon whom the abortion was performed) that paid for or reimbursed the costs of the abortion in whole or in part. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 9**: Any and all documents describing, referring to, concerning, or relating to any abortion provided by an out-of-state abortion provider on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 10**: Any and all documents describing, referring to, concerning, or relating to Buckle Bunnies Fund's role in providing, supporting, funding, or facilitating any abortion provided by an out-of-state abortion provider on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 11**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that Buckle Bunnies Fund consulted or collaborated with in performing supporting, funding, or facilitating any abortion provided by an out-of-state abortion provider on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 12**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that aided or abetted any abortion provided by an out-of-state abortion provider on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas. This includes the identity of anyone who paid for or reimbursed the costs of the abortion, including insurers, employers of the patient, and abortion funds, and any individual or entity (apart from the pregnant woman upon whom the abortion was performed) that paid for or reimbursed the costs of the abortion in whole or in part. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 13**: Any and all documents describing, referring to, concerning, or relating to self-managed abortions provided by Buckle Bunnies Fund or with Buckle Bunnies Fund's support. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 14**: Any and all documents describing, referring to, concerning, or relating to Buckle Bunnies Fund's role in providing, supporting, funding, or facilitating self-managed abortions. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 15**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that Buckle Bunnies Fund consulted or collaborated with in performing supporting, funding, or facilitating self-managed abortions. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 16**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual or entity that aided or abetted a self-managed abortion. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 17**: Any and all documents identifying, describing, referring to, concerning, or relating to the sources of financial support for Buckle Bunnies Fund. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 18**: Any and all documents identifying, describing, referring to, concerning, or relating to any officer, employee, volunteer, board member, or donor of Buckle Bunnies Fund. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 19**: Any and all documents identifying, describing, referring to, concerning, or relating to any individual who aided or abetted: (1) any abortion performed by a Texas-licensed physician on or after September 1, 2021, in which a fetal heartbeat was detectable (or likely to be detectable if properly tested), including abortions that occurred while Judge Pitman's injunction was in effect from October 6–8, 2021; (2) any abortion performed in Texas on or after June 24, 2022, including abortions performed while Judge Weems's TRO was in effect from June 28–July 1, 2022; (3) any abortion provided by an out-of-state abortion provider on or after September 1, 2021, if there is any possibility that the patient might have opted for a drug-induced abortion and ingested either of the abortion drugs in Texas; or (4) any self-managed abortion. This includes the identity of anyone who paid for the abortion, including insurers, employers of the patient, and abortion funds. You may redact the names and identifying information of abortion patients or women seeking abortions.

**Request No. 20**: Any and all documents identifying, describing, referring to, concerning, or relating to any use of the mails for the mailing, carriage in the mails, or delivery of: (1) any article or thing designed, adapted, or intended for producing abortion; or (2) any article, instrument, substance, drug, medicine, or thing which is advertised or described in a manner calculated to lead another to use or apply it for producing abortion.

**Request No. 21**: Any and all documents identifying, describing, referring to, concerning, or relating to: (1) the use of any express company or other common carrier or interactive computer service for carriage in interstate or foreign commerce of any drug, medicine, article, or thing designed, adapted, or intended for producing abortion; or (2) the taking or receiving, from any express company or other common carrier or interactive computer service, any drug, medicine, article, or thing designed, adapted, or intended for producing abortion.

**Request No. 22**: Any and all abortion-inducing drugs in your possession or in the possession of the Buckle Bunnies Fund, including mifepristone (also known as mife-prex) and misoprostol.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **FUND TEXAS CHOICE, et al.,** <br><br> **Plaintiffs,** <br> **v.** <br><br> **JOSÉ GARZA, in his official capacity as District Attorney of Travis County, Texas, et al.,** <br><br> **Defendants.** | **Civil Case No. 1:22-cv-859-RP** |

**[PROPOSED] ORDER GRANTING PLAINTIFF
BUCKLE BUNNIES FUND'S AND NON-PARTY MAKAYLA MONTOYA-FRAZIER'S
MOTION FOR PROTECTIVE ORDER, MOTION TO QUASH SUBPOENA, AND
OBJECTIONS TO THIRD-PARTY SUBPOENA OF MAKAYLA MONTOYA-FRAZIER**

Before the Court is Plaintiff Buckle Bunnies Fund's and Non-Party Makayla Montoya-Frazier's (collectively, "Movants") Motion for Protective Order, Motion to Quash Subpoena, and Objections to Third-Party Subpoena of Makayla Montoya-Frazier ("Motion"). Having considered the pleadings, applicable law, and arguments of counsel, the Court finds that the Motion should be granted.

The Court hereby ORDERS that Plaintiffs' Motion is **GRANTED**, and **ORDERS** as follows:

1. Ms. Montoya-Frazier's motion to quash pursuant to Federal Rule of Civil Procedure 45(c)-(d) is granted;

2. Plaintiff Buckle Bunnies Fund's motion for protective order under Federal Rule of Civil Procedure 26(c) is granted; and

3. Movants' objections are sustained.

**PROPOSED ORDER – PAGE 1**                                    -

**0196**

Ms. Montoya-Frazier is therefore excused from complying with the November 22, 2023, subpoena served by Defendants Shannon D. Thomason, Sadie Weldon, Ashley Maxwell, Zach Maxwell, and Mistie Sharp.

**SO ORDERED** this _____ day of _____, 2023.

_____

HON. ROBERT L. PITMAN

**PROPOSED ORDER – PAGE 2**                    -

**0197**

# EXHIBIT E

FILED
12/22/2023 8:11 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Rogelio Espinosa
Bexar County - 438th District Court

Cause No. 2023CI22459

| | |
|---|---|
| **San Antonio Family Association**, et al. | IN THE DISTRICT COURT |
| Plaintiffs, | |
| v. | BEXAR COUNTY, TEXAS |
| **City of San Antonio**, et al., | |
| Defendants. | 438th JUDICIAL DISTRICT |

## PLAINTIFFS' NOTICE OF SUBPOENA FOR ORAL DEPOSITION OF MAKAYLA MONTOYA-FRAZIER

Please take notice that at least 10 days after the service of this notice, the plaintiffs will cause a subpoena to be served compelling the oral deposition of non-party witness Makayla Montoya-Frazier, consistent with Rule 205.2 of the Texas Rules of Civil Procedure. A copy of the subpoena that will be served on non-party witness Makayla Montoya-Frazier is attached.

Respectfully submitted.

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: December 22, 2023          *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on December 22, 2023, I served this document through the electronic filing manager upon:

KENNON L. WOOTEN
LAUREN DITTY
Scott Douglass & Mcconnico LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701-2589
(512) 495-6300 (phone)
(512) 495-6399 (fax)
kwooten@scottdoug.com
lditty@scottdoug.com

*Counsel for Defendants*

   /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs*

Dated: December 22, 2023

## SUBPOENA FOR THE PRODUCTION OF
## DOCUMENTS TO A NON-PARTY WITNESS

This subpoena is issued in the name of the State of Texas:

To any sheriff or constable of the State of Texas, or any other person authorized to serve and execute subpoenas as provided by Texas Rule of Civil Procedure 176, Greetings:

You are hereby commanded to summon:

Makayla Montoya-Frazier

to appear at:

Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701

on January 29, 2024, to give an oral deposition as a witness in the above-styled and numbered cause, and to attend from day to day until lawfully dischared. The witness is further commanded to produce at the time and place set forth above the documents and tangible things listed in Exhibit A.

If more convenient, the documents and tangible things may be produced electronically by e-mailing them to jonathan@mitchell.law, rather than delivering physical copies to the address listed above.

Pursuant to Rule 176.8(a) of the Texas Rules of Civil Procedure:

**Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.**

This subpoena is issued by Jonathan F. Mitchell, plaintiff's counsel of record in the above-styled and numbered cause.

Jonathan F. Mitchell
*Counsel for Plaintiffs*

# RETURN OF SERVICE

Came to hand this _____ day of _____, 20___, and executed this the _____ day of _____, 20___, a true and correct copy hereof in the following manner: By delivering to the within named witness _____, via

_____ USPS Priority Mail
_____ USPS Certified Mail/Return Receipt Requested
_____ Personal Servie/ Hand-Served
_____ Fax/Electronic Mail

Returned this _____ day of _____, 2020.


By: _____
       Authorized Person who is not a party to the suit and is not less than 18 years of age.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ACCEPTANCE OF SERVICE OF SUBPOENA BY WITNESS PER RULE 176 OF THE TEXAS RULES OF CIVIL PROCEDURE

I, the undersigned witness named in the Subpoena acknowledge receipt of a copy thereof, and hereby accept service of the attached subpoena.

Rule 176.8(a) Contempt. Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.


_____      _____
SIGNATURE OF WITNESS           DATE

## EXHIBIT A

### Documents to Be Produced by Makayla Montoya-Frazier

**I.  DEFINITIONS AND INSTRUCTIONS FOR REQUESTS FOR PRODUCTION**

1. Each request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

2. Unless otherwise indicated, the relevant time period for these requests is from January 1, 2019, to the present.

3. Unless otherwise defined, the terms used should be read and construed in accordance with the English language and the ordinary meanings and definitions attached. You should, therefore: (i) construe the words "and" as well as "or" in the disjunctive or conjunctive, as necessary to make the request more inclusive; (ii) construe the term "including" to mean "including, but not limited to"; and (iii) construe the words "all" and "each" to mean all and each.

The following definitions apply to each of these requests:

- The terms **"Buckle Bunnies Fund"** and **"Buckle Bunnies"** refer to the Buckle Bunnies Fund, including any agent or person acting or purporting to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The term **"Jane's Due Process"** refers to Jane's Due Process, including any agent or person authorized to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The term **"Avow"** refers to Avow, including any agent or person acting or purporting to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms **"Sueños Sin Fronteras de Tejas"** or **"Sueños Sin Fronteras"** refer to the Sueños Sin Fronteras de Tejas, including any agent or person acting or purporting to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms **"Lilith Fund for Reproductive Equity"** or **"Lilith Fund"** refer to the Lilith Fund for Reproductive Equity, including any agent

or person acting or purporting to act for or on its behalf, including its officers, employees, staff, and unpaid volunteers.

- The terms "**city of San Antonio**," or "**city**" refer to Defendant the city of San Antonio, including any agent or person acting or purporting to act for or on the city's behalf, including the city's elected officials, employees, staff, and unpaid volunteers.

- The term "**Reproductive Justice Fund**" refers to the "Reproductive Justice Fund" mentioned in the city of San Antonio's adopted budget for fiscal year 2024.

- The term "**abortion**" includes any act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to terminate a pregnancy or cause the death of a human embryo, fetus, or unborn child inside a woman known to be pregnant. The term does not include the use of Plan B, morning-after pills, or emergency contraception.

- The term "**abortion-inducing drugs**" includes mifepristone, misoprostol, or any drug, device, or medication that can be used to induce an abortion.

- The terms "**action**" and "**actions**" include, but are not limited to, any act of communication, negotiation, approval, disapproval, decisionmaking, discussion, direction, instruction, advertising, creation of documents, editing of documents, reading or review of documents, oversight, building, or construction.

- The terms "**communication**" and "**communicate**" refer to any method used to transmit or exchange information, concepts, or ideas (whether verbal or nonverbal) including oral, written, typed, or electronic transmittal of any type of information or data, by the use of words, silence, numbers, symbols, images, or depictions, from one person or entity to another person or entity.

- The term "**document**" includes any written, typed, or electronic notation of information, preserved in any manner and by any type of format or method (whether written, typed, or electronic). The term includes any e-mail or text message.

- The term "**entity**" means any legal entity inquired about (other than a natural person) including a partnership, professional association, joint

venture, corporation, governmental agency, or other form of legal entity.

- The terms "**identify**" and "**identity**," when used in connection with a natural person, require disclosure of that person's full name, present or last known address, and present or last known telephone number. When used in connection with a legal entity, the terms require disclosure of its legal name, its address, and telephone number.

- The terms "**implement**" and "**implementation**" refer to any method, process, or action used to put a decision or plan into effect or achieve a goal or obligation.

- The term "**information**" refers to and includes documents, records, communications, facts, ideas, data, observations, opinions, photographs, slides, video recordings, audio recordings, and tangible and intangible items and evidence of any kind or sort.

- The terms "**killing**" and "**murder**" include abortion, as well as any act that intentionally terminates the life of a human zygote, embryo, fetus, or unborn child.

- The terms "**person**" and "**persons**" mean any legal entity inquired about, whether a natural person, partnership, sole proprietorship, professional association, joint venture, corporation, governmental agency, or other form of legal entity.

- The term "**record**" means letters, words, sounds, or numbers, or the equivalent of letters, words, sounds, or numbers, that have been written, recorded, or received by:

  (A)   handwriting;
  (B)   typewriting;
  (C)   printing;
  (D)   photostat;
  (E)   photograph;
  (F)   magnetic impulse;
  (G)   mechanical or electronic recording;
  (H)   digitized optical image; or
  (I)   another form of data compilation.

  The term "**record**" also includes any communication, including an e-mail or text-message communication.

- The term "**reproduction**" means an accurate and complete counterpart of an original document or record produced by:

  (A)    production from the same impression or the same matrix as the original;
  (B)    photograph, including an enlargement or miniature;
  (C)    mechanical or electronic re-recording;
  (D)    chemical reproduction;
  (E)    digitized optical image; or
  (F)    another technique that accurately reproduces the original.

- The term "**self-managed abortion**" means an act performed in Texas in which a pregnant woman obtains or attempts to obtain an abortion without the involvement of a Texas-licensed physician.

- The term "**third party**" means any person, persons, or entity other than the defendants or the attorneys of record for the defendants.

- The terms "**woman**" and "**women**" include any person whose biological sex is female, including any person with XX chromosomes and any person with a uterus, regardless of any gender identity that the person attempts to assert or claim.

- The terms "**and**" and "**or**," when used in these definitions and in the discovery requests, include the conjunction "and/or."

## II.   Documents Requested

**Request No. 1**: All documents and communications, as well as a reproduction of each record constituting a document or communication, including all attachments or exhibits, that implement, mention, discuss, or contain any information about the Reproductive Justice Fund:

   a.    between the Buckle Bunnies Fund and the city of San Antonio;

   b.    between the Buckle Bunnies Fund and Avow;

   c.    between the Buckle Bunnies Fund and the Jane's Due Process;

   d.    between the Buckle Bunnies Fund and Sueños Sin Fronteras;

   e.    between the Buckle Bunnies Fund and the Lilith Fund; and/or

f.　　between the Buckle Bunnies Fund and a third party.

**RESPONSE**:


**Request No. 2**: All documents and communications, as well as a reproduction of each record constituting a document or communication, including all attachments or exhibits, that implement, mention, discuss, or contain any information about anyone's application for or attempt to obtain money from the Reproductive Justice Fund, or anyone's plans to apply for or attempt to obtain money from the Reproductive Justice Fund.

**RESPONSE**:


**Request No. 3**: All documents and communications, as well as a reproduction of each record constituting a document or communication, including all attachments or exhibits, that implement, mention, discuss, or contain any information about the Reproductive Justice Fund.

**RESPONSE**:


**Request No. 4**: All documents and communications, as well as a reproduction of each record constituting a document or communication, including all attachments or exhibits, that implement, mention, discuss, or contain any information about any abortion that you have assisted or facilitated in any way since September 1, 2021. This includes every abortion that you paid for in whole or in part, subsidized in any way, or reimbursed or defrayed the costs of, including payments, subsidies, or reimbursements made for travel costs, lodging, child care, or any other cost or expense associated with an abortion or a person's efforts to obtain an abortion. This also includes abortions for which you provided any type of practical, logistical, and emotional support.

You must include all documents and communications that fall within the crime–fraud exception to the doctor–patient privilege, the crime–fraud exception to the attorney–client privilege, or the crime–fraud exception to any other privilege that might be asserted.

The crime–fraud exception applies to communications that advise or counsel anyone to: (a) send or receive abortion pills or any type of abortion-related paraphernalia through the mail or by using any express company, common carrier, or interactive computer service; (b) obtain or facilitate a drug-induced abortion performed on or after 9:15 A.M. central time on June 24, 2022, in which any portion of the drug

regimen is swallowed or ingested in Texas or in another state or jurisdiction where abortion was criminalized at the moment the drug was swallowed or ingested; (c) commit any act performed within the state of Texas on or after 9:15 A.M. central time on June 24, 2022, that "knowingly procures" a drug-induced abortion, regardless of where the abortion is ultimately performed, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; (d) obtain or facilitate any type of abortion performed in Texas on or after 9:15 A.M. central time on June 24, 2022, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; or (e) obtain any self-managed abortion in Texas, regardless of whether it would occur before or after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

You may redact the name, home address, e-mail address, telephone number, dates of birth, and social security number of the woman who obtained or sought to obtain the abortion.

**RESPONSE:**


**Request No. 5**: All documents and communications, as well as a reproduction of each record constituting a document or communication, including all attachments or exhibits, that implement, mention, discuss, or contain any information about any criminal abortion that you have assisted or facilitated in any way since September 1, 2021. This includes every criminal abortion that you paid for in whole or in part, subsidized in any way, or reimbursed or defrayed the costs of, including payments, subsidies, or reimbursements made for travel costs, lodging, child care, or any other cost or expense associated with a criminal abortion or a person's efforts to obtain a criminal abortion. This also includes criminal abortions for which you provided any type of practical, logistical, and emotional support.

A "criminal abortion" includes: (a) any abortion performed within the state of Texas on or after 9:15 A.M. central time on June 24, 2022, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; (b) any drug-induced abortion performed on or after 9:15 A.M. central time on June 24, 2022, in which any portion of the drug regimen is swallowed or ingested in Texas or in another state or jurisdiction where abortion was criminalized at the moment the drug was swallowed or ingested; and (c) any self-managed abortion that occurred within the state of Texas, regardless of whether it occurred before or after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

You must include all documents and communications that fall within the crime–fraud exception to the doctor–patient privilege, the crime–fraud exception to the attorney–

client privilege, or the crime–fraud exception to any other privilege that might be asserted.''

The crime–fraud exception applies to communications that advise or counsel anyone to: (a) send or receive abortion pills or any type of abortion-related paraphernalia through the mail or by using any express company, common carrier, or interactive computer service; (b) obtain or facilitate a drug-induced abortion performed on or after 9:15 A.M. central time on June 24, 2022, in which any portion of the drug regimen is swallowed or ingested in Texas or in another state or jurisdiction where abortion was criminalized at the moment the drug was swallowed or ingested; (c) commit any act performed within the state of Texas on or after 9:15 A.M. central time on June 24, 2022, that "knowingly procures" a drug-induced abortion, regardless of where the abortion is ultimately performed, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; (d) obtain or facilitate any type of abortion performed in Texas on or after 9:15 A.M. central time on June 24, 2022, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; or (e) obtain any self-managed abortion in Texas, regardless of whether it would occur before or after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

You may redact the name, home address, e-mail address, telephone number, dates of birth, and social security number of the woman who obtained the abortion.

**RESPONSE:**

**Request No. 6**: All documents and communications, as well as a reproduction of each record constituting a document or communication, including all attachments or exhibits, that implement, mention, discuss, or contain any information about any criminal act that you have assisted or facilitated in any way since September 1, 2021. This includes every criminal act that you paid for in whole or in part, subsidized in any way, or reimbursed or defrayed the costs of, including payments, subsidies, or reimbursements of other cost or expense associated with a criminal act or a person's efforts to commit a criminal act. This also includes criminal acts for which you provided any type of practical, logistical, and emotional support.

A "criminal act" includes: (a) any "criminal abortion" described in the second paragraph of Request No. 5; (b) the sending or receiving of abortion pills or any type of abortion-related paraphernalia through the mail or by using any express company, common carrier, or interactive computer service; and (c) any act performed within the state of Texas on or after 9:15 A.M. central time on June 24, 2022, that "knowingly

procures" a drug-induced abortion, regardless of where the abortion is ultimately performed, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother.

You must include all documents and communications that fall within the crime–fraud exception to the doctor–patient privilege, the crime–fraud exception to the attorney–client privilege, or the crime–fraud exception to any other privilege that might be asserted."

The crime–fraud exception applies to communications that advise or counsel anyone to: (a) send or receive abortion pills or any type of abortion-related paraphernalia through the mail or by using any express company, common carrier, or interactive computer service; (b) obtain or facilitate a drug-induced abortion performed on or after 9:15 A.M. central time on June 24, 2022, in which any portion of the drug regimen is swallowed or ingested in Texas or in another state or jurisdiction where abortion was criminalized at the moment the drug was swallowed or ingested; (c) commit any act performed within the state of Texas on or after 9:15 A.M. central time on June 24, 2022, that "knowingly procures" a drug-induced abortion, regardless of where the abortion is ultimately performed, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; (d) obtain or facilitate any type of abortion performed in Texas on or after 9:15 A.M. central time on June 24, 2022, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; or (e) obtain any self-managed abortion in Texas, regardless of whether it would occur before or after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

You may redact the name, home address, e-mail address, telephone number, dates of birth, and social security number of the woman who obtained the abortion.

**RESPONSE:**


**Request No. 7**: All documents and communications, as well as a reproduction of each record constituting a document or communication, including all attachments or exhibits, that implement, mention, discuss, or contain any information about any of the roads or highways in Texas that you have used to transport pregnant women to abortion providers.

**RESPONSE:**


**Request for Production No. 8**: Any and all communications, as well as a reproduction of each record constituting a communication, that you have had with anyone

about this litigation, other than communications between you and your attorneys that fall within the attorney–client privilege and outside the crime–fraud exception.

The crime–fraud exception applies to communications that advise or counsel anyone to: (a) send or receive abortion pills or any type of abortion-related paraphernalia through the mail or by using any express company, common carrier, or interactive computer service; (b) obtain or facilitate a drug-induced abortion performed on or after 9:15 A.M. central time on June 24, 2022, in which any portion of the drug regimen is swallowed or ingested in Texas or in another state or jurisdiction where abortion was criminalized at the moment the drug was swallowed or ingested; (c) commit any act performed within the state of Texas on or after 9:15 A.M. central time on June 24, 2022, that "knowingly procures" a drug-induced abortion, regardless of where the abortion is ultimately performed, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; (d) obtain or facilitate any type of abortion performed in Texas on or after 9:15 A.M. central time on June 24, 2022, unless the abortion is procured or attempted by medical advice for the purpose of saving the life of the mother; or (e) obtain any self-managed abortion in Texas, regardless of whether it would occur before or after the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

**RESPONSE:**


**Request No. 9**: Any and all abortion-inducing drugs in your possession or in the possession of the Buckle Bunnies Fund, including mifepristone (also known as mifeprex) and misoprostol.

## EXHIBIT B—TRCP 176.6

You are advised that under Texas Rule of Civil Procedure 176.6, a person served with a subpoena has certain rights and obligations, specifically, that rule states:

(a) Compliance required. Except as provided in this subdivision, a person served with a subpoena must comply with the command stated in the subpoena unless discharged by the court or by the party summoning such witness. A person commanded to appear and give testimony must remain at the place of deposition, hearing, or trial from day to day until discharged by the court or by the party summoning the witness.

(b) Organizations. If a subpoena commanding testimony is directed to a corporation, partnership, association, governmental agency, or other organization, and the matters on which examination is requested are described with reasonable particularity, the organization must designate one or more persons to testify on its behalf as to matters known or reasonably available to the organization.

(c) Production of documents or tangible things. A person commanded to produce documents or tangible things need not appear in person at the time and place of production unless the person is also commanded to attend and give testimony, either in the same subpoena or a separate one. A person must produce documents as they are kept in the usual course of business or must organize and label them to correspond with the categories in the demand. A person may withhold material or information claimed to be privileged but must comply with Rule 193.3. A nonparty's production of a document authenticates the document for use against the nonparty to the same extent as a party's production of a document is authenticated for use against the party under Rule 193.7.

(d) Objections. A person commanded to produce and permit inspection and copying of designated documents and things may serve on the party requesting issuance of the subpoena—before the time specified for compliance—written objections to producing any or all of the designated materials. A person need not comply with the part of a subpoena to which objection is made as provided in this paragraph unless ordered to do so by the court. The party requesting the subpoena may move for such an order at any time after an objection is made.

(e) Protective orders. A person commanded to appear at a deposition, hearing, or trial, or to produce and permit inspection and copying of designated documents and things may move for a protective order under Rule 192.6(b)—before the time specified for compliance—either in the court in which the action is pending or in a district court in the county where the subpoena was served. The person must serve the motion on all parties in accordance with Rule 21a. A person need not comply with the part of a subpoena from which protection is sought under this paragraph unless ordered to do so by the court. The party requesting the subpoena may seek such an order at any time after the motion for protection is filed.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jonathan Mitchell on behalf of Jonathan Mitchell
Bar No. 24075463
jonathan@mitchell.law
Envelope ID: 82856413
Filing Code Description: NOTICE
Filing Description: of Third-Party Subpoena for Makayla Montoya-Frazier (Plaintiffs')
Status as of 12/26/2023 10:53 AM CST

Associated Case Party: San Antonio Family Association

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Sullivan | 24083920 | john.sullivan@the-sl-lawfirm.com | 12/22/2023 8:11:08 PM | SENT |
| Jonathan F.Mitchell | | jonathan@mitchell.law | 12/22/2023 8:11:08 PM | SENT |
| Jace Yarbrough | | jace.yarbrough@the-sl-lawfirm.com | 12/22/2023 8:11:08 PM | SENT |

Associated Case Party: City of San Antonio

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kennon L.Wooten | | kwooten@scottdoug.com | 12/22/2023 8:11:08 PM | SENT |
| Angela Goldberg | | agoldberg@scottdoug.com | 12/22/2023 8:11:08 PM | SENT |
| Lauren Ditty | | lditty@scottdoug.com | 12/22/2023 8:11:08 PM | SENT |
| Susie Smith | | ssmith@scottdoug.com | 12/22/2023 8:11:08 PM | SENT |
| Jordan Kadjar | | jkadjar@scottdoug.com | 12/22/2023 8:11:08 PM | SENT |

Associated Case Party: Texas Right to Life

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Seago | | jseago@txrtl.com | 12/22/2023 8:11:08 PM | SENT |
| Miranda Willborg | | mwillborg@txrtl.com | 12/22/2023 8:11:08 PM | SENT |
| Ashley Solano | | asolano@txrtl.com | 12/22/2023 8:11:08 PM | SENT |

0213

# EXHIBIT F



Kennon L. Wooten
Direct Dial: 512.495.6341
kwooten@scottdoug.com

December 18, 2023

**SENT VIA EMAIL**

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
jonathan@mitchell.law

John C. Sullivan
Jace Yarbrough
SlL Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, Texas 75104
john.sullivan@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

In Re:   Cause No. 2023C122459; *San Antonio Family Association, et al. v. City of San Antonio, et al.*; In the 438th Judicial District Court of Bexar County, Texas

Dear Counsel:

I write to address deficiencies in Plaintiffs' initial disclosures and pleading in the above-referenced matter. As noted below, your response is requested by or before December 22, 2023.

Plaintiffs' initial disclosures do not comply with Texas Rule of Civil Procedure 193.1, which requires parties "responding to written discovery" to "make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made." Tex. R. Civ. P. 193.1; *see also* Tex. R. Civ. P. 192.7(a) (defining "written discovery" to include "required disclosures"). Plaintiffs' response to Texas Rule of Civil Procedure 194.2(b)(3)—which requires disclosure of "the legal theories and, in general, the factual bases of the responding party's claims"—was simply to "incorporate all legal theories and facts described in their original petition, filed on October 17, 2023." Pls.' Initial Disclosures at 1. That is insufficient as a general matter but particularly so in this case, in which Defendants have challenged Plaintiffs'

**0215**

claim that they have taxpayer standing, in part because "Plaintiffs' Original Petition is bereft of any factual allegations to substantiate their bare conclusions that, as individuals, they are San Antonio taxpayers or that, as organizations, their members are San Antonio taxpayers." Defs.' Original Answer ¶ 2(c). In addition, if Plaintiffs are purporting to have any knowledge of relevant facts in this case, Plaintiffs also provided a deficient disclosure in response to Texas Rule of Civil Procedure 194.2(b)(5) by not including their own information when providing "the name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case[.]" Tex. R. Civ. P. 194.2(b)(5). If, as the initial disclosures indicate, all Plaintiffs lack any knowledge of any relevant facts in this case, that raises more significant concerns regarding the claims they have asserted in this case.

Reviewing Plaintiffs' initial disclosures in conjunction with Plaintiffs' pleading also has revealed a failure of Plaintiffs to comply with pleading requirements set forth in statute and rule. In their initial disclosures, Plaintiffs stated as follows: "Exhibits 1 through 4 to the plaintiffs' original petition are the only documents, electronically stored information, and tangible things currently in our possession, custody, or control that we will use to support our claims . . . ." Pls.' Initial Disclosures at 3. Those exhibits include a superseded statute, which the Fifth Circuit has determined has been repealed, *McCorvey v. Hill*, 385 F.3d 846, 849 (5th Cir. 2004), *cert. denied* 543 U.S. 1154 (2005), as well as three articles that predate the budget action challenged in this case. Nothing in those exhibits addresses the challenged budget action or even describes the *current* activities of any of the organizations Plaintiffs have cast as "criminal" or as engaging in "criminal activities" in their pleading. *See, e.g.*, Pls.' Original Pet. at 2, ¶¶ 18-19, 24-25, 31. Thus, beyond characterizing organizations as criminal without any conviction let alone indictment, Plaintiffs seemingly have characterized them as criminal without any evidentiary support at all. This is problematic. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 10.001; Tex. R. Civ. P. 13.

Additionally, as stated in Defendants' Original Answer and expanded on in Defendants' initial disclosures, Plaintiffs' Original Petition lacks requisite information to establish taxpayer standing. *E.g.*, *Andrade v. Venable*, 372 S.W.3d 134, 138 (Tex. 2012) ("A taxpayer plaintiff, like any other plaintiff, carries the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction."); *Williams v. Lara*, 52 S.W.3d 171, 179 (Tex. 2001) ("Whether [the plaintiff] has taxpayer standing depends upon the type of tax she claims to have paid."); *id.* at 181 ("To be entitled to municipal taxpayer standing, a litigant must prove that the government is actually expending money on the activity that the taxpayer challenges; merely demonstrating that tax dollars are spent on something related to the allegedly illegal conduct is not enough.").

With this letter, we request that Plaintiffs amend their initial disclosures and pleading by December 22, 2023 to correct the deficiencies described above. If the requested amendments do not occur by that date, Defendants will seek court intervention. If you want to discuss any of the matters addressed in this letter, I will be happy to schedule a call or a meeting with you.

4871-9245-2247

Please be advised that this letter is not intended to reflect, and should not be construed to reflect, an exhaustive explanation of deficiencies in Plaintiffs' initial disclosures or pleading. It is simply intended to address certain glaring deficiencies that have been identified to date.

Best Regards,

Kennon L. Wooten
Defendants' Counsel

Cc:
Deborah Klein (Deborah.Klein@sanantonio.gov)
Erica Matlock (Erica.Matlock@sanantonio.gov)
Lauren Ditty (lditty@scottdoug.com)

4871-9245-2247

0217

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jordan Kadjar on behalf of Kennon Wooten
Bar No. 24046624
jkadjar@scottdoug.com
Envelope ID: 83968917
Filing Code Description: Plea
Filing Description: TO THE JURISDICTION
Status as of 2/1/2024 11:19 AM CST

Associated Case Party: City of San Antonio

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kennon L.Wooten | | kwooten@scottdoug.com | 1/30/2024 6:44:25 PM | SENT |
| Angela Goldberg | | agoldberg@scottdoug.com | 1/30/2024 6:44:25 PM | SENT |
| Lauren Ditty | | lditty@scottdoug.com | 1/30/2024 6:44:25 PM | SENT |
| Susie Smith | | ssmith@scottdoug.com | 1/30/2024 6:44:25 PM | SENT |
| Jordan Kadjar | | jkadjar@scottdoug.com | 1/30/2024 6:44:25 PM | SENT |

Associated Case Party: San Antonio Family Association

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Sullivan | 24083920 | john.sullivan@the-sl-lawfirm.com | 1/30/2024 6:44:25 PM | SENT |
| Jonathan F.Mitchell | | jonathan@mitchell.law | 1/30/2024 6:44:25 PM | SENT |
| Jace Yarbrough | | jace.yarbrough@the-sl-lawfirm.com | 1/30/2024 6:44:25 PM | SENT |
| Jason Khattar | | jason@SanAntonioFamilyAssociation.com | 1/30/2024 6:44:25 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Linda Carranza | | lcarranza@thompsoncoburn.com | 1/30/2024 6:44:25 PM | SENT |
| Laurie DeBardeleben | | ldebardeleben@thompsoncoburn.com | 1/30/2024 6:44:25 PM | SENT |
| Dolly Whitaker | | dwhitaker@thompsoncoburn.com | 1/30/2024 6:44:25 PM | SENT |
| Elizabeth Myers | | emyers@thompsoncoburn.com | 1/30/2024 6:44:25 PM | SENT |
| John Atkins | | jatkins@thompsoncoburn.com | 1/30/2024 6:44:25 PM | SENT |
| Jennifer R.Ecklund | | jecklund@thompsoncoburn.com | 1/30/2024 6:44:25 PM | SENT |

0218

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jordan Kadjar on behalf of Kennon Wooten
Bar No. 24046624
jkadjar@scottdoug.com
Envelope ID: 83968917
Filing Code Description: Plea
Filing Description: TO THE JURISDICTION
Status as of 2/1/2024 11:19 AM CST

Associated Case Party: Texas Right to Life

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Seago | | jseago@txrtl.com | 1/30/2024 6:44:25 PM | SENT |
| Miranda Willborg | | mwillborg@txrtl.com | 1/30/2024 6:44:25 PM | SENT |
| Ashley Solano | | asolano@txrtl.com | 1/30/2024 6:44:25 PM | SENT |

0219

# EXHIBIT D

CAUSE NO. 2023CI22459

| | | |
|---|---|---|
| San Antonio Family Association, et al., | § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| v. | § | BEXAR COUNTY, TEXAS |
| | § | |
| The City of San Antonio, et al., | § | |
| *Defendants.* | § | 438th JUDICIAL DISTRICT |

## <u>ORDER GRANTING DEFENDANTS' PLEA TO THE JURISDICTION</u>

On March 28, 2024, the Court heard Defendants' Plea to the Jurisdiction ("the Plea"). After considering the Plea, briefing responsive to the Plea, the reply in support of the Plea, the sur-reply opposing the Plea, the arguments of counsel, and the evidence, the Court finds that the Plea is meritorious and should be GRANTED.

IT IS THEREFORE ORDERED that the Plea is granted.

IT IS FURTHER ORDERED that all of Plaintiffs' claims is this case should be and are hereby DISMISSED without prejudice, and that the costs are taxed to the party incurring same.

This order disposes of all claims against all parties in this case. It is final and appealable.

Signed on this the ___ APR 24 2024 ___, 2024.

JUDGE PRESIDING

Cynthia Chapa
Presiding Judge
288th Judicial District
Bexar County, Texas

Page 1 of 3

**0221**

AGREED AS TO FORM

By: /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

John C. Sullivan
Texas Bar No. 24083920
Jace Yarbrough
Texas Bar No. 24110560
S|L Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hill, Texas 75104
(469) 523-1351 (phone)
(469) 613-0891 (fax)
john.sullivan@the-sl-lawfirm.com
jace.yarbrough@the-sl-lawfirm.com

**Attorneys for Plaintiffs**

By: /s/ Kennon L. Wooten
SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701-2589
(512) 495-6300
(512) 495-6399 Fax
Kennon L. Wooten
State Bar No. 24046624
kwooten@scottdoug.com
Lauren Ditty
State Bar No. 24116290
lditty@scottdoug.com

CITY OF SAN ANTONIO
Office of the City Attorney
Litigation Division
International Center
203 S. St. Mary's St., 2nd Floor
San Antonio, Texas 78205
(210) 207-8940

0222

(210) 207-4357 Fax
Deborah Lynne Klein
Deputy City Attorney
State Bar No. 11556750
deborah.klein@sanantonio.gov
Erica Matlock
State Bar No. 24092418
erica.matlock@sanantonio.gov

**Attorneys for Defendants**

**0223**

# EXHIBIT E

| | | |
|---|---|---|
| STATE OF TEXAS, | § | IN THE DISTRICT COURT OF |
| *PLAINTIFF*, | § | |
| | § | |
| V. | § | |
| | § | |
| THE CITY OF SAN ANTONIO; RON | § | BEXAR COUNTY, TEXAS |
| NIRENBERG, IN HIS OFFICIAL | § | |
| CAPACITY AS MAYOR OF THE CITY | § | |
| OF SAN ANTONIO; ERIK WALSH, IN | § | |
| HIS OFFICIAL CAPACITY AS CITY | § | 407TH JUDICIAL DISTRICT |
| MANAGER OF THE CITY OF SAN | § | |
| ANTONIO, | | |
| *DEFENDANTS*. | | |

## AFFIDAVIT OF DR. CLAUDE A. JACOB

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Before me, the undersigned notary, on this day personally appeared Claude A. Jacob, DrPH, MPH, who, after being duly sworn according to law, upon his oath, stated as follows:

1.      "My name is Claude A. Jacob. I am over eighteen years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.      I am the Public Health Director of the San Antonio Metropolitan Health District ("Metro Health"). I direct over 50 programs and initiatives across Metro Health's Communicable Disease, Community Health & Safety, and Environmental Health & Operations divisions. Metro Health's mission is to prevent illness, promote healthy behaviors, and protect against health hazards throughout our community through education, collaboration, and key services.

3.      Metro Health is the public health agency responsible for providing public health programs in San Antonio and unincorporated areas of Bexar County. Services provided by Metro Health include regulatory functions, emergency planning and disaster response, preventive health, clinical and laboratory services, communicable disease control, violence prevention, behavioral health programming, and advancing health equity, social justice, and policy change.

4.      On April 3, 2025, in my capacity as Metro Health's Public Health Director, I presented to the San Antonio City Council the slides included in Exhibit 1 to the State of Texas's Petition and Application for Temporary Restraining Order and Injunctive Relief in this case. I also appended to this affidavit a true and correct copy of the slides. I assisted with preparing the slides, based on my involvement with and knowledge of the matters addressed in the slides. Slide 12

accurately describes the timeline for consideration of the Reproductive Justice Fund that is being challenged in this case. Consistent with that timeline, on April 14, 2025, the Procurement Division of the City's Finance Department released the Request for Proposal (RFP) for the Reproductive Justice Fund. May 14, 2025 is the deadline for RFP responses. All organizations that submit proposals during the RFP process will be required to meet city procurement, contracting, and audit criteria.

5.     All RFP responses will be evaluated using the evaluation criteria set forth on slide 8. As stated on slide 12, the evaluation results are expected to be released in mid-June 2025, and the City Council is expected to consider proposed contracts with approved organizations during the A Session of its meeting at the end of June 2025. Metro Health will not be able to execute any contract with any organization until after it obtains the City Council's approval to do so. The $100,000.00 allocated to the Reproductive Justice Fund can only be disbursed through executed contracts with organizations that apply for the fund and perform favorably against Metro Health's evaluation criteria. Contracts will likely be executed in the summer of 2025. No expenditure of the Reproductive Justice Fund can occur (and, therefore, the program cannot be implemented) until after contract execution occurs. Implementation will likely occur in the summer of 2025."

FURTHER AFFIANT SAYETH NOT.

_____
Claude A. Jacob, DrPH, MPH

SUBSCRIBED AND SWORN TO before me by Claude A. Jacob, DrPH, MPH on this 23rd day of April, 2025.

TINA M GILSON
Notary Public, State of Texas
My Commission Expires
May 02, 2027
NOTARY ID 1009747-8

_____
NOTARY PUBLIC in and for the State of Texas

2

**0226**

| | | |
|---|---|---|
| State of Texas, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| v. | § | |
| | § | |
| The City of San Antonio; Ron Nirenberg, in | § | BEXAR COUNTY, TEXAS |
| his official capacity as Mayor of the City of | § | |
| San Antonio; Erik Walsh, in his official | | |
| capacity as City Manager of the City of San | | |
| Antonio, | | 407th JUDICIAL DISTRICT |
| *Defendants*. | | |

## ORDER GRANTING DEFENDANTS' PLEA TO THE JURISDICTION

On April 30, 2025, the Court heard Defendants' Plea to the Jurisdiction. After considering the Plea to the Jurisdiction, the response thereto, and the arguments of counsel, the Court finds that the Plea to the Jurisdiction should be GRANTED.

IT IS THEREFORE ORDERED that the Plea to the Jurisdiction is GRANTED.

Signed on this the 30th day of April, 2025.

_____
JUDGE PRESIDING

4902-3134-5722

**0227**

Tab C: Transcript of the Hearing of April 30, 2025

REPORTER'S RECORD

VOLUME 1 OF 1

COURT CAUSE NO. 2025-CI-07833

| | | |
|---|---|---|
| STATE OF TEXAS | ( | IN THE DISTRICT COURT |
| | ( | |
| VS. | ( | 57TH JUDICIAL DISTRICT |
| | ( | |
| CITY OF SAN ANTONIO ET AL | ( | BEXAR COUNTY, TEXAS |

------------------------------

REPORTER'S RECORD

APRIL 30, 2025

------------------------------

On April 30th, 2025 the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable ANTONIA ARTEAGA, Judge Presiding, held in 57th District Court, San Antonio, Bexar County, Texas:

Proceedings reported by oral stenography.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SAMANTHA PEREZ, CSR NO. 12643

COURT REPORTER, BEXAR COUNTY, TEXAS

Slperezcsr@gmail.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A P P E A R A N C E S

KENNON L. WOOTEN
LAUREN DITTY
SCOTT DOUGLASS MCCONNICO
303 Colorado Street
Suite 2400
Austin, Texas 78701
Phone: (512) 495-6341 (Ms. Wooten)
Phone: (512) 495-6300 (Ms. Ditty)
Kwooten@scottdoug.com
Lditty@scottdoug.com


KATHERINE PITCHER
GARRETT GREENE
KEN PAXTON
ATTORNEY GENERAL OF TEXAS
P.O Box 12548
Austin, Texas 78711
Phone: (512) 940-8425 (Ms. Pitcher)
Phone: (512) 954-5483 (Ms. Greene)
Katherine.pitcher@oag.texas.gov
Garrett.greene@oag.texas.gov


DEBORAH LYNNE KLEIN
CITY OF SAN ANTONIO
203 S.  Saint Mary's Street
2nd Floor
San Antonio, Texas 78205
Phone: (210)-207-8919
Deborah.Klein@sanantonio.gov

P R O C E E D I N G S

THE COURT: All right. 2025CI07833 State of Texas versus the City of San Antonio et al. If I could have the attorneys please identify themselves for the record and whom they represent beginning with the movants in this matter on my left. And if you'll please stand when you address the Court.

MS. PITCHER: Yes, Your Honor. My name is Katherine Pitcher, and I represent the State. And this is Garrett Greene. He's here representing the State as well.

THE COURT: Thank you. And I'm sorry, Katherine. I didn't catch your last name.

MS. PITCHER: Pitcher, like baseball.

THE COURT: Thank you very much.

MS. WOOTEN: Good morning, Your Honor. My name is Kennon Wooten. I represent the defendants in this matter. I'm here along with my partner, Lauren Ditty. And this Ms. Deborah Klein from the City Attorney's Office.

THE COURT: Good to see you-all.

MS. WOOTEN: Good to see you.

THE COURT: Good morning, Ms. Ditty, Ms. Wooten and Ms. Klein. All right. This is what I think I know. I think we're here on two motions. A motion for temporary injunction filed by the State, and a plea of the jurisdiction filed by the defendant. And in a nutshell, this regards the

City's recent passing of the RJF is what I -- a Reproductive Justice Fund. I abbreviated it in my notes. And State is asking that we stop that, maintain the status quo and prevent anything regarding the Reproductive Justice Fund to move forward as you believe it is a violation of Texas current laws and that you would be successful at the end of this if there was a permanent injunction et cetera, et cetera, et cetera. On the other side, in response to the request for a temporary injunction, the City is stating, Judge, we need you to understand that the premise that they're relying on, is faulty, to use a term that the defendants used, that the City is in fact not using taxpayer funds to -- for abortion-related services.

And second, that using taxpayer funds to travel out of state or to help folks travel out of state for healthcare or abortion services doesn't violate current Texas law. And in fact, that we are early, that this issue is not ripe because at this time all the city has done is passed it and they have merely approved a process, a procurement process granted for reproductive justice to support healthcare services, which include out-of-state travel for abortion care potentially. But that's just it. It's a process that's been approved. There's been no money spent through -- or the money will be spent through contracts with applicant organizations, and the organizations have applied for the funds. No contracts

have been executed by the City. But on this other side, the feeling is this issue is not ripe. Please grant our plea of jurisdiction. That's what I think I know. Ms. Pitcher, would you correct anything that I might have misspoke about? And you have the floor.

MS. PITCHER: Your Honor, I believe that's an accurate assessment of the arguments on both sides. So thank you. And may it please the Court. I'll begin with addressing the ripeness arguments raised by defendants since that is a threshold jurisdictional issue. The City --

MS. WOOTEN: Your Honor, I'm so sorry to interrupt.

THE COURT: Okay.

MS. WOOTEN: But we had discussed the plea of the jurisdiction being heard first.

THE COURT: I agree.

MS. WOOTEN: Okay.

THE COURT: I agree.

MS. WOOTEN: Thank you, Your Honor.

THE COURT: That -- that's my fault, Ms. Pitcher. Because it's plea of the jurisdiction, we have to hear it first. I'm going to let her go first. My apologies. That was on me. Okay.

MS. PITCHER: No problem. Thank you.

THE COURT: Thank you. Ms. Wooten.

MS. WOOTEN: Thank you, Your Honor. Would you prefer that I stand or sit?

THE COURT: When you address the Court, please stand.

MS. WOOTEN: I will. Thank you. So, Your Honor accurately stated that the defendant's position in this case under the plea of the jurisdiction is that this matter is not ripe for adjudication. The ripeness argument here stems from the fact that a lawsuit, while peppered with statements of certainty, is actually premised on a speculative chain of possibilities that may never come to pass. And Your Honor has clearly familiarized herself with the filings. But if it's okay with you, I'd like to give you a little bit more context with the background information so that you know why we're here today and where we've been before.

THE COURT: Absolutely. But I just wanted to thank whoever put the notebook together. Very nice.

MS. WOOTEN: You're welcome.

THE COURT: Did you-all do that?

MS. WOOTEN: Yes, Your Honor.

THE COURT: That was really good. Thank you.

MS. WOOTEN: I'm so glad it was helpful. So as you stated, this case is about the Reproductive Justice Fund. And we were here -- defendants were here in this esteemed courthouse a little over a year ago to address the Reproductive

Justice Fund. That case was filed for a $500,000 allocation to the Reproductive Justice Fund. The plaintiffs in that case, Your Honor, filed the case before the city's procurement process had unfolded and before it was known which organizations would apply for the money and for which services. Notwithstanding the unknowns in that case, Your Honor, the plaintiffs contended that a portion of the fund was certain to go to abortion-related services. Because the plaintiffs had filed the lawsuit, however, before the procurement process played out, and because it was not certain whether any money would go toward abortion-related services, the defendants in that case -- same defendants here, filed a plea of the jurisdiction. There on ripeness and taxpayer standing grounds, the plaintiffs were different, Your Honor; San Antonio Family Association as well as Residents of San Antonio.

The plea of the jurisdiction was granted by Judge Chapa. You may have seen that as Exhibit D to our plea of the jurisdiction in this case. The plaintiffs did appeal that matter to the Fourth Court of Appeals. And while the case was on appeal, Your Honor, it became clear that no money from that $500,000 Reproductive Justice Fund would go to any organization providing any abortion-related services. So the Fourth Court of Appeals has been advised of a potential mootness issue. That matter, however, has not been resolved. So the case remains on appeal with the Fourth Court of Appeals.

So what brings us here today? You already identified that. It's on April 3rd, 2025, The City authorized the expedited procurement process for $100,000 for Reproductive Justice Fund for downstream services to support reproductive and sexual healthcare services, which may include out-of-state travel for abortions. This is reflected, as you may have seen, Your Honor, on the face of the ordinance in the plain language. If you look to Exhibit A to our plea of the jurisdiction, you can see that in the title of the ordinance, it identifies that this is for downstream reproductive and sexual healthcare services, which may include out-of-state travel. Then if you go down, you'll see in the fifth whereas clause. There's a reference to the potential that this will include out-of-state travel. It's not a certainty. If you go to the second to the last whereas clause, Your Honor, once again, you see a reference to the possibility that this will go for out-of-state travel. And then in Section 1 of the ordinance, Your Honor, on page 2, you see that this is for an expedited procurement for downstream services to support reproductive and sexual healthcare services, which may include out-of-state travel. So nowhere, Your Honor, does this ordinance authorize execution of contracts. Nowhere does this ordinance authorize disbursement of any money for any reason at all. All it does is you identified in your preparatory remarks, is authorize an expedited procurement process for the Reproductive Justice Fund

for downstream services.

Now, in Section 2 of the ordinance, importantly, again on page 2, it states, staff vote will come back to council for consideration at a later date. And specifically, it says consideration at the time of award. And yet the State of Texas has sued, Your Honor, insisting that the City imminently plans to disperse money from the Reproductive Justice Fund to organizations that assist with out-of-state travel for abortion. Again, as you noted, no applications, at least as of late yesterday, have been received for this particular fund. No money from this fund has been spent, and the city council has not decided how it'll spend the money from the fund. Before the city council can even make that decision, Your Honor, a multistep process has to unfold. And this process is actually outlined in Exhibit 1 to the State's petition and application for temporary injunction.

Your Honor, Exhibit 1 is actually comprised of three different documents. And if you start from the back, you'll see that there's a PowerPoint presentation. And on slide 12 of that PowerPoint presentation, there's a timeline. You see here on this particular timeline that the request for proposals or RFP would be initiated in mid-April. This did happen, Your Honor. On April 14th, there was RFP process initiated. You'll also see on the same slide 12, that the results of an evaluation process are expected to be issued in

mid-June of 2025. Next, you'll see what's referenced in the ordinance itself, which is the fact that the proposed contracts will be considered by the city council at a later date. Specifically, you see on this slide that they'll be considered at the end of June in a session that will be an open meeting.

Finally, implementation is stated on the slide as being scheduled for summer of 2025. In other words, months from today. Now, Your Honor, I'd like to direct your attention to an affidavit for Dr. Claude Jacob, who is the Public Health Director of Metro Health. And that affidavit is appended as Exhibit E to our plea of the jurisdiction. I'll give you a moment to get there, Your Honor.

THE COURT: I'm good.

MS. WOOTEN: Thank you. In this affidavit, you'll see in paragraph 4 on pages 1 through 2, Dr. Jacob's statement that slide 12, which we just reviewed, Your Honor, as well as the other slides in that deck, accurately describes timeline for consideration of the Reproductive Justice Fund that is being challenged in this case. In paragraph 4 on page 2, you'll see the reference to the fact that the procurement division of the city's finance department released the RFP for the fund on April 14th, as I stated a moment ago. In that same paragraph, you see Dr. Jacob's assertion that the response window is going to remain open until May 15th, 2025, and that all organizations that submit proposals in that time will be

required to meet city procurement contracting and audit criteria.

In paragraph 5 on page 2 of that affidavit, Your Honor, you see that the evaluation results are expected to be released in mid-June of 2025. So all of that has to happen before the city council will decide in an open meeting how money from the Reproductive Justice Fund can actually be dispersed. And the agenda for that meeting that's expected to occur in late June will be posted at least 72 hours or at least three days, in other words, in advance of the meeting. So nothing's going to happen immediately, Your Honor, and nothing's going to happen secretly with respect to this money. Now, as stated in Mr. Jacob's affidavit, the A session at the end of June 2025, there we expect the city council to consider recommendations about the potential recipients of the fund. Also, as stated in Mr. Jacob's affidavit, Metro Health will not be able to execute any contracts with any organization until after it obtains City Council's approval to do so in late June. And no amount of the $100,000 Reproductive Justice Fund can be dispersed without executed contracts. Contracts will likely be executed and therefore the funded programs will likely be implemented in the summer of 2025. Again, months from today. So despite the fact that multiple steps of this process have yet to occur, Your Honor, the State of Texas is insisting, as you know, that the case is right for adjudication. And we

believe that's based on a prediction about how each step of this process is going to unfold.

Courts, of course, don't have subject matter jurisdiction to issue advisory opinions based on hypothetical facts that have not yet come to pass. Moreover, Your Honor, as explained on page 8 of our plea of the jurisdiction, because the defendants in this case have challenged the existence of jurisdictional facts rather than just challenging the pleading, the court standard of review generally mirrors that of traditional summary judgment, and now it's the plaintiff's burden to raise a genuine issue of material fact to overcome the defendant's challenge to the court's jurisdiction. Specifically, the State has to present evidence sufficient to raise a material issue of fact regarding jurisdiction. And if they don't, then the plea to the jurisdiction has to be sustained. Your Honor, defendants do submit respectfully that the state has not presented evidence sufficient to raise a material fact issue with respect to the jurisdictional challenge that we have asserted. And to demonstrate that point, I'm just going to walk the Court quickly through some ripeness standards and the evidence that's at play with respect to them.

First, as noted in our plea to the jurisdiction, there's long-standing precedent about the standards for ripeness. And I don't think these are in dispute. There's a

long-standing precedent that the case is not ripe when its evaluation depends on contingent or hypothetical facts or upon events that have not yet come to pass. This is because the courts are not empowered, as I stated earlier, to give advisory opinions and cannot award relief based on the hypothetical situation, which might or might not arise at a later date. That's a quote from the Supreme Court opinion. Now here, the State's claims are based entirely on a hypothetical series of events that might or might not come to pass. To illustrate that, Your Honor, it's possible that no organization will apply for any money for out-of-state travel for abortions. It's possible that even if the organizations do apply for funds for that particular purpose, that they won't meet the evaluation criteria that they have to meet in order to be considered for contracts. That happened with respect to the last Reproductive Justice Fund. So this is rooted not in speculation, but on observation of what's happened before with respect to the time. We don't know today, and we cannot know, what Metro Health will ultimately recommend to city council at the end of June, and we don't know how the city council will decide to proceed at the end of June. Their votes remain to be determined. So it's our position, Your Honor, that the Court shouldn't consider plaintiff's unsubstantiated allegations of certainty with respect to what's going to happen. They have not presented evidence as they must under these circumstances

to establish the claim that the money will in fact go to out-of-state travel for abortion.

To the contrary, Your Honor, the controlling ordinance that's referenced in and appended to plaintiff's plea to the jurisdiction response demonstrates the very point that we make in our plea of the jurisdiction. And that's what you already noted earlier, our position that this ordinance merely authorizes an expedited procurement process. It does not authorize execution of contracts or disbursement of money. In presenting this TI application for the Court's consideration today, the State is asking this Court to ignore separation of powers, principles that are long-standing, and that would inter -- excuse me, impermissibly intervene with the legislative process before it unfolds at the city council level. We've provided precedent to this effect on pages 16 and 17 of our plea of the jurisdiction. One quote from one of those cases, quote, restraining passage of an ordinance is a legislative act and such restraint cannot be exercised by the courts. Several other courts have made that same pronouncement.

Now, in the response to our plea of the jurisdiction, the State has asserted that this long-standing separation of powers principles doesn't apply here and that the City's not entitled to deference. And they've said, quote, "because municipalities have only those legislative powers which have been granted to them by the legislature".

Respectfully, that statement is inapplicable to the City of San Antonio, which is a home rule city. That statement is applicable to general law municipalities. Home rule cities like the City of San Antonio have a right of self-government. This is laid out in the home rule amendment to the Texas Constitution.

For home rule cities like the City of San Antonio, all powers that are not denied to them by the constitution or state law are with them. So this notion that San Antonio doesn't have these legislative powers and can't do something without the State's permission is simply incorrect. In this case, Your Honor, the exercise of legislative power will occur at the end of June 2025 in an open meeting by the city council where a vote will be taken. If at that time the City Council authorizes contracts for out-of-state travel for abortion, then the issue of whether that authorization is proper will be right for consideration. But it's not right today. Thank you, Your Honor.

THE COURT: Thank you, Ms. Wooten. Ms. Pitcher, we need your argument of the Court.

MS. PITCHER: Thank you, Your Honor. And may it please the Court. Texas is facing irreparable harm. The City of San Antonio has not made a secret about what it intends to do here with the additional funding that was appropriated to the Reproductive Justice Fund. But now in an effort to avoid

judicial scrutiny, the City is arguing that it is impossible to know what the city has clearly and unequivocally stated from the very beginning that the additional $100,000 is specifically intended to execute contracts for out-of-state abortion travel. Based on this clear, repeated expression of intent, which is -- which is demonstrated in the State's exhibits and the several steps taken by the City so far to execute those contracts, when the City passed the ordinance authorizing the expedited procurement, the state had no choice but to bring suit to properly protect its interests. The State -- this is the state's last opportunity to sue in advance before -- in order to obtain judicial relief before the harm becomes irreparable.

The State has properly pleaded an injury which is probable, imminent and irreparable, and is right for review. Texas as a sovereign entity has an intrinsic right to enforce its own laws and to reassert the control of the state. As the State has pled, injuries to this right are sufficient both to create standing and to demonstrate irreparable harm. Irreparable injury is also shown in the context of a temporary injunction, when the State demonstrates a likely success on the merits of its suit to enjoin an ultra-vires action by a local official. The State, as it has pled, will suffer irreparable injury if the City grants public money for the purpose of funding organizations to send women out of state to obtain abortions as it's imminently poised to do. This injury will

occur as soon as the city approves a contract for this purpose and the City can do so with a mere 72 hours' notice, not enough time for Texas to come back to Court to obtain prospective relief. Determining whether a controversy is ripe, requires the Court to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding Court consideration. It's sufficient for ripeness purposes that the claimant shows that the injury is likely to occur or imminent.

The City has made it perfectly clear on numerous occasions and throughout the approved ordinance that the impetus for allocating this additional funding was the city council's dissatisfaction that those previous contracts entered into under the $500,000 allocation did not result in a provision for out-of-state travel. Accordingly, the council has spent months taking steps to ensure that this time around they will accomplish their goal. And, Your Honor, at this time I have a couple of exhibits that have been agreed to by the parties for pre-admission. If you would like to take a look at those, it's the State's Exhibit 1 to our petition and then also the signed version of the ordinance.

THE COURT: And what I'd like first is your response to the jurisdiction

MS. PITCHER: Of course.

THE COURT: So that we can make certain that we

put that to bed before we go into the next one.

MS. PITCHER: Of course.

THE COURT: Go ahead.

MS. PITCHER: These exhibits have already been submitted by both parties, I believe, and attached to both.

THE COURT: And this is with regard to the state of the jurisdiction.

MS. PITCHER: Correct.

MS. WOOTEN: Our understanding is that it is for the TI application alone.

THE COURT: And so can you speak to -- Ms. Pitcher, can you speak specifically to those things that you believe are material issue of fact regarding the jurisdiction?

MS. PITCHER: Yes, Your Honor. And this is the same document that Ms. Wooten was just -- was just outlining for Your Honor. It's the slides with the agenda memorandum and the proposed ordinance. This is not a new document. Counsel for the City has repeatedly claimed the process has only just begun, but in fact, the City has already taken several steps towards awarding the funds. All that's left for the City -- that the City is legally required to do is notice a proposed contract on the agenda for final approval. Every other step that they've pled is not legally binding for them -- for them to stick to. It's not in any of their - of their pleadings.

They have not claimed that they're legally required to take any of these other steps. The agenda memorandum considered by the State counsel details the several actions which the City took in advance of passing its April 3rd ordinance.

The day after that initial $500,000 was approved for contracts by the council, a memo was sent to the community health committee that requested additional funding for services that were not provided through the previously awarded funds. And that's on slide 7 of that -- of that PowerPoint. Afterwards, on January 23rd and February 28th, the community health committee was briefed on a request to provide an additional $100,000 in funds for, quote, downstream services that were not met through the already awarded funds. And that's on slide 7. Accordingly, on March 20th, a meeting was held to gauge -- to -- quote, "gauge interest in a new solicitation to provide downstream services", unquote. Only the original 10 organizations which had proposed contracts for the 2024 Reproductive Justice Fund were invited to that meeting. That's on slide 9, and it's also in the agenda memorandum on page 4. After the meeting on March 21st, a questionnaire was sent only to those 10 organizations, which specifically asked, quote, "whether they would have interest in pursuing an additional funding opportunity specific to out-of-state travel for abortion-related care, unquote. That's on page 4. In response, four organizations indicated their

interest in providing, quote, out of state travel for abortion-related care", unquote, and that's also repeated on slide 10. Those four organizations were highlighted in the presentation given to the city council on April 3rd. Those are Beat AIDS Coalition Trust, Jane's Due Process, Suenos Sin Fronteras, and Young Women's Christian Association of San Antonio. And that's on slide 11. This fact was also highlighted in the approved text of the ordinance. That's in the signed ordinance on the second page. Quote, "whereas three firms indicated interest in an additional funding opportunity limited to out-of-state travel, with one additional firm indicating interest if the City were to provide legal protection." The final version of the ordinance authorizes a, quote, "expedited procurement," which may include out-of-state travel. The final ordinance mirrors the memorandum's recitation of the events leading up to April 3rd, begins by referencing the city's prior execution of those contracts for nearly $500,000. And against this backdrop, the ordinance continues the request for new funding, again, quote, "to fund downstream services" that could include travel out-of-state.

THE COURT: May I pause right there for a second, Ms. Pitcher, because in the last two statements, you said may and then could. And so, doesn't that bolster Ms. Wooten's argument that it's not yet ripe? Because they may or they could, but they have not necessarily done it yet. Does

that mean -- would you agree or disagree that if they may or if they could, that means that they haven't? And until they do, this issue is not ripe?

MS. PITCHER: Your Honor, I would argue that those statements are actually emphasizing their intent for this fund. The City has argued that there are a myriad of downstream services that could be provided for in this $100,000, yet the only one that they continue to emphasize over and over and over in presentations before the city council is funding out-of-state abortion travel. This -- a memo -- the request for this fund came the day after the previous contracts were executed and did not include out-of-state abortion travel. It's clear they have not been hiding the impetus for this -- for this new solicitation.

THE COURT: I'm going to just assume that you're correct, but that they're not hiding the impetus for this -- for this project. So we've got a fund project, but they -- does the law allow me to prematurely grant, or even hear this when there's been no actual action taken yet? Do you believe that the law allows me to do that when there is not an issue reforming, there's been no actual contract reforming, there's no actual action that I can quash? Because they haven't done anything. They haven't done a contract yet. They have not signed a contract. They haven't actually indicated that these funds, or this person or that person. They just have

identified a process.

MS. PITCHER: That's correct, Your Honor, that no contracts have yet been executed. However, that's why the State is here seeking prospective relief. Because the State faces irreparable harm, as I mentioned earlier, if these contracts are executed, the State's position is that the violation of the gift clause, the grant of public money, will occur at the time that the City executes and approves those contracts. And so the State is seeking prospective conjunctive relief based on that imminent threat of irreparable harm. And this, as I've just detailed, the City has taken several steps. We are about five months into this process of the City authorizing the new RFPs.

THE COURT: Anything more on the previous jurisdiction?

MS. PITCHER: Yes, Your Honor, if you don't mind. The City brought up the anticipated timeline in the slideshow, so I would like to briefly address that. The City has made much of this timeline, but all that it contains are the City's own non-legally binding representations about what that timeline constitutes. Same goes for the representations of the public health director of Metro Health. Nowhere -- speaking of speculative, he uses language like expected, never making mention of any kind of binding deadlines or when the evaluation results will be released. All the public notice

that's required, which the city itself has admitted, is the 72 hours' notice of the public city council meeting where the proposed contracts will be placed on the agenda.

There's nothing in their timeline that binds them to the end of June that they may be accurately representing that now that is their current timeline. They have not made any representations about whether or not that timeline might change as things continue. And the State will only have 72 hours' notice that these contracts will be placed on the agenda. Again, the irreparable harm to the state will occur at the time the contract is approved. So that gives us 72 hours to get back into court to try and obtain prospective injunctive relief, which, respectfully, is not enough time to guarantee that the state will be able to obtain that relief. Even a temporary restraining order here in Bexar County requires 72 hours' advance notice before it will be set.

THE COURT: You know, you can always have an ex parte TRO.

MS. PITCHER: Defendants have appeared in this case, so --

THE COURT: I know.

MS. PITCHER: Okay.

THE COURT: But you can have an emergency TRO and so-called ex parte TRO only because it happens so quickly. But all you have to do is give them a notice that you're going

to come and approach the court on any given business day, and we'll hear you.  That's the beauty of what is our central docket.

MS. PITCHER:  That's good to know, Your Honor.  That is not what was explained to us last time.  We called the court to attempt to set a TRO on the docket.

THE COURT:  I'll go one step further.  I'm going to be in the presiding court.  I'll be the presiding judge in May, and if you need a hearing, I'll be the presiding judge.  So just ask for me and we'll get you in.

MS. PITCHER:  It's good to know, Your Honor, that -- I believe that still does not address the State's concern if the city council notices the meeting on a Friday.  Again, this is 72 hours calendar days.  This is not even business days.  So the State -- or the City could notice the meeting on a Friday.  Then it's Monday, and we're trying to get into court for a TRO on the very same day the city council is poised to execute the funding.  Respectfully, the State just does not see how we could be guaranteed to get back into court in time.

THE COURT:  And if we need an emergency hearing, we can convey on a emergency hearing, but I appreciate that.  It's out of curiosity.  I don't know even though they're across the street, one of the streets.  Does the council meet on Fridays?

MS. DITTY: No, Your Honor, council meets on Thursdays.

MS. PITCHER: Well, they wouldn't -- they would just need to post the notice of the meeting on a Friday. It wouldn't be that the meeting would occur on a Friday.

THE COURT: That's a good point.

MS. PITCHER: Thank you, Your Honor. Again, I think we went through notice. This controversy is fit for judicial decision. Any contract, including out-of-state abortion travel, will violate the gift clause. And that's exactly what the city has stated and taken numerous steps to do. And if temporary injunctive relief is not granted, the state will face the hardship of likely being unable to go back into court. In their brief, defendants referenced the -- and here today, defendants referenced the previous case by the San Antonio Family Association. So I'll briefly address that.

That case did not involve an expedited procurement from a known list of previous applicants invited to a special briefing, after which they were questioned specifically about their willingness to provide out-of-state abortion travel. In this case, unlike that one, the City has approved a more targeted narrow objective. This case is also distinguishable from the Zimmerman versus City of Austin case cited by defendants for similar reasons. The court in that case said it was, quote, "possible that Austin Public Health

would never receive any applications from qualified organizations." And I believe defendants have made the same representations here today. However, organizations which have previously qualified for this exact same fund have already indicated their interest in providing abortion travel. Furthermore, the Zimmerman case was briefed before the Human Life Protection Act went into effect, and while reviewing this still good law.

And then just briefly, I'll turn to the separation of powers point that defendants raised. They asserted the argument that a court may not interfere with the legislative act by restraining passage of an ordinance, and that this would violate the separation of powers. But a case cited by defendants clarifies that, quote, "a sole exception to this general rule exists when irreparable injury will result from the mere passage of the ordinance", unquote, which is exactly what the State is here arguing today. That case is In re Spiritas Ranch Enterprises, 218 Southwest 3rd, 887.

The State cannot adequately protect its interests and guard against irreparable injury without the injunctive relief requested in its petition, and the facts are sufficient to demonstrate a right controversy. Therefore, we respectfully request that this Court deny defendants' plea to the jurisdiction. Thank you.

THE COURT: Thank you, Ms. Pitcher. A brief

response, Ms. Wooten.

MS. WOOTEN: Thank you, Your Honor. A few points. First and foremost, the notion that the City could just alter this timeline is not supported by the law. The City operates pursuant to a city charter, and that charter provides, in section 97, paragraph 1, contracts for, among other things, contractual services shall be in writing, and opportunity for competitive bidding shall be given before they are awarded as required by state law.

Also in the charter, there is a reference to the fact that ordinances typically have an effective date 10 days after the signature approval process. That's in Section 15. And, Your Honor, in that regard, if you turn to the very ordinance at issue in this case, and again, to orient you -- I know there's a notebook of a lot of things in it -- this is Exhibit A to complete the jurisdiction. Section 4 provides this ordinance is effective immediately upon receipt of eight affirmative votes. Otherwise, it is effective 10 days after passage.

Interestingly, Your Honor, if you look to the back page of the ordinance, you'll see that this was a divided vote. We had a 6-5 vote. So that means effective date is 10 days after the fact. Much more than the 72-hour window that's been described by counsel for the State. The other thing to note with respect to the posting, Your Honor, is what we're

talking about is the actual city action. The city action that's in the ordinance. The city council's votes. Not the fact that there's a mere posting of a meeting.

THE COURT: Can you guys give me just one Second. We're Off the record.

(Off the record)

THE COURT: Back on the record. Ms. Wooten, I'm so sorry to interrupt. Just go ahead.

MS. WOOTEN: Oh, no. No apology needed. Thank you, Your Honor. The other point I want to make is that the statement that we haven't presented evidence about adhering to the timeline is not true. Dr. Jacob's affidavit in paragraph four, again, as I noted earlier, provides that the slides we went over accurately describe the timeline for consideration of the Reproductive Justice Fund. And again, this isn't a statement in a vacuum; this is a statement that comports with the law governing the procurement process for the city of San Antonio.

The other thing I want to point out is that they've offered no evidence to counter what we have laid out as the timeline for how this will unfold. And, Your Honor, I walked through that before and I won't take your time with it now unless you have any questions for me, in which case I'd be happy to go over this in more detail.

But the final thing I will reiterate is that

this is a city that operates in accordance with the Open Meetings Act. Nothing is going to be a surprise. There will be an agenda posted 72 hours before a meeting. That agenda, like I said, we're not going to see that until the end of June. And the State will have plenty of time if there is, in fact, the contract approved for out-of-state travel to do something about that. As you noted, it could be done the same day the city council makes that decision. And it could certainly be done within a 10-day window after the decision is made. Respectfully, Your Honor, we reiterate that this is not ripe for the court's consideration and request dismissal without prejudice for the State to come back and file again if in case this actually ripens into a controversy that's worthy of the merits and authorizes the Court's determination. Thank you.

THE COURT: Thank you, Ms. Wooten. And thank you, Ms. Pitcher, too. Fine arguments by both. And I am going to grant a request with the jurisdiction without prejudice. Is there anything more that I need to rule on at this time? Do you have an order prepared?

MS. WOOTEN: Your Honor, I do have an order. I've shared it with opposing counsel. I will have a signature for agreed as to form, but don't know whether there's an agreement as to form.

MS. PITCHER: We can agree as to form.

MS. WOOTEN: Okay. I have the order for your

signature, but they have not yet had an opportunity to sign.

THE COURT: Please take your time. And we are adjourned.

(COURT ADJOURNED.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS.)

COUNTY OF BEXAR.)

I, Samantha Perez, Court Reporter in and for the 57th District Court, Bexar County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me. I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties. I further certify that the total cost for the preparation of this Reporter's Record for Volume 1 of 1 is $560.00 and was paid by the Office of the Texas Attorney General.  WITNESS MY OFFICIAL HAND this the 19th day of May, 2025.

/S/ Samantha L. Perez
Samantha Perez, Texas CSR #12643
Expiration Date: 09/30/2026
Texas Court Reporter,
Bexar County District Courts
100 Dolorosa
San Antonio, Texas 78205

11:48AM

**TAB D: ORDER GRANTING DEFENDANTS' PLEA TO THE JURISDICTION**

| | | |
|---|---|---|
| State of Texas, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| v. | § | |
| | § | |
| The City of San Antonio; Ron Nirenberg, in | § | BEXAR COUNTY, TEXAS |
| his official capacity as Mayor of the City of | § | |
| San Antonio; Erik Walsh, in his official | § | |
| capacity as City Manager of the City of San | § | |
| Antonio, | § | 407th JUDICIAL DISTRICT |
| *Defendants*. | § | |

## ORDER GRANTING DEFENDANTS' PLEA TO THE JURISDICTION

On April 30, 2025, the Court heard the Plea to the Jurisdiction ("the Plea") filed by Defendants—the City of San Antonio (hereinafter the "City"); Ron Nirenberg, in his official capacity as the City's Mayor; and Erik Walsh, in his official capacity as the City Manager. After considering Defendants' Plea, briefing responsive to the Plea, the arguments of counsel, and the evidence, the Court finds that the Plea is meritorious and should be GRANTED.

IT IS THEREFORE ORDERED that the Plea is granted.

IT IS FURTHER ORDERED that all of Plaintiff's claims is this case should be and are hereby DISMISSED without prejudice, and that the costs are taxed to the party incurring same.

This order disposes of all claims against all parties in this case. It is final and appealable.

May 16, 2025

Signed on this the _____ day of _____, 2025.

_____
JUDGE PRESIDING

ANTONIA ARTEAGA
DISTRICT JUDGE
57TH DISTRICT COURT

4902-2867-4619

**0261**

AGREED AS TO FORM

By: */s/ Katherine Pitcher*

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 936-1709
Amy Snow Hilton
Chief, Healthcare Program Enforcement Division
Texas Bar No. 24097834
Amy.Hilton@oag.texas.gov
Garrett Greene
Deputy Chief, Healthcare Program Enforcement Division
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov
Katherine Pitcher
Assistant Attorney General, Healthcare Program Enforcement Division
Texas Bar No. 24143894
Katherine.Pitcher@oag.texas.gov

**Attorneys for Plaintiff**

By: */s/ Kennon L. Wooten*

SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701-2589
(512) 495-6300
(512) 495-6399 Fax
Kennon L. Wooten
State Bar No. 24046624
kwooten@scottdoug.com
Lauren Ditty
State Bar No. 24116290
lditty@scottdoug.com

CITY OF SAN ANTONIO
Office of the City Attorney
Litigation Division
International Center
203 S. St. Mary's St., 2nd Floor
San Antonio, Texas 78205
(210) 207-8940
(210) 207-4357 Fax
Deborah Lynne Klein
Deputy City Attorney
State Bar No. 11556750

2

deborah.klein@sanantonio.gov

**Attorneys for Defendants**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jordan Kadjar on behalf of Kennon Wooten
Bar No. 24046624
jkadjar@scottdoug.com
Envelope ID: 100948823
Filing Code Description: ORIGINAL
Filing Description: ORDER GRANTING DEFENDANTS' PLEA TO THE JURISDICTION
Status as of 5/20/2025 12:51 PM CST

Associated Case Party: City of San Antonio

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kennon Wooten | 24046624 | kwooten@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |
| Lauren Ditty | 24116290 | lditty@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |
| Jordan Kadjar | | jkadjar@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |

Associated Case Party: Ron Nirenberg

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kennon Wooten | 24046624 | kwooten@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |
| Lauren Ditty | 24116290 | lditty@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |

Associated Case Party: Erik Walsh

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Kennon Wooten | 24046624 | kwooten@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |
| Lauren Ditty | 24116290 | lditty@scottdoug.com | 5/16/2025 3:43:08 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mary JoToupin | | maryjo.toupin@oag.texas.gov | 5/16/2025 3:43:08 PM | SENT |
| Garrett Greene | 24096217 | garrett.greene@oag.texas.gov | 5/16/2025 3:43:08 PM | ERROR |
| Amy SnowHilton | | amy.hilton@oag.texas.gov | 5/16/2025 3:43:08 PM | SENT |

0264

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jordan Kadjar on behalf of Kennon Wooten
Bar No. 24046624
jkadjar@scottdoug.com
Envelope ID: 100948823
Filing Code Description: ORIGINAL
Filing Description: ORDER GRANTING DEFENDANTS' PLEA TO THE JURISDICTION
Status as of 5/20/2025 12:51 PM CST

Associated Case Party: State of Texas

| Amy SnowHilton | | amy.hilton@oag.texas.gov | 5/16/2025 3:43:08 PM | SENT |
|---|---|---|---|---|
| Katherine Pitcher | 24143894 | katherine.pitcher@oag.texas.gov | 5/16/2025 3:43:08 PM | SENT |

0265

# TAB E: BEXAR COUNTY 9:00 AM PRESIDING-COURT MOTIONS

# Hearing Types of Motion Information

## 8:30 AM Presiding Court Motions

## 9:00 AM Presiding Court Motions

### 9:00 AM Presiding Court Motions

The following is a list of types of motions that are set in Presiding Court at 9:00 AM:

- Application for Approval of Transfer of Structured Settlement Payment Right
- Application for Expedited Foreclosure
- Bill of Review(at least 21 days notice)
- Contempt, Enforcement (at least 10 days notice or more)
- Foreclosure Sale
- Modification(45 days notice)

- Motion for Extended Summer Visitation
- Motion for New Trial
- Temporary Injunction
- Temporary Order
- Temporary Restraining Order (not less than 3 days notice/not more than 14 days notice (including weekends))
- To Transfer (45 days notice)

- Transferring Adoption
- Trial on the Merits (not less than 45 days notice -- except when agreed)
- Writ of Attachment (no time limit)
- Writ of Habeas Corpus (no time limit)
- Writ of Sequestration

## 2:00 PM Presiding Court Motions

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Toni Shah on behalf of Sara Baumgardner
Bar No. 24108865
toni.shah@oag.texas.gov
Envelope ID: 101636820
Filing Code Description: Motion
Filing Description: Appellants Motion for Temporary Relief
Status as of 6/5/2025 7:06 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kennon Wooten | 24046624 | kwooten@scottdoug.com | 6/4/2025 6:01:43 PM | SENT |
| Deborah Klein | 11556750 | Deborah.Klein@sanantonio.gov | 6/4/2025 6:01:43 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 6/4/2025 6:01:43 PM | SENT |
| Lauren Ditty | 24116290 | lditty@scottdoug.com | 6/4/2025 6:01:43 PM | SENT |

Associated Case Party: The State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Sara Baumgardner | | sara.baumgardner@oag.texas.gov | 6/4/2025 6:01:43 PM | SENT |